

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

DAVID A. STEBBINS                                                      PLAINTIFF

VS                      CASE NO. 1:14CV1267 CMH/TCB

TWO UNKNOWN NAMED
FEDERAL AGENTS OF THE                                   DEFENDANTS
U.S. MARSHAL SERVICE

### COMPLAINT AND JURY DEMAND

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Complaint and Jury Demand against two agents of the United States Marshal Service for the Eastern District of Virginia.

### NATURE OF CLAIMS

1. Plaintiff files suit against one unknown named federal agent for two causes of action:

    (a)     **Claim No. 1**: First Amendment Retaliation.

    (b)     **Claim No. 2**: Common law tort of terroristic threatening

2. Plaintiff files suit against another unknown named federal agent whose first name is "Carter," who claims to be the boss of the first agent. Again, Plaintiff brings two claims against this agent:

    (a)     **Claim No. 1**: Tacit Authorization for the claim spoken of in ¶ 1(a) of this Complaint, and …

    (b)     **Claim No. 2**: Tacit Authorization for the claim spoken of in ¶ 1(b) of this Complaint.

3. Plaintiff is simultaneously attaching a "Motion for Joinder of Parties," asking this Court to attempt to identify who the agent spoken of in ¶¶ 19-23 of this Complaint, and have him identify who the first agent is, so that they can both be added as defendants in this case.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over this dispute pursuant to 28 USC § 1331 (federal question jurisdiction).

5. The federal law which creates this cause of action is the Supreme Court precedent of *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc.*, 456 F. 2d 1339 (1972).

6. This Court has personal jurisdiction over the two defendants in this action since both Defendants work in the city of Alexandria, VA, and this tort was committed within the course and scope of their jobs.

7. Venue is proper in this court for two alternative reasons, either one of which are sufficient to cause venue to be proper in this Court. They are ...

    (a) Both Defendants work in the city of Alexandria, VA, thus making venue proper under 28 USC § 1391(b)(1).

    (b) The threat from one agent – and the other agent's subsequent refusal to sanction the first agent (more details will be provided in the "Background" section of this Complaint) – were both performed from offices located in Alexandria, VA, thus making venue proper under 28 USC § 1391(b)(2).

## BACKGROUND

8. Plaintiff is currently representing himself as Plaintiff in Case No. 14-961 in this Court (case of Stebbins v. Educap, Inc.). On September 17, 2014, Plaintiff mailed in a Motion in that case (which was uploaded to Pacer on September 22, 2014) asking the Court to compel the United States Marshal Service to do its job and serve process on the Defendant's registered agent, as they were therein commanded.

9. On September 22, 2014 (which just happens to be the same day that motion was uploaded

to Pacer), Plaintiff attempted, yet again, to call the U.S. Marshal service to try and find out what was causing the delay. Plaintiff was put through to a unit known as the "command center," which Plaintiff assumes to be an operator-style office which forwards calls to appropriate departments.

10. This command center transferred Plaintiff to some office within the U.S. Marshal Service. A man with a grouchy voice answered, and Plaintiff began to air his Complaint.

11. The person Plaintiff was speaking to (who never gave his name, which is why the Defendants in this case are "two unknown named federal agents") proceeded to advise Plaintiff that he was in charge of the "Cellblock" (which Plaintiff assumes to be the Eastern District of Virginia's slang term for the Federal Prison), and so unless Plaintiff has an inquiry about an inmate or is turning himself in pursuant to a warrant, then Plaintiff needs to stop wasting his time.

12. Plaintiff attempted to advise this person that he did not *call* the "Cellblock," but rather, was transferred there by the command center, so if he had the wrong division, it was THEIR fault, not his.

13. However, this agent did not care about what Plaintiff had to say. He interrupted Plaintiff in the middle of a sentence, and said the following:

> "Let me straighten something out for you, okay? You yell at me on the phone, I will personally seek you out and file a charge against you and make you a member of the Cellblock. Are we clear?"

14. Notice what the first agent threatened to do in ¶ 10 of this Complaint: He threatened to A) personally hunt Plaintiff down, himself! B) kidnap Plaintiff and lock him up in this so-called "Cellblock," where he would see Plaintiff every day and thus could torment Plaintiff to his heart's content, and C) make up imaginary charges out of thin air (e.g. terroristic threatening or

invasion of his privacy) in order to make this kidnapping look like a legitimate arrest. All because he believed (emphasis on those last two words) that Plaintiff was not showing him the respect he believes (again, those last two words are important) his position deserves.

