

UNTED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

DAVID A. STEBBINS                                    PLAINTIFF

VS          CASE NO. 1:14-cv-01267-CMH-TCB

RONALD CARTER AND
JOSHUA DEVINE                                        DEFENDANTS

## AMENDED COMPLAINT

Comes now, *pro se* Plaintiff David Stebbins, who hereby submits the following Amended complaint, pursuant to his rights under Fed.R.Civ.P. 15(a).

1. The contents of Plaintiff's original complaint – including the damages requests and jury demand – are hereby incorporated by reference.

2. Plaintiff wishes to add a new cause of action to the underlying case: Retaliation in violation of the Rehabilitation Act.

3. On June 8, 2015, the Defendants in the underlying action filed a Memorandum in Support of their two Motions to Dismiss. See Dkt. 37. In literally the second sentence in that memorandum, the Defense called Plaintiff an abusive filer, in an attempt to stir up resentment against Plaintiff. To support this, they attach, as Exhibit B to their Memorandum, a per curiam opinion entered in Case No. 10-5125 in the U.S. District Court for the Western District of Arkansas, a case which claimed a violation of the Rehabilitation Act.

4. Because that lawsuit was for disability discrimination, that qualifies that lawsuit as a "statutorily protected activity." Thus, for the Defense to commit the adverse action of "incorporating that protected activity into their legal defense strategy" is an act of retaliation in violation of the Rehabilitation Act. The protected activity may or may not have been the Defense's exclusive litigation strategy, but one thing is certain:

- ... At least one statutorily protected activity that Plaintiff may or may not have engaged in at any point in the past or present (even if it were fifty years ago) ...

- ... had played, for even one single solitary second ...

- ... at least a 0.000000000000000001% role in something that the Defendants did to Plaintiff, and ...

- ... the thing they did to Plaintiff was, or was intended to be, even the slightest bit adverse.

5. That means that their retaliation was unlawful.

6. Plaintiff asks that, in the event that he loses the Bivens Action, he be awarded the damages requested in said Bivens Action, since the Defendant's attempt to use Plaintiff's statutorily protected activity against him proximately caused Plaintiff's loss of that case.

Wherefore, premises considered, Plaintiff respectfully prays that this relief be granted. So requested on this, the 12th day of June, 2015.

David Stebbins
123 W. Ridge St.,
APT D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com

**The New York Times**

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers, please click here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now. »



August 6, 2000

# My Name Is Not Robert

By Benjamin Weiser

Nearly every day inside Green Haven prison in Stormville, N.Y., behind the 30-foot-high concrete walls and 12 watchtowers, within the endless gray corridors and tiers of windowless cells, the inmate Robert Sanders asked the same question: Why am I here?

He asked the guards in the main unit of the maximum-security prison, where he spent most of his time alone in Cell No. 22 on the third level, crying and praying and drinking too much coffee. He asked the doctors, social workers and nurses in the psychiatric unit, where he was often sent to deal with the voices in his head.

To the staff members, his questions were evidence of his psychosis. "He becomes delusional," they wrote in his chart. "He has bizarre behavior." The prisoner had a habit of picking cigarette butts up off the floor, but not of showering. Everyone complained that he gave off an unbearable smell, and the red-hooded sweatshirt he habitually wore was caked with food and dirt. They complained at night, too, when his chattering echoed down the narrow hall of A Block. The psychiatric team urged him to improve his hygiene and attend classes in "daily living skills." He was given 15 minutes of weekly therapy and heavy doses of Haldol, an antipsychotic drug that left his body rigid and his emotions flat. But his bewilderment grew. "Pt. said he has no idea why the

plane took him to N.Y.," a nurse wrote in Sanders's chart. He also "does not know what crime he did and his name is not Robert."

Prison records showed that Robert Sanders was a career criminal from New York who tried to kill a man over cocaine in 1990 and escaped three years later while on work release at a minimum-security prison in the Bronx. Within months, he was recaptured and sent to Green Haven, a virtual fortress that houses the state's only execution chamber and 2,194 of its most violent criminals.

There, the inmate told the staff about his life in Los Angeles. He talked about his mother, Mary, who had given birth to eight children before she had her youngest child, a boy named Kerry. He knew a lot about carpentry. And he remembered spending time at a mental hospital in Los Angeles because he was sick. But he could not understand why he was in prison or why everyone was calling him Robert.

"He looks somewhat confused," wrote Dr. Edward Y. Chung, the psychiatrist who oversaw the inmate's care, "and the response to the questioning is illogical." Harold Roberson, a therapist in the psychiatric unit, recorded similar observations. "He has on several occasions made statements that would indicate delusional thinking," Roberson wrote in the chart. "He stated we are holding him here because he committed no crimes."

The inmate's assertion might well have seemed implausible, given the extensive system of checks and safeguards used in law enforcement to ensure that one person is not mistaken for another. There is a national database of fingerprints and photographs, which are taken when people are arrested; there are lawyers and judges to protect and administer justice; and there are prison staffs with files on the medical, personal and criminal histories of inmates. The United States has had its share of wrongly convicted people, but the idea that a man who had never even been convicted was behind bars seemed inconceivable. That a prison did not know whom it had in custody would mean it had failed the most basic test of its competence and security.

