**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| DAVID A. STEBBINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:14cv1267 |
| | ) | |
| RONALD CARTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Pursuant to Local Rule 7(F)(1), defendants, Ronald Carter and Joshua Devine, in their individual capacities, and the United States of America, hereby respectfully submit the instant memorandum of law in support of their motion to dismiss plaintiff's amended complaint in the above-captioned action.

## INTRODUCTION

Plaintiff David Stebbins has now notoriously filed *pro se* litigation throughout the country, and has been cautioned by another federal District Judge – under penalty of significant sanction – not to abuse members of the court staff.  But that is exactly what plaintiff seeks permission to do in this action, by seeking monetary relief against two Deputy United States Marshals, in their individual capacities, for allegedly violating his First Amendment rights through an impulsive remark during a heated telephone conversation about whether the Marshals Service had executed service of process in one of plaintiff's many lawsuits.  Plaintiff's claims lack merit generally; more importantly, the individual-capacity defendants are entitled to the significant threshold protection afforded by the qualified immunity doctrine.

1

*First*, plaintiff's complaint simply does not state a plausible claim of First Amendment retaliation. Although the courts have held that the First Amendment is violated when a government official retaliates against an individual for engaging in protected speech activity, only significant, non-*de minimis* retaliatory actions can give rise to a claim – *e.g.*, those in which an official puts forward a "realistic" threat of "imminent" arrest. Nothing about the encounter between plaintiff and the Deputy Marshals Joshua Devine and Ronald Carter fits this standard; indeed, even plaintiff's own complaint questions whether Deputy Marshal Devine's statement was serious. Leaving aside that the conversation between Devine and plaintiff occurred telephonically (with over 1100 physical miles separating them), Devine's statement clearly did not chill plaintiff in the exercise of his own First Amendment rights, and Carter subsequently spoke with plaintiff in an attempt to reassure his concerns. But even if this Court concluded that an impulsive remark during a telephonic conversation could constitute a "realistic" and "imminent" threat of arrest, because that putative right was not clearly-established at the time of the events in question here, both Devine and Carter are entitled to qualified immunity.

*Second*, the United States – by operation of law – has substituted itself for Deputy Marshals Devine and Carter on plaintiff's common law tort claim, which is now pending under the Federal Tort Claims Act ("FTCA"). This Court lacks jurisdiction over that FTCA claim because plaintiff did not present an administrative claim to the Marshals Service before commencing this civil action. And in any event, because Virginia common law does not recognize a cause of action for "terroristic threatening," this Court should dismiss the FTCA claim on the merits.

*Third*, plaintiff's new Rehabilitation Act claim – which alleges that defendants unlawfully retaliated against him by citing to an opinion issued by another federal district court

in another case plaintiff brought under the Rehabilitation Act – is patently and unequivocally frivolous.  Initially, it is well-settled that, in this non-employment context, the Rehabilitation Act does not provide a cause of action against either the United States or individual federal employees.  Moreover, the litigative decision to cite, in a brief filed with a Court, an opinion issued by a federal court in another of plaintiff's several cases comes nowhere close to the type of "adverse action" necessary to trigger Rehabilitation Act liability.  Simply to state the proposition demonstrates its absurdity.

## FACTUAL BACKGROUND[1]

Plaintiff David Stebbins resides in Harrison, Arkansas – which is 1120 miles from this Court's Alexandria Division (or a nearly seventeen (17) hour trip by car).  Complaint (Dkt. No. 1), p.12.[2]

1.      By any standard, plaintiff is a prolific *prolix* litigator.  For instance, alleging to have found a loophole in YouTube's user agreement, Stebbins sued Google for $500 million.[3] See Stebbins v. Google, Inc., No. 5:11cv3876 (N.D. Cal.) (Dkt. No. 14).  The Northern District of California dismissed the action, concluding that Stebbins had "stated an indisputably meritless legal theory" and his "factual contentions [were] clearly baseless."  Id. at 6.  Stebbins attempted to hoist a similar theory against Microsoft, which the Western District of Washington dispatched

---

[1]Consistent with the standard that this Court employs in adjudicating a motion to dismiss brought pursuant to Federal Rule 12(b)(6), the instant factual discussion is derived primarily from plaintiff's complaint (Dkt. No. 1) and amended complaint (Dkt. No. 40) in this action.  See, e.g., Westlake Legal Grp. v. Yelp, Inc., 599 Fed. Appx. 481, 485 (4th Cir. 2015).

[2]Plaintiff's amended complaint expressly "incorporate[s] by reference" all of "[t]he contents of plaintiff's original complaint."  Am. Complaint, ¶1.  As such, many of the citations in this memorandum will be to plaintiff's original complaint, except where noted.

[3]It is well-settled that this Court, in adjudicating a motion to dismiss brought pursuant to Federal Rule 12(b)(6), "may properly take judicial notice of matters of public record."  Philips v. Pitt County Mem. Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

in similar fashion.  See Stebbins v. Microsoft, Inc., No. 2:11cv1362 (W.D. Wash. 2012) (Dkt. No. 37).  Stebbins also sued his parents in federal district court, maintaining that they claimed him as a dependent on their federal tax return, but had not paid for his living expenses; as such, Stebbins' parents were ostensibly obliged to pay to *him* the fair market value of those living expenses.  See Stebbins v. Stebbins, 3:12cv3130 (W.D. Ark.) (Dkt. No. 10).

As of 2013, Stebbins had filed sixteen cases in the Western District of Arkansas *alone*, see id. (Dkt. No. 7), and accordingly, District Judge P.K. Holmes, III entered an order limiting his ability to file civil actions in that court, see id. (Dkt. No. 10).  But more importantly, District Judge Holmes's order provided as follows:

> Mr. Stebbins is advised not to yell at court staff or use abusive language in any written or oral communication with the Court or fellow litigants.  Mr. Stebbins will be expected to behave with the decorum expected of all litigants who appear before, or file pleadings with, this Court.  Failure to behave in a proper manner may result in sanction being imposed on Mr. Stebbins or further restrictions or conditions placed on his ability to make filings or informal communications with the Court.