15. And yes, the charges would had to have been made up, since Plaintiff did not commit any crimes. There is no law prohibiting the use of disrespectful language or tone, and that certainly does not change simply because the audience happens to work for the government for a living. Thus, if he was going to file a charge against Plaintiff in order to make good on this threat, it would have to be something else.

16. Plaintiff attempted to explain to this power-tripping officer that Plaintiff has First Amendment rights, but this officer did not care. He once again interrupted Plaintiff and asked "First of all: Are we clear?" He would not allow Plaintiff to even get a word in edge-wise.

17. Plaintiff had recorded this phone call, and has uploaded this phone call to Youtube. The Court can listen to this recording for itself by going to the following web link:

   `https://www.youtube.com/watch?v=Q6WdEa5N4bs`

18. If the Court is having trouble getting this webpage to load, have a law clerk contact Plaintiff at the email address specified in the signature of this Complaint, and Plaintiff will reply, giving a link that the law clerk can actually *click* on.

19. Later that day, Plaintiff called the Alexandria office again. This time, when he was transferred to someone, he asked for the name of the agent he was speaking to. Plaintiff did not hear the name that was offered, but he felt that, if it was caught on tape, he could just go back and listen to the the tape at a later date to get the name.

20. Unfortunately, when Plaintiff reviewed the tape, it turns out that this agent only identified himself as "Carter the Supervisor." This is why it is "two" unknown named federal agents. If

Plaintiff had caught that in the call, he would have asked for Carter's last name.

21. Anyway, Carter the Supervisor nevertheless acknowledged that he was authorized to receive complaints about other agents, and so Plaintiff began to relay his complaint.

22. Carter the Supervisor said that he would "talk to" this agent. However, he affirmatively disavowed any intention on sanctioning this agent, even if his investigation showed that this agent's actions were precisely as Plaintiff described them. His half-baked reasoning behind this decision was that the agent's threats were not illegal unless he converted those words into actions.

23. Yes, you read it right: A fully-deputized agent of the law – who should be trained to know that terroristic threatening is indeed 100% illegal – holds his own men to a double standard.

24. Plaintiff has also uploaded this recorded phone conversation to Youtube. The Court can view it by going to this weblink:

    https://www.youtube.com/watch?v=w3aidsVpVxY

25. Again, if the Court is having trouble typing in this weblink manually, Plaintiff would happily give a link that you can click on, if you only ask him.

### ANALYSIS OF THE FACTS

26. First, let's discuss the first agent's terroristic threat, since it is the easiest to identify as a constitutional claim:

27. As Plaintiff pointed out in ¶¶ 14-15 of this Complaint, the agent had threatened to usurp the power of the U.S. Government, act entirely of his own accord, and personally kidnap Plaintiff (making up fabricated charges to make it appear legitimate), simply because he does not like the way Plaintiff was exercising his First Amendment rights (and that's even assuming that Plaintiff

was, in fact, yelling).

28.     Thus, this act of terroristic threatening absolutely amounts to a constitutional claim, as well as provided an additional claim for the common law tort of terroristic threatening for the pettiest of motives.

29.     Next, Carter the Supervisor deserves to be equally liable since he received full knowledge of the first agent's actions, and made the conscious choice to not impose any material consequences on that agent, instead opting to simply "talk to him." Carter the Supervisor should be jointly liable, since he purposefully covered up for the other agent.

## APPLICABLE LAW AND STANDARDS

30.     "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort." See *United States v. Goodwin*, 457 US 368, 372 (1982).

31.     Even assuming, for the sake of argument, that Plaintiff was being disrespectful to this agent, disrespectful speech is still protected by the First Amendment, as long as it does not materially hinder the government's ability to do its job. See *Love-Lane v. Martin*, 355 F. 3d 766 (4th Cir. 2004). This is an important distinction to make here, since the first agent made his threats, not when Plaintiff had called him for a matter that was not within his job description, but rather, when Plaintiff had alleged "yelled at [him] over the phone" (though, as this Court can clearly see from the youtube video Plaintiff has provided in ¶ 14 of this Complaint, whether or not Plaintiff was "yelling" is still a matter of personal perception). If it were the former, the first agent would have at least an arguable basis that his work was being hindered by Plaintiff's call; instead, he made the threat simply because he does not like Plaintiff.