So Sanders was shuttled from his cell to the psychiatric unit and back to his cell again. The staff continued to give him Haldol. He continued to sink deeper into depression and invisibility. Weeks, months and finally two years passed as Mary Sanders Lee searched for her youngest son in the streets of Los Angeles. But she would never find him there.

Kerry Sanders was in Green Haven prison in Stormville, N.Y., serving time for a man named Robert.

Kerry Sanders had a sweet disposition, but he was not someone who had much luck in life. Being born on the particular day of June 25, 1966, would turn out to be his greatest misfortune. He had grown up in the neighborhoods of South-Central Los Angeles, and by the time he was 27, he had been in and out of mental hospitals for seven years, his body and spirit losing out to the voices in his head. He was found to be suffering from paranoid schizophrenia, and like many people with the disease, he felt the relief and desperation that came with going on and off his medication.

When Sanders was not in the hospital, he stayed with his mother or one of his sisters. When his demons became too great, he would leave for the streets. On the morning of Oct. 5, 1993, he was sleeping on a bench outside the Los Angeles County-University of Southern California Medical Center when Richard S. Bentley, a county police officer patrolling the hospital grounds, approached him.

"What's up?" asked Sanders, who was wearing a black T-shirt and jeans and had just opened his eyes.

Officer Bentley's police report shows that he asked Sanders if he was all right or needed medical assistance.

"Of course I'm all right," Sanders replied. "I was just sleeping."

There was a bandage on his leg, and he said he had been treated at the hospital earlier that night. He told the officer he was homeless and showed him hospital identification, which gave his name, Kerry Sanders, and date of birth. The officer asked whether he had "any business" at the hospital.

"No, sir," Sanders answered.

Bentley then cited Sanders for trespassing and radioed the information to a police dispatcher. Up came two warrants under the name Sanders with the birth date of June 25, 1966. One was for Kerry Sanders, for failing to appear at a hearing over a jaywalking ticket in Los Angeles. The other was for Robert Sanders, an escaped felon from New York; it advised "caution."

The warrants listed each man as African-American. Robert Sanders was described as 5 foot 8, 175 pounds and a native of New York City. He had scars on both arms. Kerry Sanders was described as 5 foot 6 and 155 pounds. He had one scar on his left arm.

Bentley said in a recent interview that when he asked Sanders if he used any other names, he responded, "Yes -- Terry and Robert." "I asked him whether he was the Robert Sanders they were looking for in New York," Bentley said, "and he looked me straight in the eye and said, 'Yes, I am.'" But in his police report, Bentley listed only "Terry" under nicknames and made no mention of the exchange about New York.

Bentley told his superiors that he suspected Kerry Sanders was the fugitive Robert Sanders. The case was turned over to the Los Angeles Police Department, and at 11:56 a.m. Kerry Sanders was arrested and booked as Robert Sanders. The booking sheet included Kerry's physical characteristics -- his height and weight, his right thumb print, the scar on his left arm -- and Robert's birthplace and fugitive warrant number.

Within 24 hours, Kerry Sanders's extradition was approved. Within two weeks, he was in the New York State correctional system, answering to the name Robert as well as his own, a confused response that would have devastating results.

A man incapable of making his own breaks, Sanders never got one along the way. In Los Angeles, he was not given the required screening that could have revealed his poor mental state. Police and corrections officials in Los Angeles and New York never noticed that the photographs of the two men did not match -- nor that Robert had multiple tattoos, while Kerry had only a small one on his hand. No one saw that the jaywalking ticket Kerry Sanders received in Los Angeles on July 14, 1993, was issued while Robert Sanders was serving a three-to-nine-year prison term more than 2,800 miles away.

No one ever compared the two men's fingerprints and matched them through the vast national computer database. Had they been checked, a routine law enforcement practice when a felony suspect is apprehended, it could have taken just hours to show that Kerry was the wrong man.

Instead, he found himself in the Municipal Court of Los Angeles the next day, stuck in a holding tank with dozens of other prisoners awaiting hearings. He was assigned a deputy public defender, Stanley I. Efron, who met briefly with him, encouraging him not to fight extradition. Efron said in an interview that he examined the warrant and noticed the physical discrepancies between the two men. But he found them to be innocuous, so he asked his client whether he was Robert Sanders from New York. "Yes," Kerry replied. Efron explained that if he fought extradition, he would only prolong his stay in the county jail before being returned to New York anyway. He said Kerry agreed to sign a waiver.

In his own records, the public defender summarized his meeting with Kerry Sanders this way: "Admits ID. Can't bail. Wants to waive." Efron left blank the other sections on the form for information about the defendant's family, pending cases, prior record and financial status. Efron, 58, who has worked for 30 years in the public defender's office, said Kerry "answered all the questions, and I was convinced he was the guy."