Id.[4]

2.   Approximately a year later, Stebbins filed yet another civil action – in this Court – against an educational loan company known as EduCap, Inc.  Complaint, ¶8; see also Stebbins v. EduCap, Inc., 1:14cv961 (E.D. Va.) (Hilton, J.) (Dkt. No. 1) (filed July 28, 2014).[5]  On

---

[4]Plaintiff's aggressive litigative behavior is also revealed through an invective and obscenity-laced screed that he sent to the Chancellor of the University of Arkansas, demanding a settlement in a Rehabilitation Act claim that he would ultimately bring against the university. See Stebbins v. Univ. of Arkansas, 2012 WL 6737743, at *6 (W.D. Ark. Dec. 28, 2012); aff'd, 543 Fed. Appx. 616 (8th Cir. 2013), cert. denied, 134 S. Ct. 2145 (2014).

[5]In that action, plaintiff maintained that an "ostensibly routine collection action" with respect to educational loans provided to plaintiff "was in fact a violation of the Americans with Disabilities Act of 1990 [] and malicious prosecution under Arkansas law," and sought "injunctive relief plus over $10,000,000 in damages."  Stebbins v. EduCap, Inc., 1:14cv961 (E.D. Va.) (Dkt. No. 39, at 1).  This Court entered summary judgment in favor of EduCap,

September 22, 2014, this Court's Office of the Clerk docketed, in that action, plaintiff's motion "to compel the United States Marshal[s] Service to do its job and serve process on [EduCap's] registered agent." Complaint, ¶8; EduCap, Inc. (Dkt. No. 12) (requesting that this Court hold the Marshals Service in *contempt* for its failure to effectuate service).[6]

a.     That same day, plaintiff telephoned (in his words, "yet again") the Marshals Service for the Eastern District of Virginia to inquire about the putative service delay. Complaint, ¶9. Plaintiff's telephone call was ultimately transferred to this Court's cellblock, where Deputy United States Marshal Joshua Devine answered. Id. ¶¶10-11. In what plaintiff avers to have been a "grouchy voice," Deputy Marshal Devine explained that the cellblock was the wrong Marshals Service component for plaintiff's service query. Id. ¶11. Plaintiff then "attempted to advise" Deputy Marshal Devine "that he did not *call* the 'Cellblock,' but rather, was transferred there by the command center, so if he had the wrong division, it was THEIR fault, not his.'" Id. ¶12 (emphasis and capitalization in original). Plaintiff then alleges that Deputy Marshal Devine said the following:

> Let me straighten something out for you, okay? You yell at me on the phone, I will personally seek you out and file a charge against you and make you a member of the Cellblock. Are we clear?

Id. ¶13. Plaintiff avers that he continued to speak to Deputy Marshal Devine – going so far as to educate him on plaintiff's First Amendment protections – but that Deputy Marshal Devine simply was not interested in speaking with him further. Id. ¶16. Although plaintiff maintains that he audiotaped the conversation with Devine, and ultimately uploaded the audio to the website YouTube, id. ¶17, the link provided in plaintiff's complaint conveniently ends the audio

---

holding that Stebbins's position was "nothing more than a last-ditch effort to escape his obligations under the loan agreement." Id. at 6.

[6]This Court denied plaintiff's motion on September 24, 2014 (Dkt. No. 13).

before plaintiff is transferred to Devine.  See Threat Against Exercise of First Amendment Rights, *available at* << https://www.youtube.com/watch?v=Q6WdEa5N4bs>> (visited June 8, 2015).

b.      Subsequently – on the *same day* – plaintiff again called the Marshals Service for the Eastern District of Virginia to complain about the conversation that he had with Deputy Marshal Devine.  Id. ¶¶19-20.  Plaintiff was transferred to Supervisory Deputy United States Marshal Ronald Carter, who informed plaintiff that "he was authorized to receive complaints" about other Deputy Marshals; as such, plaintiff complained about his previous conversation with Devine.  Id. ¶21.  Carter informed plaintiff that he would "talk to" Devine about the conversation, although – to plaintiff's dismay – he would not "sanction" Devine.  Id. ¶¶22; 35.  During this second conversation, Carter told plaintiff that Devine had not actually arrested plaintiff, id. ¶22; in other words, especially after Carter spoke with Devine, plaintiff was not actually going to be arrested.

3.      Three days later, on September 25, 2014, plaintiff filed the instant action in this Court, seeking to perform "a public service – just like he was doing in the case against EduCap, Inc. – by teaching government officials a stern lesson in respecting the constitutional rights of the citizens they're supposed to be protecting."  Id. ¶52.  Plaintiff's complaint presented two causes of action against Deputy Marshals Devine and Carter in their individual capacities.

First, plaintiff alleged that Devine's off-handed comment during their telephone conversation amounted to retaliation against plaintiff for the exercise of his First Amendment rights and a "terroristic threat."  Id. ¶¶1; 27-28.  More specifically, notwithstanding his recognition that the telephonic nature of the conversation and the sheer distance between them alone rendered Devine "not even capable of making good on his threat to personally kidnap plaintiff himself," plaintiff maintained that the comment constituted a violation of his First

6

Amendment rights.  Id. ¶¶40-41.  With respect to Supervisory Deputy Marshal Carter, plaintiff avers that although Carter was not actually involved in the underlying conversation, he is identically-liable because of "his tacit authorization of [Devine's] terroristic threats."  Id. ¶¶1; 37.  Plaintiff's initial claim, brought pursuant to the limited remedy authorized by the Supreme Court in Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), seeks relief directly under the First Amendment.  Id. ¶¶1-2.

Plaintiff's second claim, however, seeks relief under the so-called "[c]ommon law tort of terroristic threatening."  Id.  For this putatively-tortious conduct, plaintiff seeks significant monetary relief, including $16,460,346.02 in punitive damages.  Id. ¶56.

Finally, in his *amended* complaint, plaintiff has added a new cause of action against the defendants for retaliation under the Rehabilitation Act.  Am. Complaint, ¶2.  In short, plaintiff maintains that because defendants – in their initial motion to dismiss memorandum – cited to a legal opinion issued by another federal district court in another Rehabilitation Act case brought by plaintiff, they have engaged in unlawful retaliation under that statute.  Id. ¶¶3-6.

## ARGUMENT

### I.   STANDARDS OF REVIEW

The instant motion seeks dismissal for a lack of subject-matter jurisdiction and for failure to state a claim upon which relief can be granted, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6).  A brief recitation of the relevant standards that this Court is required to employ in analyzing such requests for relief is therefore appropriate.