32.     Sovereign immunity does not protect them, either. The "qualification" for qualified immunity is that the law must not be "clearly established" at the time the acts were committed.

Well, it is very, very clearly established law that ...

    (a)    ... it is illegal to threaten to do something, as long as the thing you are threatening to do is, itself, illegal.

    (b)    ... it is illegal to make up charges out of thin air, simply because you don't like a person.

    (c)    ... it is not an exception to the First Amendment to simply be "disrespectful," not unless you are threatening someone or directly hindering the government's work.

33.    There are three elements for the tort of First Amendment Retaliation: "First, the plaintiff must demonstrate that his or her speech was protected. Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech. Third, the plaintiff must demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action." See *Suarez Corp. Industries v. McGraw*, 202 F. 3d 676, 686 (4th Cir. 2000).

34.    In this case, the element of causal connection is subject to the least dispute. Whether Plaintiff's speech is "protected by the first amendment" is something that the Court can take judicial notice of.

35.    This leaves us with the dispute that Carter the Supervisor conjured up: Whether mere words alone, without accompanying performance, constitutes an "adverse action."

36.    Plaintiff does not know what sort of legal or professional training that Carter the Supervisor has on his resume, and honestly, Plaintiff does not really care, because ultimately, it is the court's decision to make, and the Court knows as well as anybody that terroristic threatening is just as actionable – in the eyes of the law – as a punch to the face.

37.    As for Carter the Supervisor, the following laws govern his conduct:

(a) The government has no constitutional obligation to provide police protection against private actors. See *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 US 189 (1989).

(b) However, when the criminal that the citizen needs protection against is a government agent to begin with, acting in the course and scope of his government office, then the government DOES have a constitutional duty to protect. See *id* at 195-196 ("The [Due Process] Clause is phrased as a limitation on the State's power to act ... It forbids the State itself to deprive individuals of life, liberty, or property without due process of law, ... the Due Process Clause of the Fourteenth [and Fifth] Amendment[s] [were] intended to prevent government 'from abusing its power, or employing it as an instrument of oppression,' ... Its purpose was to protect the people from the State").

(c) Plaintiff is highly doubtful that Carter the Supervisor was sincere when he said that the subordinate agent's threats to **_literally kidnap Plaintiff and make up charges_** did not amount to a constitutional violation. However, even if Carter the Supervisor can demonstrate that he honestly and legitimately believed, in good faith, that his subordinate agent had not committed a constitutional violation, that still does not relieve him of liability for his tacit authorization of the subordinate agent's terroristic threats. See *Owen v. City of Independence*, 445 US 622 (1980).

38. Thus, Plaintiff is entitled to recover against both federal agents, once he can find the names for them (see the attached "Motion for Joinder of Parties").

## RELIEF REQUESTED

39. Plaintiff requests the following damages from the Defendants:

### Damages No. 1: $100,000 for inflicting terror on Plaintiff, for every day the threat is not withdrawn.

40. Plaintiff is not even in the same time zone as the Defendants are, let alone the same city. Thus, the subordinate agent is not even capable of making good on his threat to personally kidnap Plaintiff himself, even if he were serious about it.

41. However, that still does not stop him from making good on his threat to fabricate criminal charges against Plaintiff. He likely did not know that Plaintiff was recording the phone call, so when he expected to make up something to charge Plaintiff with (e.g. terroristic threatening), he probably expected it to just be his word against Plaintiff's, and a jury would most likely trust the word of the law enforcement officer over the word of the accused person who has every reason to lie.

42. Now, obviously, Plaintiff is not in any danger of being convicted, since he legitimately had proof that the subordinate agent had threatened to fabricate the charges. Thus, you may wonder what the source of Plaintiff's terror is.

43. The answer is simple: Although Plaintiff was not in any danger of being *convicted*, he WAS in danger – great danger – of being *arrested*. If an arrest warrant were issued, this Court would have sent a copy thereof to the United States District Court for the Western District of Arkansas for execution. Plaintiff would have been flown in to Virginia to stand trial, and the fact that Plaintiff is from out of state would mean that Plaintiff would likely be considered a flight risk, meaning that the bail – if any existed at all – would probably be so high that Plaintiff could not afford it.