It was one of four extradition cases the public defender handled that morning, and he remembered Kerry as being subdued and slow. "I had to explain things to him more than once," Efron recalled. But he said Kerry's behavior did not set off any alarm bells, nor did the events that followed.

When Efron gave Kerry copies of the waiver, which began, "I, Robert Sanders, do hereby freely and voluntarily state that I am the identical Robert Sanders," he signed them "Kerry Sanders" and drew doodles all over one copy. The case then moved to Judge Abraham A. Khan, who stopped the proceeding after Kerry said he hadn't even read the form.

"Did you sign it?" Judge Khan asked.

"Yeah," Kerry replied.

"Why did you sign it?"

"Because they told me to sign it."

My Name Is Not Robert - The New York Times

Khan had the public defender review the form again with his client. Within minutes, both said it had been read and understood. "The court is satisfied," Khan said, moving on.

Kerry's fate now belonged to New York, and on Oct. 20, Sgt. Joseph H. Badstein Jr. and another state correctional officer picked up their prisoner in Los Angeles. It was raining late that night when Kerry, shackled in leg irons, handcuffs, a waist chain and black lockbox, arrived with the two officers at the Downstate Correctional Facility in Fishkill, N.Y., a processing center for inmates. The watch commander wrote in his logbook: "11:04 p.m. Received absconder from Fulton C.F. Sanders, Robert #90 A 8885." He was issued an inmate ID card, which he signed "Kerry Sanders." The corrections department typed "Kerry Sanders" into the name line as well. He was taken to the infirmary, given a delousing shower and examined by a nurse, Linda A. Rohling. Within 15 minutes, she concluded that he might be mentally ill. Sanders "claims past psych history," Rohling wrote. He had been taking Haldol, an antipsychotic drug, and Cogentin, which was given to alleviate the physical side effects of Haldol. "Last dose five months ago," she noted.

A social worker, Michelyne Duvivier, who examined him the next morning, checked the records on Robert Sanders, who was in prison five months earlier, and found no history of mental illness. "No records found of psych in prison," she wrote. The significance went unnoticed.

Over the next 12 weeks, Kerry remained in the mental-observation unit at Downstate, one of 35,801 inmates who entered the New York State prison system in 1993. Withdrawn and quiet, he paced back and forth in the unit's recreation area. He giddily said he had "special powers," but they were "good powers" he used to help others. One morning he flooded his cell with water. "He tried to 'wash his clothing' in the toilet," the chart says. "Sees nothing unusual about this behavior." He also repeatedly asked why he was locked up, pleading with one nurse, "When can I go home?" The nurse later wrote that he was still confused about where he was, even claiming "disbelief that this was a prison."

At the end of December, Kerry was transferred to Green Haven, a maximum-security prison about 60 miles north of Manhattan. Given that Robert Sanders had absconded from a minimum-security site, it was determined that he would require a more secure location. The New York authorities, now believing they had their man, pulled Robert Sanders's fugitive warrant from the national computer system.

The youngest of nine children, kerry sanders had a singular connection with his mother, Mary Sanders Lee. When she dropped him off at elementary school, the teachers told her that she might as well stay, too, because her son would chase after her anyway. When Kerry and his friends swooped through the streets on their bikes, she followed them in her car. "He was the leader of all devilment," Lee said of her rambunctious son. "He was a good little boy."

Kerry's father, John Sanders, a gas-station attendant in Watts, was Lee's second husband. She has been married three times and widowed just as many, and for long periods struggled financially to support her nine children.

As a young child, Kerry had a healthy mind and body, and his family remembers the little boy who played with his hamster and his dog and loved to read. "He was a whiz in books," said his sister Diane, who is three years older than Kerry and used to get help from him with her homework. But as Kerry got older, his family life became increasingly turbulent. His father died when he was a teenager. His brother Carl was killed in a police shooting. Two other brothers were in and out of jail.

Mary Lee hoped Kerry would go to college like another son, Gilbert, who became a music professor. But her youngest child was not inter-ested. "He wasn't going to go to no college," she said. "I wasn't going to make no professor out of him."

After high school, Kerry enlisted in the Job Corps in San Bernar-dino, Calif., where he learned carpentry skills and fell in love with a girl named Kim, whose name he had tattooed on the back of his right hand. They had a baby, a daughter. But Kim's parents didn't approve of him and soon took mother and child away.

By the summer of 1986, when Kerry was 20, psychological problems began to manifest themselves. He told doctors at one psychiatric ward that he had been hearing voices for five years. "He kept the voices a secret until one month ago, when they became intolerable," a doctor wrote. "The voices now tell him to kill himself, and he feels he may lose control." The doctors diagnosed schizophrenia and chronic paranoia and put him on antipsychotic medication.

Over the next six years, Kerry floated among hospitals, the streets and the homes of family members, struggling with the hallucinations and delusions, the disorganized speech and erratic behavior, caused by his illness. He could be stubborn and frightening and difficult to control. "Every once in a while he would at least come home to eat," said a cousin, Linda Evans. "We'd have to hold him down to get a shower."