### A.   FEDERAL RULE 12(B)(1)

Federal Rule 12(b)(1) serves as the appropriate vehicle to challenge the court's subject matter jurisdiction in a particular matter.  See, e.g., Coulter v. United States, 256 F. Supp. 2d

484, 486 n.3 (E.D. Va. 2003), aff'd, 90 Fed. Appx. 60 (4th Cir. 2004).  The plaintiff bears the

burden of establishing the court's subject matter jurisdiction, and although this Court may utilize

the allegations contained within the four corners of the plaintiff's complaint as *evidence* in

determining whether it possesses jurisdiction over a dispute, it may also consider other evidence

outside the pleadings if necessary.  See Richmond, Fredericksburg, & Potomac R.R. Corp. v.

United States, 945 F.2d 765, 768 (4th Cir. 1991); Coulter, 256 F. Supp. 2d at 486 n.3.  A motion

brought pursuant to Federal Rule 12(b)(1) should be granted if the facts upon which the question

of the court's jurisdiction is based are undisputed and the movant is entitled to "prevail as a

matter of law."  Evans v. B.F. Perkins Co., 166 F.3d 642, 647 (4th Cir. 1999).

### B.  FEDERAL RULE 12(B)(6)

To the contrary, a motion pursuant to Rule 12(b)(6) serves to test the legal sufficiency of

the plaintiff's complaint in relation to the factual averments he puts forward.  In this respect,

although a court must accept as true all well-pled allegations in adjudicating such a motion, it

need not credit allegations that are merely conclusory, see Veney v. Wyche, 293 F.3d 726, 730

(4th Cir. 2002); or, as the Supreme Court recently acknowledged, "the tenet that a court must

accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."

Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009).

Indeed, in Iqbal, the Supreme Court continued its redevelopment of the proper Rule

12(b)(6) standard that it began two years earlier.  See Bell Atlantic Corp. v. Twombly, 550 U.S.

544 (2007) (holding that court adjudicating Rule 12(b)(6) motion must determine whether

complaint alleges facts that state a "plausible" claim for relief).  In this respect, the Iqbal court

rejected the notion that Twombly was limited to the antitrust context, see Iqbal, 556 U.S. at 684,

and held as follows with respect to the proper standard of review:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted to be true, to "state a claim to relief that is plausible on its face." A claim has factual plausibility when the plaintiff pleads factual content that allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

Id. at 678 (quoting Twombly, 550 U.S. at 570). Accordingly, although (as before) a court is required to adjudge the legitimacy of the factual averments contained within a complaint against the extant substantive law governing a particular claim, now "where the well-pleaded *facts* do not permit the court to infer more than the *mere possibility* of misconduct," the complaint fails. Id. at 679 (emphasis added).

In short, a reviewing "court should assume the[] veracity [of the allegations], and then determine whether they plausibly give rise to an entitlement to relief." Id. This endeavor, the Iqbal Court held, "will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. Courts now no longer are required to accept *any potential* inference flowing from given allegations in a Rule 12(b)(6) context; to the contrary, courts have the obligation to determine – given their experience and common-sense – whether the factual allegations "plausibly suggest" unlawful behavior, or whether those allegations are also "compatible with" other alternatives, including "lawful . . . behavior" (*i.e.*, behavior that would not entitle the plaintiff to relief). Id. at 680 (citing Twombly, 550 U.S. at 567). Where such "lawful" alternatives exist, the complaint must be dismissed. See id.

## II.   DEPUTY MARSHALS DEVINE AND CARTER ARE ENTITLED TO QUALIFIED IMMUNITY

Plaintiff's first cause of action seeks monetary relief – directly under the First Amendment – against Deputy Marshals Devine and Carter pursuant to the limited remedy that the Supreme Court authorized in Bivens. For the reasons below, both Devine and Carter are entitled to qualified immunity from the instant claim.

A.  GENERAL STANDARDS

1.  The Law of Qualified Immunity

Recognizing the significant ill-effects caused by its recognition of an individual-capacity damages remedy against federal officials engaged in allegedly-unconstitutional conduct, the Supreme Court has repeatedly held that such officials enjoy qualified immunity from suit unless their actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." Behrens v. Pelletier, 516 U.S. 299, 305 (1996). The Court has articulated the rationale behind the qualified immunity doctrine on several occasions, but perhaps best in Anderson v. Creighton, 483 U.S. 635 (1987):

> [P]ermitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liabilities and harassing litigation will unduly inhibit officials in the discharge of their duties.

Id. at 638; see also Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).[7]  In other words, the mere specter of damages could cause officials to be primarily concerned with avoiding personal liability, and not the swift discharge of their duties, see Doe v. Broderick, 225 F.3d 440, 452 (4th Cir. 2000), or "deter people from public service" altogether.  See Hayter v. City of Mount Vernon, 154 F.3d 269, 273 (5th Cir. 1998).

The Supreme Court has repeatedly emphasized that qualified immunity entails "an immunity from suit rather than a mere defense to liability," and therefore these immunity issues must be resolved at the earliest possible stage of litigation before "such pretrial matters as

---

[7]Although the modern version of the qualified immunity doctrine epitomized by such cases as Harlow and Anderson are of a recent vintage, the policy underpinnings of the doctrine have been a part of the jurisprudence since nearly the dawn of the republic.  See Otis v. Watkins, 13 U.S. (9 Cranch) 339, 355-56 (1817) (holding that "if [an official] form an incorrect opinion, or if, in the opinion of the jury, it shall been made unadvisedly, or without reasonable care or diligence . . . the law exposes his conduct to no such scrutiny.  If it did, no public officer would be hardy enough to act under it").

discovery" take place.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); see also Harlow, 457 U.S. at 818 (explaining that "[u]ntil this threshold immunity question is resolved, discovery should not be allowed"); Iqbal, 556 U.S. at 685 ("The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including 'avoidance of disruptive discovery.'").  And for this reason, a denial of qualified immunity may be *immediately* appealed.  See Mitchell, 472 U.S. at 526.