44. Even a defendant who is exonerated does not come out of the altercation unscathed. He has still had to endure the psychological torment of being incarcerated, and you can tell, from the face of that recorded phone call, that THIS was the injury that the subordinate agent was

threatening to inflict upon Plaintiff.

45. Besides, Plaintiff had something even worse to fear than simply being incarcerated. Even if Plaintiff was exonerated in whatever charges the subordinate agent drew up, the federal government would not be obligated to furnish transportation back to Plaintiff's home.

46. When citizens are arrested locally, this is frustrating enough. Those arrested, brought to the county jail, and subsequently released still have to furnish their own taxi rides back to their homes, which is still annoying and unfair.

47. In this case, however, Plaintiff would have virtually no hope of returning home. He would be *stranded in Virginia*! Stranded there, all alone, with nowhere to stay, no one in the region he could contact, and no money with which to furnish a bus ride back home!

48. Thus, if the subordinate officer managed to fabricate any charges and get Plaintiff arrested (even if the arrest wasn't performed by him personally), he would effectively KILL Plaintiff (either by inmate violence, or simply by starvation), win lose or draw! THAT is what Plaintiff is so afraid of!

49. Thus, because of the danger that this threat puts Plaintiff in, Plaintiff believes that one hundred thousand dollars for every day that this danger is not withdrawn is an appropriate amount of damages, since Plaintiff is – quite literally – scared for his life right now.

50. Plaintiff is also filing an Emergency Motion for a Preliminary Injunction. If that motion is granted, Plaintiff will be safe for the time being. The danger would be withdrawn on the date the order granting this motion appears on Pacer. However, unless and until that motion is granted, the danger – and the terror – is applicable full-force.

51. Plaintiff is NOT asking this Court to summarily award Plaintiff this money as part of the preliminary injunction. Remember, this is a preliminary INJUNCTION, not preliminary

damages. However, Plaintiff asks that this Court award Plaintiff $100k for each day until the danger exists, once Plaintiff receives a judgment in his favor.

### Damages No. 2: $16,460,346.02 in punitive damages, per defendant

52. In addition to protecting Plaintiff's own life (literally), Plaintiff also hopes to do a public service – just like he was doing in the case against Educap, Inc – by teaching government officials a stern lesson in respecting the constitutional rights of the citizens they're supposed to be protecting.

53. Plaintiff's request for punitive damages is based on the precedent of *TXO Production Corp. v. Alliance Resources Corp.*, 509 US 443 (1993), adjusted for inflation. This precedent states that ten million dollars in punitive damages is a sufficient amount of punitive damages when the defendant commits extremely egregious conduct.

54. Well, this is an example of extremely egregious conduct. Even if Plaintiff were yelling at the subordinate agent, and even if that were an exception to the First Amendment, the subordinate agent's actions were so grossly disproportionate to the offense that no person in their right mind would dare feel that it is justified. Plaintiff's actions would, at best, amount to disorderly conduct, and the subordinate agent threatened to hunt Plaintiff down with his bare hands and drag him to a completely different time zone, where he would be stranded in a foreign area to die!

55. Extreme damages … in response to extreme conduct.

56. That precedent was published in the year 1993. The website of the United States Bureau of Labor Statistics has an inflation calculator which states that ten million dollars in the year 1993 amounts to $16,460,346.02 in 2014.

57. You can visit this inflation calculator by going to the following weblink (the same

invitation spoken of in ¶¶ 18 & 25 still applies here).

www.bls.gov/data/inflation_calculator.htm

## JURY DEMAND

58. If, by some miracle, the audio recordings of the threat are not enough evidence, and a trial is needed to determine any facts, Plaintiff asks that this trial be decided by a jury of his peers.

## CONCLUSION

59. Wherefore, premises considered, Plaintiff respectfully prays that the relief requested in this Complaint be granted, a preliminary injunction be issued to protect Plaintiff in the meantime, and to whatever other relief Plaintiff may be entitled.

So requested on this, the 23rd day of September, 2014.

*/s/ David Stebbins*
David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com