Mary Lee welcomed her son at the door when he showed up and prayed when he left. She took him to psychiatrists and to hospitals. She befriended the owners of delicatessens, doughnut shops and check-cashing stores on the streets where Kerry roamed, asking them to keep an eye out for her son. And she tried to focus on the better times: Kerry, when stabilized on medication, would dance with his niece and watch his baby cousin and spend hours at his mother's home, reading magazines and mysteries and books on carpentry. He promised to build her a house someday. "I told him, 'I be so old I won't be able to sit down in it,'" Lee recalled. "He said, 'Momma, you don't know what I'll do for you, so hush.'"

In the summer of 1993, Kerry was once again off his medication and living on the streets, and he was out of touch with his family for weeks at a time. On July 14, the police stopped him for crossing against a red light. He was issued a ticket for jaywalking but did not appear for a hearing. A misdemeanor warrant was issued for his arrest and entered in the police computer.

By late fall, Lee became alarmed when she still hadn't heard from Kerry and he hadn't shown up to get his monthly disability check. She said she took the uncashed check to the Social Security office, telling a clerk that she had no idea where her son had gone.

On Dec. 29, 1993, Kerry Sanders arrived at Green Haven, a sprawling compound of weathered concrete buildings on 928 acres of Dutchess County farmland. Low-rising corridors connect each of its nine cellblocks like a maze, giving boundary to several grassy prison yards and numerous guarded checkpoints.

Sanders was constantly being moved between his cell and the psychiatric ward. He was a stocky man, soft-fleshed and gentle, and his round face made him look much younger than his 27 years. From the beginning, he was a peculiarity to the staff and other inmates -- silent, withdrawn, disoriented.

Soon after his arrival, Sanders met Dr. Chung, the psychiatrist who would supervise his care. The prisoner was cooperative but had problems, Chung wrote in the chart. His posture was rigid, his gait not spontaneous. "He looks like a zombie," the doctor noted, ordering that Kerry remain on Haldol and stay in the psychiatric unit "for closer observation."

On Jan. 3, 1994, Sanders attended his first weekly session with the mental health team assigned to his case. A nurse, Silvia Koola, wrote in his chart that he "observed that he was confused and does not know why he is in New York prison; even his homeland is Los Angeles." She added, "He also was telling he does not know what crime he did and his name is not Robert."

In mid-January, Sanders was transferred to the third tier of A Block, one of several cramped cellblocks on the west side of the compound, near the psychiatric facility, a prison yard and the mess hall. At times, the grayness of the place was consumed by its own monotonous noise, of bars clanging, of inmates being led through the corridors, of guards yelling out orders and counting the jumpsuited men in their cells.

It was a world in which Sanders feared to be alone but was more fearful of being with others. He spent most of his time in his cell, making occasional trips to the yard to smoke, to watch television or to play dominos or cards. His counselors remarked that he befriended no one and that they could not get him to participate in group activities like the video club or table games. "He has a psychiatric disorder," a social worker, Donald L. Hanson, noted. "He needs a supportive environment."

The staff listened to him talk about his family, his woodworking and his stays in mental hospitals in California. They wrote it all down, meticulously. None of it matched the information the prison system had on Robert Sanders, but no one noticed anyway.

Chung continued to see Kerry regularly, usually once a month, in his office in the psychiatric unit. The doctor reported after each session that the patient was "doing well." Other mental health workers described a grimmer picture.

On the evening of July 7, 1994, a guard found a frightened Sanders acting bizarrely in his cell and escorted him to the psychiatric unit. "He appears somewhat confused," wrote Dr. Stanley Skollar, the psychiatrist on duty. "He is willing to accept medication but indicates that because of this 'fright' he didn't sleep last night and 'will not sleep tonight.' We will give him his Haldol."

On Aug. 5, Chung wrote in his notes that Sanders said he was pregnant; the doctor also observed that Sanders was "doing well" in his daily activities.

That month, Hanson, the social worker, noted that Sanders was doing poorly in his academic classes. Harold Roberson, the recreational therapist, wrote that Sanders was depressed and tired. "Client continues to feel that we are holding him here," he added, "often asking when are we going to let him go home."

On Sept. 16, Chung wrote that Sanders no longer believed he was pregnant and that he was doing better in his classes. "He sleeps well and eats well."

One week later, on Sept. 23, Roberson observed Sanders to be hearing voices and talking to himself. That same day, Chung noted that he was smiling and laughing inappropriately. He said he was 24 years old, even though he was 28. "He is doing well," the doctor wrote.

On Oct. 20, 1994, as Sanders's first year in prison ended, Roberson wrote that the prisoner was still hearing voices and complaining, "They won't let me go home."

Mary Lee tied a handkerchief around her head and set out by bus and then foot to search the streets of South-Central where she knew Kerry liked to hang out: Florence, Hoover, Figueroa. She had been looking for her son for months, knocking on doors, going in and out of stores and showing Kerry's photograph to as many people as she could. Her road map, she said, was "wherever you think his mind would think to take him."