Determinations into whether a particular officer enjoys qualified immunity are generally governed by a two-pronged analysis.  First, one must ask whether the facts, viewed in the light most favorable to the plaintiff, demonstrate a constitutional violation.  See Saucier v. Katz, 533 U.S. 194, 199 (2001); Pike v. Osbourne, 301 F.3d 182, 184 (4th Cir. 2002).  Only if one answers this initial inquiry in the affirmative need one then "determine whether the contours of the right were clearly established such that a reasonable official would understand that what he [was] doing violated that right."  Pike, 301 F.3d at 185.  More recently, however, the Supreme Court held that a court need not undertake the analysis in any particular order, such that if a particular right is not clearly-established, a court may – in its discretion – simply end the inquiry and not reach whether the plaintiff's constitutional rights were actually violated.  See Pearson v. Callahan, 555 U.S. 223, 225 (2009).

The inquiry into whether the particular right in question was "clearly established" is synonymous with the question of "notice."  The Supreme Court has repeatedly articulated that the clearly established inquiry must be approached from the "specific context of the case" at hand, not from a general perspective.  Batten v. Gomez, 324 F.3d 288, 293-94 (4th Cir. 2003).  As the Supreme Court held in Anderson:

> [T]he right that the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense:  The contours of

the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Anderson, 483 U.S. at 640.  From this premise, the Saucier Court held that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." Saucier, 533 U.S. at 202 (emphasis added); see also Figg v. Schroeder, 312 F.3d 625, 635-36 (4th Cir. 2002).  In the instant matter, therefore, plaintiff cannot surpass the "clearly established" hurdle simply by arguing that the First Amendment protects him from retaliation.  To the contrary, plaintiff must demonstrate that "precedent, either from the Supreme Court, the circuit in which the case arises, or a consensus of cases from other circuits, provides the officer in question with fair notice that the actions he took, given the facts with which he was presented, did not comport with constitutional norms."  Altman v. City of High Point, 330 F.3d 194, 210 (4th Cir. 2003).  If "officers of reasonable competence *could* disagree" on whether the conduct at issue was constitutional, the defendant official is entitled to qualified immunity.  Malley v. Briggs, 475 U.S. 335, 341 (1986) (emphasis added).

## 2.    First Amendment Retaliation

The First Amendment protects, *inter alia*, the "freedom of speech."  U.S. CONST. amend. I.  Because it "tends to chill an individual's exercise of his First Amendment rights," this constitutional provision similarly affords protection for *some* forms of government retaliation for engaging in protected speech activity.  Baltimore Sun Co. v. Ehrlich, 437 F.3d 410, 415 (4th Cir. 2006).  As a general matter, a plaintiff must establish the following in order to state a claim for First Amendment retaliation:

> First, the plaintiff must demonstrate that his or her speech was protected.  Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech.  Third, the plaintiff must

demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action.

Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685-86 (4th Cir. 2000).  With respect to the second element of this framework, an "adverse action" occurs only when the "allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights."  Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005).

As will be seen below, even assuming that plaintiff's complaint contains allegations sufficient to establish a plausible claim that he engaged in protected speech during his telephonic conversation with Devine and that this speech caused Devine to make the remark at issue here,[8] his claim must fail on the second element.  Put simply, a mere impulsive remark during a mutually-heated conversation – especially given the particular circumstances of this conversation – is not the type of "realistic threat" of imminent government retaliation against which the First Amendment protects.  At the very least, such a "right" was definitely not clearly established in 2014, and both Devine and Carter are entitled to qualified immunity.

**B.    DEPUTY MARSHAL DEVINE:  AN IMPULSIVE REMARK DURING A MUTUALLY-HEATED TELEPHONIC CONVERSATION DOES NOT CONSTITUTE A CLEARLY-ESTABLISHED "REALISTIC THREAT" OF ARREST**

As the Fourth Circuit has held, "[n]ot every" government action taken in response to putatively-protected speech activity "is sufficient to chill the exercise of First Amendment rights, nor is every restriction actionable, even if retaliatory."  DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir. 1995); see also Baltimore Sun, 437 F.3d at 416.  And accordingly, the courts have recognized that one "must show that the defendant's conduct resulted in something more than a

---

[8] Defendants only assume *arguendo* – and solely for purposes of the instant motion – that plaintiff could establish the first and third elements of the relevant First Amendment analysis.

*de minimis* inconvenience to [his] exercise of First Amendment rights" in order to be actionable. Constantine, 411 F.3d at 500; see also Suarez, 202 F.3d at 686.  Courts thus ensure that First Amendment liability does not follow "everyday, run-of-the-mill encounters" between government officials and private citizens, Baltimore Sun, 437 F.3d at 416, and mere "rhetoric" by government officials does not serve to impute constitutional liability, see Int'l Ass'n of Machinists & Aerospace Workers v. Haley, 832 F. Supp. 2d 612, 629-30 (D.S.C. 2011), aff'd, 482 Fed. Appx. 759 (4th Cir. 2012).

For these reasons, although certain serious threats of arrest in retaliation for First Amendment activity can constitute "adverse action," any "threaten[ed]" action must "intimate that punishment, sanction, or adverse regulatory action will *imminently* follow."  Suarez, 202 F.3d at 687 (emphasis added).  The particular context in which a purported adverse action occurs is thus significant, see id. at 686, rendering only those "realistic threat[s] of arrest enough to chill First Amendment rights."  Hodgkins *ex rel.* Hodgkins v. Peterson, 355 F.3d 1048, 1056 (7th Cir. 2004); see also Kimberlin v. Nat'l Bloggers Club, 2015 WL 1242763, at *16 (D. Md. Mar. 17, 2015).[9]

1.     It is for at least this reason that plaintiff's First Amendment claim against Deputy Marshal Devine must fail at the very threshold – even assuming the veracity of the facts averred in his complaint, Devine did not issue a "realistic threat" to plaintiff that he would be subject to imminent arrest.  Far to the contrary, Devine used impulsive rhetoric during a heated telephonic conversation with plaintiff that ended as quickly as it began.  And plaintiff *himself* – through his

---

[9] Given plaintiff's *pro se* status, defendants have attached all unpublished decisions cited in this memorandum that can only be located through online databases as Exhibit B to this motion.

own complaint in this action – openly believes that Devine may not have been "serious" in his statement.  Complaint, ¶40.