The blocks, many of them burned out and deserted, the remnants of the Rodney King rioting in 1992, were controlled by rival gangs, and Lee, 60 and practical, did not hesitate to rely on them to help her on her way. When she finished on one block, gang members guided her to the next one, whistling loudly as they passed her into new territory. She changed the handkerchief around her head to

match the next gang's colors and kept going.

The search was exhausting. One day, dispirited, she found herself being encouraged by a young boy who walked alongside her. "Mary Mother, she been crying like you when Jesus was missing them three years," he told her. "So you crying about your son? What about Jesus, who died for us?"

It was "the beautifulest thing that I ever heard a young boy tell me in my life," said Lee, the granddaughter of a Baptist minister. "I really did step fast then, when that child told me that."

She felt driven to find her son, she said, despite the conviction of family members that her search was futile. Some of her children suggested that she hold a memorial service for Kerry and grew concerned when she said she could hear his voice. "Round by dusk, dark, I could hear him calling," Lee explained. "I could hear the sound of keys, the rattling of keys. I kept telling them: 'Well, he's got to be somewhere, kidnapped. Somebody got him somewhere locked up, and he can't get to me. I keep hearing him say, 'Momma,' and I know I'm not going crazy."

She combed the parks, skid row and hospitals and pleaded with the homeless. She sent Kerry's picture to the Sally Jessy Raphael show after seeing a program about missing family members. And she forced herself to make trips to the county morgue, where she asked about the latest "John Doe" bodies. "I didn't have it in my heart that my son was dead," Lee said. "If he's dead, I'm dead."

She became a regular at the police station in her neighborhood, seeking out officers who patrolled the streets and knew her son. When she wasn't at the station house, she was phoning the officers there to see if there was any news. "Did you pick him up or anything?" she asked them. "I hope I'll find him 'fore you do."

When Kerry Sanders arrived at Green Haven, his hold on reality was faint and fragile: he knew his name, he knew details about his family and life in Los Angeles and he remembered his time in the Job Corps. By the fall of 1994, as he entered his second year in the prison, that thread of sanity was all but vanished. As the voices in his head grew louder, so did his chattering. "He said he was aware of it and it will not happen again," Hanson wrote after other prisoners complained that Sanders was keeping them up at night. As the months dragged on, so did Sanders's solitary routines. "He rarely comes to staff to complain about anything except, 'When am I going to be let out of here?'" Roberson observed on Nov. 23, 1994.

There was a widespread view among the staff that Sanders's questioning did not need to be investigated. Juan Villalba, a correctional officer assigned to inmates with psychiatric problems, would later say that Sanders came to him at least once a week, asking: "Mr. Poncho, when they going to let me go? I didn't do nothing." Villalba, who said he heard such complaints from many prisoners, humored Sanders, saying he would be released "one of these days."

Michael S. Rassin, another recreational therapist, would also later acknowledge that Sanders possibly said to him as many as 75 times, "I don't know why I'm here." Rassin told him to write to the superintendent.

At the start of 1995, Sanders's questioning became more frequent as he grew more desperate. The psychiatric chart shows:

JANUARY: Admits he hears voices. States he is depressed because he is in prison and there is nothing he can do about it.

MARCH: Says we are holding him here because he committed no crimes. Will be encouraged to come to the staff and talk when he feels he has a problem.

Chung said in a recent interview that he saw his job as limited to treating the patient's psychotic symptoms, not exploring his claims of wrongful imprisonment. "Not my responsibility," he said.

Chung was the only employee at Green Haven who agreed to be interviewed for this article. At 71, he is a veteran of the state system, having spent 10 years at Green Haven before recently moving to another prison. Born in North Korea, he escaped at the age of 15 to the South, where he went on to attend medical school. In 1977, he moved to the United States and completed a residency in psychiatry.

At Green Haven, he said he saw 50 to 75 patients a week and did not remember the Sanders case specifically, but after reviewing a copy of his handwritten notes in the chart, he confirmed his participation. Chung said that many prisoners made claims of innocence: "Ninety-nine percent of people deny that they are criminals." He said some of his patients "claim they came from heaven, and some of those, that they are Jesus Christ."

By the summer of 1995, the line between reality and delusion disappeared for Sanders. Some members of the staff were calling him Kerry as well as Robert. The chart continues:

JUNE: "I hear these voices." Says he sees his mother in the prison.

AUGUST: Says people are coming out of the walls. Unable to sleep.

SEPTEMBER: Expressing thoughts about being held in prison by the staff against his will.

A man who was known on the streets as "chicken" was waiting for the bus and 26 pounds of crack cocaine at the Greyhound terminal

in Cleveland on Oct. 7, 1995, when the federal agents showed up. The Drug Enforcement Administration had been tipped off about the drug deal, but its agents had no idea what else they were about to discover when they made their arrest.