As will be recalled, in determining whether particular government action is sufficiently adverse to enjoy First Amendment protection – *i.e.*, here, whether the threat of arrest was at all "realistic" – the particularized context in which the action occurs matters.  The *only* conversation between plaintiff and Devine occurred telephonically, with over 1100 miles (and seventeen driving hours) separating the two individuals.[10]  And thus, as plaintiff himself openly concedes, Complaint, ¶40, the threat of arrest was simply not realistic – Devine was not in a position to effectuate his arrest, let alone *imminently* as the Fourth Circuit has required.

Plaintiff was also well aware that Devine's statement did not constitute a "realistic threat" of arrest, as plaintiff's own reaction to the statement demonstrates.  Although not itself necessarily dispositive of the inquiry, it is significant that Devine's statement did not chill plaintiff from continuing to engage in his speech activity.  See Constantine, 411 F.3d at 500 (holding that "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity"); see also Baltimore Sun, 437 F.3d at 419 ("Nitkin's and Olesker's actual response attests to the *de minimis* impact that the Governor's directive would have on reports of ordinary firmness.").  Far to the contrary, plaintiff – if anything – *increased* the vitriol inherent in his part of the conversation, proudly providing Devine a lesson in plaintiff's putative First Amendment rights.  Complaint, ¶16.  Moreover, plaintiff – that *same day* – called the Marshals' Office for the Eastern District of Virginia to complain about Devine's conduct, id. ¶¶19-22, and filed the instant civil action against Devine

---

[10]Those opinions dealing with the constitutional implications of law enforcement officers who have threatened protesters or religious proselytizers with arrest *in person*, see McGlone v. Bell, 681 F.3d 718, 723-24 (6th Cir. 2012), are therefore simply inapposite.

three days later.  It is thus hardly surprising that plaintiff's own complaint in this action openly

questions whether Devine was "serious" about his statement.  Id. ¶40.[11]  These are hardly the

hallmarks of an individual chilled in the exercise of speech (*i.e.*, yelling) activity based on a

"realistic threat" of arrest, which provides further credence to the notion that no ordinary

individual would have thought the putative threat to be real.

Moreover, Deputy Marshal Devine took no further action against plaintiff as would

suggest that his "nebulous statement" actually did constitute a "realistic threat" of arrest – *i.e.*,

once the telephonic conversation ended, even after plaintiff's further First Amendment "tutorial,"

so did the relationship between the two men.  See Haley, 832 F. Supp. 2d at 629 ("Although a

threat need not be corroborated by action to be actionable, a nebulous statement combined with

action may communicate a threat that words alone would not convey.").  In fact, quite to the

contrary, during plaintiff's subsequent conversation with Supervisory Deputy Marshal Carter, the

latter – Devine's *supervisor* – indicated that he would "talk to" Devine about the telephonic

conversation at issue here, and that plaintiff had not actually been arrested.  Complaint, ¶22.

And although plaintiff ostensibly now criticizes Carter's refusal to take further disciplinary

action against Devine, id. ¶29, the only reasonable inference that an ordinary individual would

take from this conversation is that Carter was informing plaintiff that he was in no real danger of

being arrested, especially after he "talked to" Devine about the same.  These circumstances are

---

[11]The gratuitously melodramatic language that plaintiff utilizes to describe the situation
that might have befallen him had he actually been arrested – *e.g.*, "He would be *stranded in
Virginia!*  Stranded there, all alone, with nowhere to stay, no one in the region he could contact,
and no money with which to furnish a bus ride home!," Complaint, ¶47 (emphasis in original) –
clearly evinces that plaintiff did not consider Deputy Marshal Devine's statement to constitute a
"realistic threat" of arrest.

far different from the "galvanization" of law enforcement personnel that other courts have found sufficient to constitute a "realistic threat" of arrest:

> Specifically, by galvanizing law enforcement to open criminal investigations into Kimberlin, Frey created a realistic threat of arrest that would likely instill fear in an individual of ordinary firmness.  Indeed, in July 2012 two FBI agents came to Kimberlin's home to question him about his alleged role in various swattings.  As such, the Court concludes that by creating a realistic threat of arrest, Frey's conduct could reasonably be expected to chill the exercise of one's First Amendment rights.

Kimberlin, 2015 WL 1242763, at *16.

*          *          *

In the end, Deputy Marshal Devine allegedly made an impulsive remark, in the heat-of-the-moment, during an argumentative conversation.  That, coupled with the other circumstances surrounding the underlying conversation and its immediate aftermath, is simply not sufficient – under Fourth Circuit jurisprudence – to cross the line from a *de minimis* or run of the mill comment to an actionable "realistic threat" of imminent arrest.  Indeed, as one court has noted, "[i]f the word 'imminently' is to be given any meaning at all," Haley, 832 F. Supp. 2d at 630, plaintiff must aver a more pointed threat in circumstances in which one could reasonably believe the threat to be real.   Plaintiff has thus not averred facts sufficient to give rise to a plausible First Amendment claim.

2.      But even were this Court to conclude that the circumstances surrounding Deputy Marshal Devine's statement were somehow sufficient to give rise to an actionable "realistic threat" of arrest, there can be little doubt that it would be traversing a new jurisprudential path.  As such, Devine is entitled to qualified immunity because plaintiff's putative First Amendment right to be free from such a "nebulous" remark was not clearly-established at the time of the events in question.

17

Although the generic notion that the First Amendment protects individuals from retaliatory action on the part of government officials was clearly established in September 2014, see Baltimore Sun, 437 F.3d at 415-16, that simply is not the proper inquiry for purposes of qualified immunity. Rather, as stated above, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." Saucier, 533 U.S. at 202 (emphasis added). Accordingly, the "clearly established" question here is whether there was any authority to place Devine on notice that an off-hand, impulsive statement by a law enforcement officer referencing arrest during a heated *telephonic* conversation with an individual who was physically-located over 1000 miles away ran afoul of the First Amendment.