The man they apprehended had a muscular build and a long face. He had many tattoos and scars. He showed them a license bearing the name Laradney J. Dixon and an address in Cleveland. One agent suspected that it was a fake, especially after noticing that one tattoo on his arm read "Robert." Unsure of the man's identity, the agents took fingerprints and sent them to the F.B.I. in Washington. Within hours, the D.E.A. learned that the prints matched those of a felon named Robert Sanders. But he was supposedly sitting in a prison in New York.

Lillian Capuano was working as a clerk in charge of inmate records at Green Haven when the D.E.A.'s call came in. An agent told her he had the fugitive Robert Sanders in custody. She said that was impossible; he was already at Green Haven. The agent, to prove his contention, asked her to send Robert Sanders's fingerprints to the F.B.I.

Capuano, suspicious, noted in a memo that she called the bureau to verify that the D.E.A.'s request was real. Reassured, she sent the prints the prison system had on file for Robert Sanders, taken during his initial imprisonment in 1990. They matched those of the man arrested in Cleveland.

Mystified, officials at Green Haven then fingerprinted the inmate they had imprisoned for two years as Robert Sanders. In all the time since Kerry's arrest on the bench in Los Angeles, this was the first instance his prints had been taken and examined. They matched none in the F.B.I.'s files. On Oct. 26, Capuano began to pore through prison records and discovered that since the inmate was brought back to New York, he had been "signing Kerry Sanders, not Robert Sanders."

Later that day, George W. Seyfert 3rd, a deputy inspector general with the New York State Department of Correctional Services, was called to Green Haven and began his own review of the files on Robert Sanders. They showed that Robert Sanders had been arrested several times before he shot a man over cocaine in Harlem in 1990. He was sentenced to three to nine years in prison. He was fingerprinted, photographed and assigned identification No. 90 A 8885. A clerk wrote that he was "adjusting without incident" and that he had no medical or psychiatric problems. The files also showed that after three years in the New York system, Robert Sanders was moved to Fulton State Correctional Facility in the Bronx. Under its work-release program, he was allowed to leave each morning at 8 to work in a Harlem barbershop. He came back every day at 3, except on Aug. 30, 1993, when he didn't.

At 12:30 p.m. on Oct. 26, 1995, Seyfert, who had settled into a conference room that is used for parole hearings, called for the "inmate who claims to be Kerry Sanders." He looked at Kerry and at the photograph of Robert Sanders. There was no resemblance. Over the next hour, Seyfert questioned Kerry, who responded slowly, mumbling and slurring his words at times. But the inspector heard and wrote down what he needed to know:

Kerry Sanders. Date of birth: June 25, 1966. Born in Los Angeles in a hospital near the Coliseum where the Rams played. His father was John Sanders; he died in 1982. His mother was Mary. His sister was Roberta. He had a brother who died. He named his other brothers: Don, Rickey, Gilbert. He gave his Social Security number. "I used to work as a carpenter," he said.

Kerry told Seyfert that he was arrested for "sleeping on a park bench" in Los Angeles. He said he answered to the name Robert after his arrest there but had never used the name before that. Seyfert asked him if he ever did anything wrong. Kerry began to ramble on about an incident in which he said he shot a wall while baby-sitting in Arizona.

Had he ever done anything else wrong? Seyfert asked.

"Masturbate — that's it," Kerry said.

The inspector had one more question. "How are you doing here?"

"I'm O.K.," Kerry replied. "It's good here, but you wouldn't like it."

With Robert Sanders now in federal custody in Cleveland in the crack cocaine case, the authorities in New York were determined to have him serve out the remaining time on his original state sentence. So they reposted the warrant for his arrest in the national database.

Meanwhile, Seyfert began trying to reach Kerry's family. On the afternoon of Oct. 27, he tracked down Mary Lee's phone number and began dialing. She picked up the phone. Seyfert asked her to hold for a minute, and then put Kerry on the line.

"Hello? Yes — Momma?"

Five hours after Seyfert's phone call, Sergeant Badstein, one of the New York correctional officers who flew to Los Angeles two years earlier, took Kerry back home. "Here come Kerry with a red sweater on and some blue jeans, and he's so glad to see his Momma, he didn't know what to do," Lee remembered. "I said: 'Where your coat at? You been in New York? You mean to tell me that you didn't have no coat on up in New York? You get devil cold.'"

Lee hugged her son and hugged the two Los Angeles police officers who escorted him from the airport. She invited them in for coffee as she and her family celebrated Kerry's return, but the officers declined. Badstein, in a memo to his supervisor, seemed pleased with

Lee's reaction and that New York's role had remained largely invisible. "She was only interested in his safe return," Badstein wrote, adding that Kerry's mother "thanked us profusely."

He noted that there were "no press or media cameras or the like" and that Lee "did not ask my name, nor did anyone else in her apartment. No identification was requested and none was offered. All parties seemed satisfied to see only the uniforms of the L.A.P.D. escorts." Badstein said he left Kerry with nothing that "bore the name" of Green Haven or the New York corrections department. Kerry was sent home with $48.13, a plastic bag with some medicine, a soda and a pack of cigarettes -- but with no explanation for his imprisonment or recommendations on following up his psychiatric care. It was Kerry who told his family about his time in prison. "They took me to New York," he said to his sister Roberta. "It was so cold there. They put me in this little room."