Not only did no such authority exist in September 2014 – something that immediately entitles Devine to qualified immunity – but the then-extant decisional authority would have pointed Devine in the opposite direction. As stated earlier, the Fourth Circuit had held only those significant threats that bore the indicia that *"imminent"* adversity (such as arrest) would befall a speaker – *i.e.*, a "realistic threat" of arrest – could give rise to First Amendment liability. Moreover, the court of appeals had indicated that *de minimis* commentary would not run afoul of the First Amendment, and another district court – in attempting to amalgamate all of the jurisprudential authority on the subject – has held that "nebulous" "rhetoric" does not violate the First Amendment. See Haley, 832 F. Supp. 2d at 629-31. Put simply, "reasonable officials could disagree" about whether the type of statement made by Devine – given the "situation" in which that statement was made – constituted a violation of the First Amendment.

This is especially the case given that, as the Fourth Circuit has held, the "adversity" element of the First Amendment analysis is extremely fact-driven and context-specific. See

<u>Suarez</u>, 202 F.3d at 686.  In other situations, courts have held that given the purposes behind the doctrine, government officials are more likely to enjoy qualified immunity when confronted with the need to engage in this on-the-spot kind of constitutional calculus.  Cf. <u>Lederman v. United States</u>, 291 F.3d 36, 46-47 (D.C. Cir. 2002) (holding that "because narrow tailoring is 'not an exact science,' a reasonable officer should not be expected to perform that analysis prior to arresting an individual for violation an ostensibly lawful time, place, and manner restriction governing expressive activity in a public forum").  Here, Devine was in the middle of a heated conversation with plaintiff at the time of his purportedly-unconstitutional actions – it would be inconsistent with the underpinnings of the qualified immunity doctrine to penalize him in retrospect for erroneously performing the fact-bound analysis on a moment's notice.  See, e.g., <u>Wilson v. Layne</u>, 526 U.S. 603, 618 (1999) ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.").  Because government officers remain entitled to qualified immunity even when they make "bad guesses in grey areas," <u>S.P. v. City of Tacoma Park</u>, 134 F.3d 260, 266 (4th Cir. 1998), and this is the ultimate "grey" constitutional "area," Deputy Marshal Devine is entitled to qualified immunity.

      **C.**      **SUPERVISORY DEPUTY MARSHAL CARTER:  GOVERNMENT OFFICIALS WHO HAVE NO PERSONAL INVOLVEMENT IN THE UNDERLYING ALLEGED CONSTITUTIONAL VIOLATION ARE ENTITLED TO QUALIFIED IMMUNITY**

Plaintiff also attempts to attach First Amendment liability to Supervisory Deputy Marshal Carter, despite the fact that he had no involvement in the underlying telephone conversation between plaintiff and Devine; in fact, Carter simply spoke with plaintiff in the immediate aftermath of the conversation when plaintiff called to complain about Devine's conduct.  In his complaint, plaintiff alleges that Carter "tacitly authorized" Devine's behavior because Carter did

not promise to issue discipline to Devine in a fashion that plaintiff deemed appropriate.

Complaint, ¶¶2; 22-23.   Leaving aside that Carter did not have sufficient personal involvement in the underlying putative threat, plaintiff – as the Fourth Circuit recently confirmed – completely miscomprehends the "tacit authorization" theory of liability.  And accordingly, Supervisory Deputy Marshal Carter is entitled to qualified immunity.

As the Supreme Court has now confirmed, a Bivens plaintiff is required to plead sufficient facts to make plausible that "each Government-official defendant, through the official's *own individual actions*, has violated the Constitution."   Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) (emphasis added); see also Danser v. Stansberry, 772 F.3d 340, 349 (4th Cir. 2014). Plaintiff simply cannot surpass this significant hurdle here, as his own complaint indicates that Carter had no personal involvement in the underlying conversation between plaintiff and Devine in which the putative First Amendment violation (*i.e.*, Devine's comment) was made.  This alone entitles Carter to qualified immunity.

Perhaps conceding this difficulty, plaintiff's complaint ostensibly seeks to attach liability to Carter on a "tacit authorization" theory.  Complaint, ¶2.  This effort must fail even at the threshold, however, because the fact that plaintiff has not pled sufficient facts to give rise to a plausible and clearly-established First Amendment claim against Devine precludes any effort to render Carter liable for that unconstitutional behavior.  Nevertheless, even assuming the validity of "tacit authorization" liability in the wake of Iqbal,[12] plaintiff greatly misapprehends its reach. As the Fourth Circuit recently held, in words directly applicable here:

---

[12] Put simply, because the notion of "tacit authorization" is that a government official is being held liable for the *constitutional* violation of another, such is ostensibly inconsistent with Iqbal's mandate that government officials can only be held liable under Bivens for their *own* failings of a *constitutional* dimension.

20

> Our conclusion is not altered by Danser's argument that Stansberry and Roy are not entitled to qualified immunity because they "tacitly authorized" Boyd's action by failing to discipline him after the incident.  At its core, Danser's argument reflects a misperception of the 'tacit authorization' theory, which focuses on information known to a supervisor *before* an incident occurs.  A supervisor may be held liable under a tacit authorization theory if that supervisor fails to take action in response to a known pattern of comparable conduct occurring before the incident at issue took place.  Here, there is no evidence in the record that either Stansberry or Roy was aware before the date of Danser's attack of any alleged defects in the assignment process for the recreation cages or of a pattern of officers leaving the recreation area unattended.

Danser, 772 F.3d at 349-50.  Similarly here, plaintiff has pled no facts indicating that Carter had any knowledge that Devine had a propensity to make "realistic threats" of arrest under inappropriate circumstances in retaliation for First Amendment speech.  And as such, plaintiff has not pled a plausible "tacit authorization" theory, and Supervisory Deputy Marshal Carter is entitled to qualified immunity.