Then his family tried to find out more. His mother ultimately contacted Green Haven's superintendent, Christopher P. Artuz. "My son is mentally challenged," she wrote on Dec. 6, 1995. "He does not remember everything, and I need this information."

Anthony J. Annucci, deputy commissioner and the top lawyer for the corrections department, responded two months later. He suggested that Kerry was mostly to blame for his imprisonment, noting that he had answered to "Robert" at the time of his arrest and in Green Haven. "The diminished mental faculties of Kerry Sanders apparently were a significant reason why this error went undetected for as long as it had," Annucci wrote. "I deeply regret any hardship to Kerry Sanders and his family occasioned by this case of mistaken identity."

In the two years after Kerry's release, his family said they saw a disturbed man deteriorate further. "He wasn't the same," Roberta said. He had flashbacks and shortness of breath. He told his sister and her daughter that he had been sexually assaulted in prison. When he slept at Roberta's house, he kept the lights on. When they watched television, she said he would suddenly shout as if he were back in his cell, "Man, leave my stuff alone!" or "Don't get on my bunk." His moods grew more erratic, his behavior more volatile. He went on and off his medication and often went back to the streets.

On the evening of Jan. 10, 1997, two officers spotted Kerry crossing against a "Don't Walk" sign on Florence Avenue, forcing cars to brake suddenly as they exited the freeway. They stopped him and asked him for his name and birth date. They radioed the information to the dispatcher and heard back about the felony warrant for Robert Sanders from New York. The police in Los Angeles apparently did not notice that Robert Sanders was in prison in the federal cocaine case. The officers pressed ahead.

According to their report, they asked Kerry whether he knew there was a warrant for him in New York and he responded: "Yes, I was there 10 months ago, and I used the name Robert Sanders. Here, in California, I use the name Kerry Sanders so no one will know I'm Robert Sanders."

Kerry Sanders was booked and jailed as Robert Sanders, with "Kerry" listed as an alias. Again, the police did not check fingerprints. They notified prison authorities in New York that they had Robert Sanders in custody. Three days later, New York said to let him go, and the case was dismissed. "Wrong suspect, exonerated," the police report says. When he saw his mother, Kerry told her what happened. "I been in jail for Robert Sanders again," he said. "Momma, they cannot keep Robert Sanders in jail. He got to do his own time by himself, Momma."

"Just because you're paranoid, doesn't mean they're not out to get you." So read the sign hanging in the waiting room of the psychiatric unit at Green Haven when Benjamin Schonbrun, a lawyer in a small civil rights practice in Los Angeles, visited the prison in May. Its sting was not lost on Schonbrun, who went there to talk to staff members who treated Kerry during his time there.

Shortly after her son's return, Mary Lee hired Schonbrun's firm to file a federal civil rights lawsuit against the authorities in New York and Los Angeles. Five years later, they are still trying to sort out moral, legal and financial responsibility for what happened. Lee hopes that any damages will enable her son to afford better psychiatric care, a wish that has become a backdrop of the case.

The lawsuit argues that Kerry's imprisonment not only damaged his already poor mental health but has also had residual effects in the years since his return home. In the spring of 1998, he was arrested three times. The police said he defaced a window at a Jack in the Box, destroyed a beauty shop door and was found one day with a semiautomatic rifle he had picked out of a garbage bin.

This January, the law firm negotiated a $290,000 settlement with Los Angeles County for its role in the case. In a letter to the county board of supervisors, the county's own lawyers sharply criticized the police, the public defender and jail officials, noting that the most basic screening tools of law enforcement, fingerprints and photographs, were abandoned. "Further," the county's lawyers wrote, "there was no suspicion that Kerry Lee Sanders suffered from mental illness that would have alerted individuals to the fact that they might have the wrong person in custody."

In New York, the attorney general's office has chosen to fight the lawsuit in Federal District Court in Manhattan, not disputing that Kerry was wrongly imprisoned but denying any liability. It first claimed that the suit should be dismissed because the statute of limitations had run out; it soon withdrew that argument. It also contended that to bring the suit, Kerry had to meet strict legal requirements that apply to prisoners. Judge Deborah A. Batts, who has not hid her disdain for some of the state's arguments, found this one to be "without merit." The requirements didn't apply, she ruled, because Kerry shouldn't have been a prisoner in the first place.

State officials, including spokesmen for the Department of Correctional Services, the Office of Mental Health -- which runs the psychiatric unit at Green Haven -- and the attorney general's office have refused to comment because of the pending lawsuit.

Paul Shechtman, a former federal prosecutor who oversaw the correctional system from 1995 to 1996 as the criminal justice adviser to Governor Pataki, called the case remarkable. "Whatever else," Shechtman said, "it does seem that it's appropriate for the state to say mea culpa."