## II.   THIS COURT LACKS SUBJECT-MATTER JURISDICTION OVER PLAINTIFF'S CLAIMS AGAINST THE UNITED STATES

Plaintiff originally brought his remaining causes of action – those for "terroristic threatening" under Virginia common law – against Deputy Marshals Carter and Devine.  But simultaneously with the instant motion, on the basis of a certification of scope of employment signed by the United States Attorney for this district, the United States has substituted itself – as a matter of law – as party defendant for these former individual defendants.  See 28 U.S.C. § 2679(d)(2); see also Guiterrez de Martinez v. DEA, 111 F.3d 1148, 1153 (4th Cir. 1997) (holding that "[t]he Attorney General's certification is conclusive unless challenged").[13]  These common

---

[13]In Guiterrez de Martinez v. Lamagno, 515 U.S. 417 (1995), the Supreme Court held that a plaintiff may seek judicial review of the Justice Department's certification by challenging the propriety of the certification.  See id. at 436-37.  Virginia *respondeat superior* law would govern the relevant scope inquiry.  See Jamison v. Wiley, 14 F.3d 222, 227 n.2 (4th Cir. 1994).  As the Fourth Circuit has correctly identified, "Virginia courts take a fairly broad view of scope of employment."  Guiterrez, 111 F.3d at 1157; see also Plummer v. Center Psychiatrists, Ltd., 476 S.E. 2d 172, 175 (Va. 1996) (holding that psychologist who purportedly engaged in sexual

law causes of action are therefore presently pending against the United States under the provisions of the Federal Tort Claims Act ("FTCA").  See 28 U.S.C. §§ 2679(d)(2) ("Such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."); 2679(d)(4) (providing that ensuing FTCA action "shall be subject to the limitations and exceptions applicable to those actions").

It is by now axiomatic that the United States and its agencies enjoy sovereign immunity from suit unless Congress has explicitly abrogated such immunity.  See FDIC v. Meyer, 510 U.S. 471, 475 (1994); Pittston Co. v. United States, 199 F.3d 694, 701 (4th Cir. 1999).  The FTCA serves as a limited waiver of the United States's sovereign immunity, see Medina v. United States, 259 F.3d 220, 223-24 (4th Cir. 2001), as it authorizes the United States to be held liable in tort "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  Nevertheless, Congress has promulgated a number of exceptions to this limited waiver of sovereign immunity, each of which serves as a limitation on the jurisdiction of this Court, and must be strictly construed in favor of the United States.  See Medina, 259 F.3d at 223-24; Robb v. United States, 80 F.3d 884, 887 (4th Cir. 1996).  The instant motion relates to one such exception – the requirement that a putative plaintiff first present an administrative claim to the relevant agency prior to seeking relief in this Court.

---

relations with a patient remained within the scope of employment).  Although, pursuant to well-established Fourth Circuit authority, the United States will await a challenge from plaintiff to discuss the veracity of United States Attorney's certification, see Guiterrez, 111 F.3d at 1153 (explaining scope challenge procedure), there can be little doubt that speaking with a citizen about service of process is within the scope of employment for a Deputy United States Marshal, and that taking a complaint about the putative conduct of a Deputy Marshal is within the scope of employment for a Supervisory Deputy United States Marshal.

### A.   PLAINTIFF HAS NOT PRESENTED A PROPER FTCA ADMINISTRATIVE CLAIM TO THE MARSHALS SERVICE

Initially, the FTCA conditions this Court's jurisdiction over any claim brought pursuant to its provisions on a plaintiff's prior presentment of an administrative claim to the allegedly responsible agency and the denial of that claim by the agency:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a); see McNeil v. United States, 508 U.S. 106, 111 (1993); Henderson v. United States, 785 F.2d 121, 123 (4th Cir. 1986) (holding that presentment requirement of § 2675(a) is "jurisdictional and may not be waived").  As indicated by the attached declaration, plaintiff has failed to present an administrative claim to the appropriate agency under the FTCA – in this case, the Marshals Service.  See Bordley Declaration, ¶5 (attached at Exhibit A).[14] Because plaintiff did not present an administrative claim to the Marshals Service, let alone wait until the Marshals Service denied that claim before filing his instant complaint, this Court should dismiss his FTCA action against the United States for a lack of subject matter jurisdiction.

### B.   VIRGINIA COMMON LAW DOES NOT RECOGNIZE THE TORT OF "TERRORISTIC THREATENING"

Nor, even had plaintiff presented a proper administrative claim to the Marshals Service, would his FTCA claim bear any merit.  The explicit language of the FTCA provides the source of the standards governing the United States's potential liability in tort:

---

[14]In analyzing motions to dismiss for lack of subject matter jurisdiction, it is well-settled that this Court is entitled to review materials outside the pleadings.  See White Tail Park, Inc. v. Stroube, 413 F.3d 451, 459 (4th Cir. 2005); Velasco v. Government of Indonesia, 370 F.3d 392, 398 (4th Cir. 2004).

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred*.

28 U.S.C. § 1346(b)(1) (emphasis added); see also id. § 2674.  "In actions brought under the FTCA, federal courts [thus] apply the substantive law of the state in which the act or omission occurred," Myrick v. United States, 723 F.2d 1158, 1159 (4th Cir. 1983); more particularly, the common law of tort for the state in question, see Khatami v. Compton, 844 F. Supp. 2d 654, 659 (D. Md. 2012).  And on this score, undersigned counsel is unaware of any authority for the proposition that the common law of Virginia recognizes the tort of "terroristic threatening."  Plaintiff's second cause of action therefore fails to state a plausible claim under the FTCA, and it should similarly be dismissed pursuant to Federal Rule 12(b)(6).[15]

---

[15]What plaintiff might be referencing with respect to this second count is that certain state statutes, including those in Hawaii and Arkansas, *criminally sanction* behavior specifically defined by the statutory language to constitute "terroristic threatening."  For instance, Arkansas's criminal code defines, *inter alia*, the following as felony "terroristic threatening":  "With the purpose of terrorizing another person, the person threatens to cause death or serious physical injury or substantial property damage to another person."  ARK. CODE ANN. § 5-13-301(a)(1)(A).  Leaving aside that plaintiff's complaint does not aver any conduct on the part of Devine and Carter that would come even close to meeting this statutory standard, plaintiff's effort to import this criminal statute into the FTCA suffers from two more significant threshold difficulties.  First, Devine and Carter acted in *Virginia*, a state that has *not* promulgated a "terroristic threatening" statute.  And second, the mere violation of a criminal code provision does not automatically equate to state common law tort liability:

> [I]t is nevertheless clear that not every violation of the criminal law constitutes a tort, nor does the criminal law automatically impose a tort duty upon one person that is owed to another.

Wilmington Trust Co. v. Clark, 424 A.2d 744, 753 (Md. 1981); see also San Benito Bank & Trust Co. v. Landair Travels, 31 S.W. 3d 312, 322 (Tex. App. 2000).