As recently as this spring, the state attorney general's office informed Kerry's lawyers that except for the psychiatric records, all other files pertaining to his two years in the prison had been lost. A trial date has not been set.

Since last October, Schonbrun and two of his partners, Wilmer J. Harris and Michael D. Seplow, have been taking depositions from prison and mental health employees involved in the case. Almost all those involved see themselves as blameless, saying they were not responsible for checking into Sanders's claims of innocence. "I let him know there was nothing I could do," said Michael Rassin, the recreational therapist.

"I am not a legal aid society," Harold Roberson, the other recreational therapist, said.

"It's not my job -- I don't do that," said Silvia Koola, the nurse.

Questioned about Kerry's release from Green Haven, Sergeant Badstein, the correctional officer who wrote to his boss that he did not show ID when he accompanied Kerry home, said, "All of our transports are low profile." Badstein also now maintains that he told Mary Lee who he was.

Seyfert, the deputy inspector general, asked whether he arranged any follow-up care for Kerry, said it was not the state's responsibility. "My jurisdiction ended at the door of the Green Haven Correctional Facility." Seyfert, who has worked for the corrections department for 25 years, said the Sanders case was the only one he was aware of in the state system in which an innocent man, unable to speak for himself, was picked up and put in jail in place of an escaped convict. He acknowledged, however, that he had not investigated whether there were any other such cases.

In the suit, the lawyers also contend that Kerry was sexually assaulted in prison and that his comments to the staff that he was pregnant should have been seen as a sign from a mentally ill man that he was raped. Dr. Chung, asked in his interview about Kerry's pregnancy comment, said it can be viewed only one way: "Just nonsense."

"Do you think it makes any sense that a male is pregnant?" Chung asked. "If the patient is female, then it can make sense. Maybe rape or some relationship. Even if he had a relationship with others, a male can't be pregnant." Asked whether Kerry might have been signaling that he had been raped, Chung said, "We say, G.O.K. -- God only knows."

Of the more than 20 people who have testified in depositions or been interviewed for this article, only one official expressed shock at Kerry's imprisonment. Wayne L. Strack, a deputy commissioner for corrections at the time, said he was "flabbergasted" when he learned about the case.

"With all the checks and balances that we've got, I can't understand how it happened," Strack said in a deposition. "I mean, it's drilled in you from Day 1 of the job: You take an inmate, you're responsible, you identify him. I mean -- my mind goes boggled." He said the responsibility was broad because "too many things happened."

The issues of responsibility and culpability, of quality of care and of monumental and systematic failings continue to surround the lawsuit. Yet in 2,000 pages of depositions, there have been few displays of compassion and fewer of outrage. At Green Haven, no one on the staff was even told what happened, and no one asked. One day, Kerry Sanders just disappeared.

Chung, only recently learning the details, said it was better for Kerry to be in prison than wandering the streets. "He got medication, free meal, food, everything," the doctor said in his deposition. "He should say, 'Thank you, for two years you guys treated me very nicely.'"

Kerry Sanders turned 34 on June 25 and he says he is "ready for the future." Since March, he has been staying at a supervised board-and-care residence in Los Angeles, where he has his own room and a structured schedule. A psychiatrist visits him once a month, and a nurse dispenses his medication, cooks his meals, organizes his activities and makes sure he rises each day at 6 so he will be ready for a van that takes him to a therapy center for counseling and classes.

His room at the residence is spare but neat, and he has his own stereo. He spends his time playing cassettes -- the Temptations and Tyrone Davis are among his favorites -- watching Superman cartoons and talking with his housemates. "Two girls and six guys -- and me," Kerry said in one of several recent interviews. He can sign out to walk to a nearby park or to a grocery store, where he buys cigarettes and chips. His mother, now 67, visits him regularly, and she can take him home on weekends to her apartment in Inglewood, where he can see his sisters and their children.

Kerry remains stocky, his movement slowed by medication, his speech tentative, his memory clouded. But he can recall some of his two years at the prison. "When I got invited to go to New York, I don't know what happened," he said. "They picked me up, and they asked me if I was Kerry Sanders or Robert Sanders. I told them my name was Kerry Sanders."

"It was just horrible," he added. "Going in and out of cells every day. Going to dinner. Standing at attention." He cried and prayed a lot.

"I wanted to get out, and I wanted to come home," Kerry said. "It was like losing oxygen."

After so many chaotic years, Kerry's life is more stable now, and he seems unencumbered by bitterness or anger over what happened to him. Yet he has a sad resignation about what he knows his future will mean. "It will be the same as it is today," Kerry said.

Robert Sanders remains in federal prison in the Cleveland drug case, serving a 15-year sentence. New York still has the warrant out for his arrest.

Photos: In Mary Lee's search for her son, she wore the colors of the gangs whose territory she passed through.; Kerry's fragile grasp on reality grew even weaker in prison. (Ozier Muhammad the New York Times)

Copyright 2015 The New York Times Company   Home   Privacy Policy   Search   Corrections   XM.   Help   Contact Us   Back to Top