III.     **PLAINTIFF'S NEW REHABILITATION ACT CLAIM IS FRIVOLOUS**

In his amended complaint, plaintiff adds a new cause of action under the Rehabilitation Act, alleging that by citing to an opinion issued by another federal district court in one of plaintiff's previous civil actions in their initial motion to dismiss memorandum, defendants engaged in unlawful retaliation. Simply to state the proposition – *i.e.*, that the Rehabilitation Act prohibits litigants in one civil action from citing to an opinion issued with respect to a previous Rehabilitation Act claim – is to demonstrate its absurdity. And as such, whether pursuant to the defendants' motion, or pursuant to its own obligation to screen out frivolous claims brought by those, like plaintiff here, proceeding *in forma pauperis*,[16] this new claim should be dismissed.

A.     **A RIGHT OF ACTION DOES NOT LIE AGAINST FEDERAL OFFICIALS UNDER THE REHABILITATION ACT**

The Rehabilitation Act does not contain a right of action in federal court in this context. Specifically, the Rehabilitation Act's remedial provision is located at 29 U.S.C. § 794a. First, that section provides that the remedies available under Title VII of the Civil Rights Act of 1964 "shall be available . . . to any employee or applicant for employment aggrieved." 29 U.S.C. § 794a(a)(1). Because plaintiff is not employed by the United States in any capacity, and this action does not concern employment, § 794a(a)(1) cannot provide the necessary right of action.

Second, § 794a provides that the remedies available under *Title VI* of the same statute, see 42 U.S.C. § 2000d, "shall be available to any person aggrieved by any act or failure to act by

---

[16] Pursuant to 28 U.S.C. § 1915, this Court must screen all claims brought by plaintiffs proceeding *in forma pauperis*, and must dismiss any such claim – at any time during the pendency of the civil action – if it is "frivolous," "malicious," "fails to state a claim upon which relief can be granted," or "seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2). Each of these four terms or phrases equally applies to plaintiff's new Rehabilitation Act claim. This Court's screening and *sua sponte* dismissal obligation attaches even to claims presented through amended complaints. See, e.g., Keitz v. Unnamed Sponsors of Cocaine Research Study, 829 F. Supp. 2d 374, 375 (W.D. Va. 2011).

any recipient of Federal assistance or *Federal provider* of such assistance under section 794 of

this title." 29 U.S.C. § 794a(a)(2) (emphasis added). Plaintiff has not alleged, nor could he, that

the Marshals Service is a "Federal provider" of "assistance" sufficient to fall within the ambit of

this section. See Lane v. Pena, 518 U.S. 187, 195 (1996) (holding that a federal agency is not a

"Federal provider" for purposes of § 794a). And as such, by the plain and unequivocal language

of the statute, a right of action in federal court against federal officials under the Rehabilitation

Act does not exist.

From this very premise, the Supreme Court has clearly held that the United States has not

waived its sovereign immunity, and thus has not consented to be sued under the Rehabilitation

Act for damages. See id. at 197. Any such claim must be dismissed for lack of jurisdiction. For

similar reasons, plaintiff cannot bring a Rehabilitation Act claim against the defendants in their

individual capacities; indeed, Fourth Circuit has held that a Rehabilitation Act claim does not lie

against individual government officials. See Moneyhan v. Keller, 563 Fed. Appx. 256, 258 (4th

Cir. 2014).

**B.     THERE IS NO AUTHORITY FOR THE PROPOSITION THAT CITATION OF A LEGAL OPINION IN A COURT-FILED BRIEF CONSTITUTES "ADVERSE ACTION" UNDER THE REHABILITATION ACT**

Nor do the merits of plaintiff's putative Rehabilitation Act retaliation claim fare any

better. At the outset, plaintiff understandably cannot cite any authority for the absurd proposition

that one engages in actionable retaliation under the statute simply by citing – as a part of a legal

memorandum filed with a Court in one's own defense – an opinion in a prior civil action that

plaintiff brought under the Rehabilitation Act. For that reason alone, Carter and Devine, in their

individual capacity, are certainly entitled to qualified immunity from any such claim. See Davis

v. Scherer, 468 U.S. 183, 197 (1984) (noting that qualified immunity protects officials from suit even with respect to putative statutory violations).

From a legal perspective, however, plaintiff's putative Rehabilitation Act theory fails, *inter alia*, because the citation of a prior opinion in a court-filed legal brief does not come close to the type of "adverse action" necessary to trigger retaliation liability under the statute. As this Court is well aware, the Supreme Court has noted that the type of adverse action necessary to maintain a retaliation claim in an *employment action* is one that "would have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). And on this score, the Supreme Court warned that this standard required district courts to differentiate between trivial and significant harms – and that only the latter would suffice to trigger liability. See id. It hardly requires the provision of legal authority to demonstrate that the citation of a prior Rehabilitation Act opinion causes no harm whatsoever – let alone *significant* harm that would dissuade a reasonable individual (let alone this plaintiff) from bringing another Rehabilitation Act claim. Moreover, as courts have held, because this is not an employment action, plaintiff "must present facts showing that []he was deprived of access to [] benefits [administered by a federal provider] in a significant way." Elliott v. Delaware State Univ., 879 F. Supp. 2d 438, 445 (D. Del. 2012). Plaintiff's complaint, for obvious reasons, does not identify the benefits he was deprived by the citation of the aforementioned Rehabilitation Act opinion.

Plaintiff's new Rehabilitation Act claim is completely frivolous, and this Court should dismiss the same.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should dismiss plaintiff's complaint in this action

pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), or *sua sponte* pursuant to 28

U.S.C § 1915(e)(2).

Respectfully submitted,

DANA J. BOENTE
UNITED STATES ATTORNEY

By:          /s/
DENNIS C. BARGHAAN, JR.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax:      (703) 299-3983
Email:  dennis.barghaan@usdoj.gov

DATE: June 24, 2015         ATTORNEYS FOR DEFENDANTS

OF COUNSEL:      Ed Bordley
United States Marshals Service

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and will transmit a true and correct copy of the foregoing to the following non-user via first-class mail:

David Stebbins
123 W. Ridge Street, Apt. D
Harrison, Arkansas  72601


<u>Date</u>: June 24, 2015                                 _____/s/_____

DENNIS C. BARGHAAN, JR.
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax:          (703) 299-3983
Email:  dennis.barghaan@usdoj.gov

ATTORNEYS FOR DEFENDANTS