# EXHIBIT C



Not Reported in F.Supp.2d, 2010 WL 8750304 (W.D.Va.)
**(Cite as: 2010 WL 8750304 (W.D.Va.))**

Only the Westlaw citation is currently available.

United States District Court, W.D. Virginia,
Roanoke Division.
Elwin Frederick STRANGE, Plaintiff,
v.
Terry O'BRIEN, et al., Defendant.

Civil Action No. 7:10–cv–0151.
July 30, 2010.

Elwin Fredrick Strange, White Deer, PA, pro se.

### MEMORANDUM OPINION

GLEN E. CONRAD, Chief Judge.

**\*1** Plaintiff Elwin Frederick Strange, a federal inmate proceeding pro se, brings this action as a civil rights complaint under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971), with jurisdiction vested under 28 U.S.C. § 1331 .[FN1] Strange alleges that the defendant prison officials failed to provide him with appropriate medical treatment after he fell from his upper bunk and broke his foot. Upon consideration of the complaint, the court finds that this action should be dismissed pursuant to 28 U.S.C. § 1915A(b)(l) for failure to state a claim upon which relief may be granted.

> **FN1.** Plaintiff filed this action in the United States District Court for the Middle District of Pennsylvania. It was transferred because the cause of action arose at a prison within the jurisdiction of this court.

### I. Background

In his initial complaint, Strange stated only the following:

Foot was broken due to lack of safety ladder to get into double bunk beds, medical was deliberately indifferent to issues, even when examined by outside physician. Pain and suffering occurred

over an extensive period of time.

(Compl.2.) After the action was transferred here, the court issued an order advising Strange that his allegations failed to state any constitutional claim actionable under *Bivens,* but granted him an opportunity to amend to state facts concerning the actions that each defendant had taken, personally, in violation of his constitutional rights and advised him to provide evidence concerning his exhaustion of administrative remedies. In response, Strange submitted an amended complaint, alleging the following sequence of events on which he bases his claims.

On December 20, 2008, while Strange was an inmate at the United States Penitentiary in Jonesville, Virginia (USP Lee), he fell while climbing down from his upper bunk and injured his right foot. The bunk beds do not have attached ladders. Strange reported his injury to the unit officer, who told him that he would be examined at the Ambulatory Care Clinic the next day. At the clinic on December 21, 2008, the staff prescribed an oral anti-inflammatory medication and instructed Strange to rest and elevate his foot, to apply ice for treatment of discomfort, and to return to the clinic the next working day for a follow-up appointment. The clinic personnel did not take an X-ray of his foot that day.

Strange returned to the clinic on December 23, 2008. Although he told the medical staff that the foot was broken, they diagnosed the injury as a sprain and ordered an X-ray. They also prescribed pain medication, gave him an ace bandage and some crutches, and issued him a one-week work restriction. An X-ray of his right foot was performed on December 31, 2008 at a local medical center. The doctor who read the X-ray and examined Strange that day informed him that the foot was, indeed, broken, recommended that he be seen by an orthopedic specialist, and "issued names of referrals to the BOP medical department to perform the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 8750304 (W.D.Va.)
**(Cite as: 2010 WL 8750304 (W.D.Va.))**

medical practic [sic] needed." The doctor also explained to the escort guards what treatment Strange needed.

After Strange returned to USP Lee, P.A. Bartee told him, without looking at the X-ray or the medical chart from the medical center, that he did not need to see a specialist. Instead, the jail medical unit issued Strange a specialized orthopedic boot, told him to continue using the crutches, and renewed his pain medication. When Strange filed grievances about what he believed to be inadequate treatment of his broken foot, requesting immediate treatment for his foot, relief was denied. He saw Dr. Cruise on January 14, 2009, who advised him that he did not need to see an orthopedic specialist. He was then re-evaluated by a staff medical officer, who ordered a follow up X-ray and prescribed anti-inflammatory medication. When Strange filed grievances in January and March 2009, complaining about the medical treatment he had received, they were denied by Warden O'Brien. His appeal of the warden's response was denied by the regional director.

**\*2** Strange had another follow up examination at the clinic on March 12, 2009. Staff requested an orthopedic consultation and directed that, in the meantime, he would be monitored by the jail medical staff. On May 6, 2009, an orthopedic surgeon operated on Strange's right foot. The operation included insertion of a plate with six screws into the foot. Strange alleges that he now has damaged tendons and ligaments and permanent damage to his foot, "which could have been avoided if not for the gross negligence, deliberate indifference, mis[diagnosis] and treatment" he received from jail medical staff.

In the original complaint, Strange sued four individuals employed at USP Lee: Warden Terry O'Brien; Physician's Assistant Bartee, Dr. Cruise (also referred to as Dr. Cruze), and Chief Medical Administrator Albright (also referred to as Jane Doe). In the amended complaint, Strange expands upon the claims against these individuals and also

names the BOP as a defendant. He alleges ten claims, as follows: (1) the actions of the warden and the medical defendants violated plaintiff's constitutional rights under the Eighth Amendment and the Due Process Clause; (2) the warden and Jane Doe acted with deliberate indifference to medical malpractice committed by the USP Lee medical staff by failing to discipline and correct their subordinates for the treatment provided to plaintiff; (3) the BOP, as a matter of policy and practice, is deliberately indifferent to the inadequate discipline and training of its medical staff; (4) the defendants conspired to violate plaintiff's civil rights by agreeing to deprive him of medical treatment for his broken foot; (5) the BOP violated OSHA codes by failing to install safety ladders on the prison bunk beds; (6) Jane Doe "expressly authorized [defendant Partee] to malpractice treatment" and violate plaintiff's constitutional rights because she knew of, and acquiesced to, Partee's propensity to commit such illegal acts; (7) all the individual defendants were negligent in providing medical treatment for plaintiff's broken foot; (8) the BOP was negligent in screening prospective medical staff and in training and supervising them; (9) all the defendants wantonly inflicted pain on plaintiff by acting with deliberate indifference to his broken foot and by not installing safety ladders; and (10) all defendants intentionally inflicted emotional distress on plaintiff.

## II. Discussion

To state a cause of action under *Bivens,* an individual must prove that he suffered harm as a result of constitutional violations committed against him by federal officials. 403 U.S. at 397. "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1948 (2009). A *Bivens* claim is analogous to a claim under 42 U.S.C. § 1983, which authorizes civil actions against state officials in their personal capacities for violations of constitutional rights. Case law involving § 1983 claims is applicable in *Bivens* ac-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 8750304 (W.D.Va.)
**(Cite as: 2010 WL 8750304 (W.D.Va.))**

tions and vice versa. *See Farmer v. Brennan,* 511 U.S. 825, 839 (1994); *Mitchell v. Forsyth,* 472 U.S. 511, 530 (1985); *Turner v. Dammon,* 848 F.2d 440, 443–44 (4th Cir.1988).

**\*3** A complaint filed by an inmate challenging the conduct of an "officer or employee of a governmental entity" may be dismissed under § 1915A(b)(1) if the complaint is "frivolous, malicious or fails to state a claim upon which relief may be granted." The factual allegations in the complaint must contain "more than labels and conclusions" and "must be enough to raise a right to relief above a speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). After review of Strange's allegations as amended, the court concludes that he fails to allege facts stating any plausible claim actionable under § 1983.

**A. Deliberate Indifference to Medical Needs**
The United States Supreme Court has held that punishments or prison conditions are "repugnant to the Eighth Amendment" if they "are incompatible with "the evolving standards of decency that mark the progress of a maturing society ... or ... involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble,* 429 U.S. 97, 102 (1976) (internal quotations omitted). To prove that medical treatment he received while a prisoner amounted to a constitutional violation, an inmate must show that personnel to whose care he was committed exhibited "deliberate indifference" to his "serious medical needs." *Id.* at 104–105.

First, the prisoner must demonstrate a medical need serious enough to give rise to a constitutional violation. "[A] serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve,* 535 F.3d 225, 241 (4th Cir.2008) (internal quotations omitted).

Second, plaintiff must show that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed, that

he drew or must have drawn that inference, and that he failed to respond reasonably to the risk. *Farmer v. Brennan,* 511 U.S. 825, 837–844 (1994). Inadvertent failure to provide treatment, negligent diagnosis, and medical malpractice do not present constitutional deprivations. *Estelle,* 429 U.S. at 105–106. A claim concerning a disagreement between an inmate and medical personnel regarding diagnosis and course of treatment does not implicate the Eighth Amendment, because questions of medical judgment are not subject to judicial review. *Wright v. Collins,* 766 F.2d 841, 849 (4th Cir.1985); *Russell v. Sheffer,* 528 F.2d 318, 319 (4th Cir.1975). Prison personnel may rely on the opinion of the medical staff as to the proper course of treatment. *Miltier v. Beorn,* 896 F.2d 848, 855 (4th Cir.1990).

In Claim (1), Strange alleges that Partee and Cruise provided treatment for his broken foot, but did not follow another doctor's advice to send him to an orthopedic specialist. In so doing, these defendants made medical judgments that a consultation with an orthopedic specialist was not immediately necessary and that it was appropriate to try other treatment first. Such medical judgments, whether correct or not in any given situation, do not constitute cruel and unusual punishment. *Estelle,* 429 U.S. at 107–08. The fact that their medical decisions did not coincide with the medical opinion offered by the other doctor's recommendation states nothing more than a disagreement over treatment, which is insufficient to state a constitutional claim. *Wright,* 766 F.2d at 849. At the most, these allegations may give rise to a claim of medical malpractice, which is insufficient to state a constitutional claim actionable under *Bivens, Id.* at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Moreover, Strange's suggestion that failure to see the orthopedic specialist earlier resulted in permanent damage to his foot is merely speculative. Accordingly, Strange's allegations related to Claim (1) state no actionable *Bivens* claim against Partee and Cruise.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 8750304 (W.D.Va.)
(Cite as: 2010 WL 8750304 (W.D.Va.))

Page 4

**\*4** In Claims (1) and (2), Strange alleges that Warden O'Brien, directly and in his supervisory role, acted with deliberate indifference to his need for medical treatment. Without any medical expertise of his own, however, O'Brien rightfully relied on the professional judgments of his medical staff as to the appropriate course of treatment for Strange's injured foot, and in so doing, was not deliberately indifferent to a risk of harm known to him.[FN2] *Miltier,* 896 F.2d at 855. Accordingly, Strange's allegations related to Claim (1) state no actionable *Bivens* claim against the warden.

> FN2. Strange's allegations also fail to support a claim against the warden for inappropriately denying his grievances concerning his medical treatment. Inmates do not have a constitutionally protected right to a grievance procedure. *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir.1994). Accordingly, allegations that a prison official did not respond appropriately to a grievance states no deprivation of constitutional rights.

In Claims (1), (2), and (6), Strange alleges that Jane Doe was deliberately indifferent to his medical needs in three respects—directly, by virtue of her general supervisory role over Partee and Cruise, and by "expressly authorizing" Partee's actions. Other than these conclusory assertions about Jane Doe, Strange fails to allege any facts concerning actions that this defendant took, personally, in relation to his medical treatment, although the court expressly directed him to provide such facts.[FN3] *Iqbal,* 129 S.Ct. at 1948. Thus, Strange fails to state a *Bivens* claim against this defendant. Moreover, assuming Strange could demonstrate that Jane Doe knew of and approved the actions of Partee and Cruise, this court could not second guess her medical judgment that the treatment decisions in Strange's case were appropriate, given his test results and his ongoing symptoms as the USP Lee medical staff assessed them. *Russell,* 528 F.2d at 319. In short, Strange's Claims (1), (2), and (6), al-

leging deliberate indifference to serious medical needs by the individual defendants,[FN4] must be dismissed under § 1915A(b)(1) for failure to state a claim.[FN5]

> FN3. Jane Doe, as a supervisory official, cannot be held automatically liable for violations of plaintiffs constitutional rights through the actions of subordinate officials; the doctrine of *respondeat superior* is inapplicable to actions under *Bivens, See, e.g., Dean v. Gladney,* 621 F.2d 1331, 1336 (5th Cir.1980) (finding that, as in § 1983 cases, liability in *Bivens* actions cannot be based upon theory of respondeat superior).

> FN4. Although Strange alleges that the actions of these four defendants with regard to his medical treatment somehow violated his federal due process rights, the court cannot find support for such a claim in his allegations. It is well established that, as a practical matter, the contours of the Due Process Clause in the prison context tend to be coextensive with the substantive constitutional principles applied via the Eighth Amendment to convicted inmates. *See, e.g. Hill v. Nicodemus,* 979 F.2d 987, 991–92 (4th Cir.1992) (regarding medical needs).

> FN5. In Claim (9), Strange alleges that all of the defendants wantonly inflicted pain on him, in violation of the Eighth Amendment, by acting with deliberate indifference to his broken foot. Because he fails to allege facts in support of this claim, other than the allegations of inadequate medical treatment offered in support of Claims (1), (2), and (6), for the same reasons, the court will dismiss this portion of Claim (9), pursuant to § 1915A(b)(1).

**B. Conspiracy Claim**

An essential element in any claim of conspiracy to deprive the plaintiff of his constitutional

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2010 WL 8750304 (W.D.Va.)
(Cite as: 2010 WL 8750304 (W.D.Va.))

rights is an agreement to do so among the alleged co-conspirators. *Ballinger v. North Carolina Agricultural Extension Service,* 815 F.2d 1001 (4th Cir.1987). Without such a meeting of the minds, the independent acts of two or more wrongdoers do not amount to a conspiracy. *Murdaugh Volkswagon v. First National Bank,* 639 F.2d 1073 (4th Cir.1981). The plaintiff must allege facts which show that the defendants shared a "unity of purpose or common design" to injure the plaintiff. *American Tobacco Co. v. United States,* 328 U.S. 781 (1946). Where the complaint makes only conclusory allegations of a conspiracy under § 1983 and fails to allege facts showing any agreement or meeting of the minds among the defendants, the court may properly dismiss the complaint. *See Woodrum v. Woodward County, Okl.,* 866 F.2d 1121, 1126 (9th Cir.1989); *Cole v. Gray,* 638 F.2d 804 (5th Cir.1981).

Strange alleges in Claim (4) that the individual defendants "conspired" to deprive him of medical treatment for his foot. He does not allege any facts, however, showing that the defendants formed any type of agreement or acted in concert to injure him. The mere fact that each of these actors played a part in providing treatment for his broken foot, according to their medical judgments, is not sufficient to show that they shared a unity of purpose. In addition, as the court has already concluded, Strange's allegations do not support a claim that any of the defendants acted with deliberate indifference to his serious medical needs in violation of his constitutional rights. Thus, Strange fails to allege facts sufficient to state a claim of conspiracy actionable under *Bivens,* and Claim (4) must be dismissed accordingly, pursuant to § 1915A(b)(l).

**C. Hazardous Conditions**
    **\*5** In Claim (9), Strange alleges that the individual defendants were deliberately indifferent to the safety hazard posed by the lack of ladders on the USP Lee bunks. The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman,* 452 U.S. 337 (1981). On the other hand, individuals do not have a constitu-

tional right (1) to be free from a government employee's negligence, even if it causes an injury, or (2) to have the government protect them from such an injury. *Daniels v. Williams,* 474 U.S. 327 (1986). In order to state a claim of constitutional significance regarding prison conditions, a plaintiff must allege facts demonstrating that the challenged conditions resulted in a deprivation of a basic human need that was objectively "sufficiently serious" and (2) that, subjectively, the defendant prison officials acted with a sufficiently "culpable state of mind" with regard to the conditions. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). To satisfy the objective element of a conditions claim, the plaintiff must show that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions. *Strickler v. Waters,* 989 F.2d 1375, 1380–1381 (4th Cir.1993). Plaintiff satisfies the subjective component of his claim if he shows deliberate indifferencethat the official was aware of facts from which he could draw an inference that a substantial risk of harm existed, that he actually drew that inference, and that he disregarded the risk by failing to take "reasonable measures" to alleviate it. *Farmer,* 511 U.S. at 835–37.

A supervisory official can be liable for a subordinate's constitutional violations if plaintiff demonstrates: (1) that the conduct by subordinate employees which directly caused the deprivation was undertaken to effectuate an official policy or custom for which the official was responsible, *id.,* or (2) that the supervisory official was aware of a pervasive, unreasonable risk of harm to plaintiff from a specified source and failed to take corrective action himself, out of his own deliberate indifference or his tacit authorization of inaction by subordinates. *Slakan v. Porter,* 737 F.2d 368, 372–73 (4th Cir.1984). In this context, plaintiff ordinarily cannot prove supervisory liability based on a single incident or isolated incidents. *Id.* at 373.

Strange fails to allege that the medical defendants (Partee, Cruise, and Jane Doe) had any personal involvement in decisions regarding safe living

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 8750304 (W.D.Va.)
**(Cite as: 2010 WL 8750304 (W.D.Va.))**

conditions at USP Lee. Accordingly, his allegations fail to state any constitutional claim against them related to the lack of safety ladders. *Iqbal,* 129 S.Ct. at 1948.

Apparently, Strange is attempting to blame the warden in his supervisory role for the alleged safety hazard created by the lack of bunk ladders. He fails to allege any facts from which the warden knew that no ladders placed inmates at a substantial risk of serious harm. A single incident in which lack of a ladder caused a serious injury, as allegedly occurred in Strange's case, is not sufficient to put the warden on notice of such a risk. Accordingly, the court concludes that Strange fails to state any constitutional claim against the warden, based on the lack of bunk ladders, and will dismiss Claim (9), pursuant to § 1915A(b)(1).

**D. *Bivens* Claims against the BOP**

**\*6** Under the well-established legal doctrine of sovereign immunity, the United States, its departments, and agencies cannot be sued without its express consent. *See United States v. Mitchell,* 463 U.S. 206, 212 (1983). The United States has not consented to a *Bivens* suit against it or against one of its agencies, such as the BOP. *F.D.I.C. v. Meyer,* 510 U.S. 471, 486 (1994). Therefore, Claim (3), alleging that the BOP is liable under *Bivens* for the inadequate training of its medical staff, states no actionable claim, as the BOP is immune against such suits. The court will dismiss Claim (3), pursuant to § 1915A(b)(1), for failure to state a claim.

**E. Negligence Claims**

In Claims (5), (7), and (8), Strange alleges that he was injured as a result of certain, allegedly negligent acts or omissions committed by BOP employees. While negligent actions by governmental officials are insufficient to support constitutional claims and are therefore not actionable under *Bivens,* these allegations may be properly presented as claims against the United States under the Federal Tort Claims Act (FTCA). The FTCA provides a remedy whereby a claimant may recover monetary damages from the United States for injury "caused

by the negligent or wrongful act or omission of any employee of the Government while acting within the scope ... of employment." 28 U.S.C. § 1346(b).

The court has an obligation to liberally construe a pro se litigant's pleadings to avoid loss of viable claims based on lack of legal expertise. *Haines v. Kerner,* 404 U.S. 519, 520 (1972). When a pro se litigant alleges a cause of action that may be meritorious against persons not named for lack of legal knowledge, the district court should "afford him a reasonable opportunity to determine the correct person or persons against whom the claim is asserted, advise him how to proceed and direct or permit amendment of the pleadings to bring that person or persons before the court." *Gordon v. Leeke,* 574 F.2d 1147, 1152–53 (4th Cir.1978). Under these principles, the court liberally construes Strange's negligence claims as arising under the FTCA and substitutes the United States as the proper defendant to such claims.

Litigants must strictly comply with the procedural requirements of the FTCA. *See* 28 U.S.C. § 2675: *United States v. Kubrick,* 444 U.S. 111, 117–18(1979).

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b). An FTCA claim is presented "when a Federal agency receives from a claimant ... an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death." 28 C.F.R. § 14.2(a). Once such a claim is denied by the agency, the litigant has six months to file an FTCA court action. The plaintiff has the burden to prove that he completed all these conditions

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 8750304 (W.D.Va.)
**(Cite as: 2010 WL 8750304 (W.D.Va.))**

precedent to filing an FTCA lawsuit. *Kielwien v. United States,* 540 F.2d 676, 679 (4th Cir.1976). A plaintiff's failure to exhaust administrative remedies before he brings suit mandates dismissal of the claim. *McNeil v. United States,* 508 U.S. 106, 113 (1993).

**\*7** Strange has signed a statement and submitted documentation, purporting to verify that he exhausted administrative remedies within the BOP's grievance procedure before filing this lawsuit. He does not allege, and his documentation does not indicate, however, that he filed an administrative tort claim with the BOP, asking to recover monetary damages for these alleged negligent acts by BOP employees. Because Strange bears the burden of proving exhaustion and has failed to do so, despite being directed by the court to provide all such documentation, the court will dismiss his FTCA claims without prejudice, pursuant to § 1915A(b)(l). Because he is proceeding without counsel, however, the court will grant him thirty days in which to move for reinstatement of the FTCA claims, provided that he submits appropriate documentation, demonstrating that he has fulfilled the necessary prerequisites to filing such claims by having pursued an agency claim concerning the alleged incidents of negligence.

**F. Intentional Infliction of Emotional Distress**

This state law claim is not independently actionable under *Bivens,* which vindicates only violations of federal constitutional rights by federal governmental employees. Thus, to the extent that Strange raises Claim (10) under *Bivens,* it must be dismissed. To the extent that he raises it under the supplemental jurisdiction of the court, pursuant to 28 U.S.C. § 1367(c), the court declines to exercise such jurisdiction in light of the dismissal of all federal claims. Accordingly, this state law claim will be dismissed without prejudice, pursuant to § 1367(c).

**III. Conclusion**

Upon review of the record, the court concludes that Strange's claims under *Bivens* and the FTCA

must be dismissed without prejudice, pursuant to § 1915A(b)(1), and all state law claims must be dismissed without prejudice, pursuant to § 1367(c). An appropriate order shall be entered this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send certified copies of this memorandum opinion and accompanying order to plaintiff and defendant.

W.D.Va.,2010.
Strange v. O'Brien
Not Reported in F.Supp.2d, 2010 WL 8750304 (W.D.Va.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

242 F.3d 389, 2000 WL 1838274 (C.A.10 (Colo.)), 2000 CJ C.A.R. 6715
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 242 F.3d 389, 2000 WL 1838274 (C.A.10 (Colo.)))**

NOTICE: THIS IS AN UNPUBLISHED OPIN-ION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. See CTA 10 Rule 32.1 before citing.)

United States Court of Appeals, Tenth Circuit.
Alden Lamont MOORE, Plaintiff-Appellant,
v.
Michael COOKSEY, Michael Pugh, G.L. Hershberger, and L.R. Kowalski, Defendants-Appellees.

No. 00-1109.
Dec. 14, 2000.

Before BRORBY, KELLY, and LUCERO, Circuit Judges.

ORDER AND JUDGMENT [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

KELLY.

*1 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R.App.P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Plaintiff Alden Lamont Moore, a federal prisoner, appeals the dismissal of his pro se complaint filed under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388

(1971), and the Rehabilitation Act, 29 U.S.C. § 794(a). We affirm.

Moore was transferred from a prison in Lompoc, California, to the control unit in the Administrative Maximum facility (ADX) at Florence, Colorado, after he stabbed another inmate with an ice pick-type weapon. In his complaint, Moore claimed that the transfer to ADX, the conditions of confinement there, and the ADX medical treatment for his AIDS-related symptoms violate his rights under the Constitution and the Rehabilitation Act. Specifically, he asserted that he was transferred to ADX because of his HIV-positive status, that his access to showers at ADX was limited based on discriminatory motives, and that medical care providers at ADX improperly concluded that his needs could be met at that facility. Moore sought money damages and an injunction requiring his transfer to a facility that houses a general population of HIV-positive prisoners.

Upon defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, the matter was referred to a magistrate judge. As to Moore's claims for damages under the Rehabilitation Act, the magistrate judge recommended dismissal because none of the named defendants are subject to personal liability for damages, R., Vol. 2, Doc. 16 at 5 (citing *Hiler v. Brown,* 177 F.3d 542, 545-46 (6th Cir.1999) (stating that the Rehabilitation Act does not permit actions against persons in their individual capacities)). Furthermore, the magistrate judge concluded that the Bureau of Prisons and its director are shielded by sovereign immunity. R., Vol. 2, Doc. 16 at 6 (citing *Lane v. Pena,* 518 U.S. 187, 197, 200 (1996)). Finally, Moore failed to allege facts demonstrating that his treatment was due to his disability. R., Vol. 2, Doc. 16 at 10-12 (citing *Randolph v. Rodgers,* 170 F.3d 850, 858 (8th Cir.1999) (setting out elements of a prima facie case under the Rehabilitation Act)).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

242 F.3d 389, 2000 WL 1838274 (C.A.10 (Colo.)), 2000 CJ C.A.R. 6715
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 242 F.3d 389, 2000 WL 1838274 (C.A.10 (Colo.)))**

Concerning Moore's constitutional claims, the magistrate judge determined that:

(1) Conditions in ADX are within " 'the range of confinement to be normally expected for one serving' " a federal prison sentence and therefore the transfer to ADX did not involve an interest protected by the Due Process Clause. R., Vol. 2, Doc. 16 at 7 (quoting *Sandin v. Conner,* 515 U.S. 472, 487 (1995)); *see also Meachum v. Fano,* 427 U.S. 215, 225 (1976) (explaining that the Due Process Clause does not protect a prisoner against transfer to a more restrictive prison);

**\*2** (2) Moore's allegations of disparate treatment did not support an equal protection claim. R., Vol. 2, Doc. 16 at 7-8 (citing, *e.g., Romer v. Evans,* 517 U.S. 620, 631 (1996) (stating that a classification which bears a "rational relation to some legitimate end" generally complies with the Equal Protection Clause)); and

(3) Moore's disagreement with practitioners as to appropriate medical treatment was not actionable as a constitutional claim because Moore did not exhaust his available administrative remedies, R., Vol. 2, Doc. 16 at 9-10 (citing 42 U.S.C. § 1997e(a) ), and failed to allege facts showing that defendants acted with deliberate indifference to his serious medical needs, R., Vol. 2 at 13-15 (citing *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)).

The magistrate judge therefore recommended dismissal of Moore's claims for damages and denial of his requests for injunctive relief. After considering Moore's objections, the district court adopted the magistrate judge's recommendation and dismissed the case. On appeal, Moore challenges the dismissal. Additionally, he contests the magistrate judge's denial of his request for appointment of counsel and refusal to conduct an investigation into alleged malpractice on the part of a government attorney.

This court reviews de novo a dismissal under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, accepting the facts pleaded as true. *See Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1236 (10th Cir.1999). A Rule 12(b)(6) dismissal is upheld only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quotation omitted). After a careful review of the record, we conclude that the district court correctly determined that Moore's allegations are insufficient to impose liability under the Rehabilitation Act or demonstrate violations of Moore's constitutional rights.

Concerning the denial of appointment of counsel in a civil case, we review the district's court determination for an abuse of discretion. *Rucks v. Boergermann,* 57 F.3d 978, 979 (10th Cir.1995). In considering whether to appoint counsel, the factors the district court should take into account include " 'the merits of the litigant's claims, the nature of the factual issues raised in the claims, the litigant's ability to present his claims, and the complexity of the legal issues raised by the claims.' " *Id.* (quoting *Williams v. Meese,* 926 F.2d 994, 996 (10th Cir.1991)). Because Moore's claims lack merit, there was no abuse of discretion in denying the motion to appoint counsel. Furthermore, we find no error in the refusal to investigate alleged malpractice on the part of government counsel.

The judgment of the district court is AFFIRMED for substantially the reasons stated in the Recommendation of United States Magistrate Judge filed February 11, 2000.

C.A.10 (Colo.),2000.
Moore v. Cooksey
242 F.3d 389, 2000 WL 1838274 (C.A.10 (Colo.)), 2000 CJ C.A.R. 6715

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.)))**

NOTICE: THIS IS AN UNPUBLISHED OPIN-
ION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. See Federal Rule of Appel-
late Procedure 32.1 and this court's local Rule
32.1.1. for rules regarding the citation of unpub-
lished opinions.)

United States Court of Appeals, Second Circuit.
Robert H. SARVIS, Plaintiff-Appellant,
v.
UNITED STATES of America, Federal Bureau of
Prisons, Frederick Menifee and Page True, Defend-
ants-Appellees.

No. 99-0318.
Oct. 19, 2000.

Appeal from the United States District Court for the
District of Vermont, Murtha, J.
Robert H. Sarvis, Brattleboro, VT, pro se.

Carol L. Shea, Assistant United States Attorney,
Burlington, VT; Charles R. Tetzlaff, United States
Attorney for the District of Vermont; Paul J. van de
Graaf, Chief, Civil Division, on the brief, for ap-
pellees.

Present McLAUGHLIN, JACOBS, and STRAUB,
Circuit Judges.

*SUMMARY ORDER*

**\*1** UPON DUE CONSIDERATION, IT IS
HEREBY ORDERED, ADJUDGED AND DE-
CREED that the judgment of the district court be
AFFIRMED.

Robert H. Sarvis, pro se, sued the Federal Bur-
eau of Prisons (BOP) and two prison wardens in the
United States District Court for the District of Ver-

mont (Murtha, J.) for wrongs allegedly committed
while he was in federal prison. He now appeals the
district court's judgment, which (1) dismissed his
claims arising under the Rehabilitation Act, the
Americans with Disabilities Act ("ADA") and the
Federal Tort Claims Act ("FTCA"); and (2) granted
summary judgment on his constitutional claim of
retaliation against the exercise of First Amendment
rights. On appeal, Sarvis challenges essentially all
of the district court's dispositive rulings. We affirm.

BACKGROUND

In March 1995, Sarvis was sentenced to a
forty-six month term of incarceration and a five
year term of supervised release for bank fraud and
related crimes. *See United States v. Sarvis*, 205
F.3d 1326 (2d Cir.2000) (summary order). He
entered the Allenwood, Pennsylvania federal penit-
entiary in April 1995. While in custody there, Sar-
vis applied for admission to the Intensive Confine-
ment Center ("ICC"), a BOP facility in Lewisburg,
Pennsylvania. The ICC operates a rigorous, highly
structured six month program designed to promote
a prisoner's discipline and self-control. A prisoner
who successfully completes the program becomes
eligible to serve the remainder of his prison sen-
tence in a halfway house and, later, in home deten-
tion.

The Allenwood staff initially judged Sarvis to
be medically unfit to enter the ICC program. Sarvis
unsuccessfully challenged this decision in the
United States District Court for the Middle District
of Pennsylvania, but Allenwood's medical staff
nevertheless reversed position and cleared Sarvis
for ICC participation.

Sarvis alleges that after he arrived at the ICC in
August 1997, the ICC staff punished him for insti-
tuting litigation. Among many other, less serious
allegations, Sarvis charges that a guard "assaulted
and battered" him and "threatened to kill [him] or
have him killed." Sarvis did not complete the ICC
program; in March 1998, the ICC staff, citing dis-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.)))**

ciplinary problems, transferred him back to the Allenwood facility. He was released from prison in August 1998, and he began serving his term of supervised release in the District of Vermont.

Sarvis filed the instant action in 1999, seeking recovery on the following theories:

1. the BOP violated the Rehabilitation Act § 504 and the ADA by (i) denying him admission to the ICC on the basis of his medical conditions, (ii) retaliating against him while he was at Allenwood for filing the Middle District of Pennsylvania action, (iii) retaliating against him while he attended the ICC for the same reason;

2. the BOP violated his First Amendment rights by retaliating against him for filing various administrative complaints;

3. a prison guard, "as an agent of the BOP," battered and assaulted him; and

**\*2** 4. the BOP negligently supervised employees at both (i) Allenwood and (ii) the ICC, thereby allowing retaliation to occur.

The district court construed the battery, assault and negligent supervision claims as arising under the FTCA, and granted the United States' motion to be substituted as the sole defendant on those claims. *See* 28 U.S.C. § 2679(d)(1).

After defendants served dispositive motions, Sarvis moved to amend his complaint "to add allegations of negligent supervision and assault and battery in the event the court finds he failed to properly plead them in" the complaint. He also asked the court to "grant him ten days to so amend." Judge Murtha stamped Sarvis's motion "granted" on October 7, 1999 and noted that the court would "so construe the complaint"; however, the court did not indicate whether it would allow Sarvis to submit an amended pleading. Sarvis had not submitted any amendment when, five days later, Judge Murtha dismissed the Rehabilitation Act, ADA and FTCA claims, and granted summary judgment on the con-

stitutional claim.

DISCUSSION

Sarvis argues that the district court erred by (1) dismissing his ADA and Rehabilitation Act claims, (2) granting summary judgment on his constitutional claim of retaliation, and (3) denying him the opportunity to submit an amended pleading regarding his claims of battery, assault and negligent supervision.

A. The ADA and Rehabilitation Act Claims

The district court properly dismissed Sarvis's claims of discrimination against the BOP under the ADA and the Rehabilitation Act. Sarvis's ADA claim arises under Title II of that law, which proscribes discrimination against the disabled by "a public entity." 42 U.S.C. § 12132. The statute defines "public entity" to mean, in relevant part, "any State or local government" or "any department, agency, special purpose district, or other instrumentality of a State or States or local government." *Id.* § 12131(1). Based on this definition, we have held that "Title II of the ADA is not applicable to the federal government." *Cellular Phone Taskforce v. FCC,* 217 F.3d 72, 73 (2d Cir.2000) (per curiam). Sarvis therefore cannot proceed against the BOP under the ADA.

Sarvis's Rehabilitation Act claim is based on § 504(a) of that statute, which prohibits discrimination on the basis of disability "under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). Sarvis's claim was properly dismissed because Congress has not waived the Federal Government's sovereign immunity against awards of money damages for § 504(a) violations, except where a federal agency is acting as a ' 'Federal provider' of financial assistance. " *See* Lane v. Pena, 518 U.S. 187, 193 (1996) (quoting Rehabilitation Act § 505(a)(2), 29 U.S.C. § 794a(a)(2) (emphasis added)). The waiver is limited to "the funding activities of those providers," and does not reach " 'any act' of an agency that serves as a 'Federal provider' in any context ." *Id.* at 195 (quoting Rehabilitation Act § 505(a)(2)). The BOP

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.)))**

was not acting as "Federal provider" in this sense during the course of events described in Sarvis's complaint.

B. The Constitutional Claim

**\*3** Sarvis based his constitutional claim on the principle that retaliation "against a prisoner for pursuing a grievance violates the right to petition the government for the redress of grievances guaranteed by the" First Amendment. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *see also Davidson v. Chestnut,* 193 F.3d 144, 145-46. (2d Cir.1999) (per curiam). According to Sarvis, agents of the BOP were angered by his filing of the Middle District of Pennsylvania action and numerous administrative complaints. They allegedly retaliated against him by (1) imposing unjustified disciplinary sanctions, and (2) refusing to allow him to serve his term of supervised release in the District of Maine.

A defendant is entitled to summary judgment on such a claim "if the undisputed facts demonstrate that the challenged action[s] clearly would have been taken on a valid basis alone." *Davidson,* 193 F.3d at 149. A "finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration," for two reasons. *Graham,* 89 F.3d at 79. First, "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Id.* Second, "we have been cautioned to recognize that prison officials have broad administrative authority." *Id.; see also Davidson,* 193 F.3d at 149.

Under these standards, we affirm the district court's grant of summary judgment. Defendants produced evidence that Sarvis committed numerous violations of prison rules. These violations were sufficient to justify his removal from the ICC as well as the other disciplinary sanctions imposed on him. Defendants also showed that Sarvis was denied leave to serve his term of supervised release in the District of Maine because, among other reasons, he lied to officers in the District of Maine's

probation office and entered into an agreement with a resident of Portland, Maine to deceive the office into thinking that he had a job offer. On this uncontroverted evidence, a reasonable jury would have to find that valid reasons alone supported the actions that Sarvis challenges as retaliatory.

C. The FTCA Claims

We agree with the district court that Sarvis did not administratively exhaust his FTCA claims of battery, assault and negligent supervision prior to commencing this suit.[FN1] Accordingly, the district court did not err in refusing to allow him to amend those claims. *See Pangburn v. Culbertson,* 200 F.3d 65, 70-71 (2d Cir.1999) ("[F]utility is a valid reason for denying a motion to amend ... where it is beyond doubt that the plaintiff can prove no set of facts in support of his amended claims.") (internal quotation marks and citations omitted).

FN1. We assume for purposes of this order only that Sarvis's tort claims are not barred by the FTCA's "intentional tort" exception, codified at 28 U.S.C. § 2680(h), which provides that the FTCA's waiver of sovereign immunity does not extend to "[a]ny claim arising out of," inter alia, battery and assault. *Id.* The exception, however, is itself subject to a proviso, which states that sovereign immunity is waived nevertheless if the battery or assault is committed by an "investigative or law enforcement officer[ ] of the United States Government." *Id.*

The statute defines "investigative or law enforcement officer" to mean "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." Because an "officer or employee of the Bureau of Prisons may make arrests," 18 U.S.C. § 3050, defendants in this action are at least arguably subject to the proviso. *See Torres v. Taylor,* 456 F.Supp. 951, 954 & nn. 19, 20 (S.D.N.Y.1978) (Weinfeld,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.)))**

J.).

The FTCA "provides that an 'action shall not be instituted upon a claim against the United States for money damages' unless the claimant has first exhausted his administrative remedies." *McNeil v. United States,* 508 U.S. 106, 107 (1993) (quoting 28 U .S.C. § 2675(a)). The administrative claim "must provide enough information to permit the agency [1] to conduct an investigation and [2] to investigate the claim's worth." *Romulus v. United States,* 160 F.3d 131, 132 (1998) (per curiam). If a claim has not been properly presented to an administrative agency, a federal district court must dismiss it for lack of subject matter jurisdiction. *See id.*

**\*4** Sarvis filed administrative claims pursuant to the FTCA in February and March 1998. The only allegation in the February 1998 filing that relates even remotely to his claims of battery, assault and negligent supervision is a charge that he suffered "acts of retaliation" by BOP employees. This allegation is insufficiently specific to meet the presentment requirement. *See Romulus,* 160 F.3d at 132 (An administrative claim must be "specific enough ... to enable the federal government to expedite the fair settlement of tort claims.") (citing *Johnson v. United States,* 788 F.2d 845, 848-49 (2d Cir.1986)).

Sarvis's March 1998 filing was more detailed. He accused one staff member of threatening his life on four different occasions. He also charged that a supervisory staff member made unspecified threats and called Sarvis disparaging names.

While specific, these charges do not present claims of battery, assault or negligent supervision. Under Pennsylvania law, which governs Sarvis's tort claims under the FTCA, *see Makarova v. United States,* 201 F.3d 110, 114 (2d Cir.2000); 28 U.S.C. § 1346(b)(1), battery requires "a harmful or offensive *contact.* " *Dalrymple v. Brown* 701 A.2d 164, 170 (Pa.1997) (emphasis added). Sarvis's administrative claim nowhere alleges this element.

The tort of assault "may be described as an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery." *Cucinotti v. Ortmann,* 159 A.2d 216, 217 (Pa.1960) ; *accord Pino v. Wyeth-Ayerst/AHPC,* 1995 WL 708551, at \*4 (E.D.Pa. Nov. 29, 1995). Sarvis argues that his assault claim is administratively exhausted because he duly alleged that ICC staff members threatened his life at various times. We disagree. In Pennsylvania, " *[w]ords in themselves, no matter how threatening, do not constitute an assault;* the [defendant] must be in a position to carry out the threat immediately, and *he must take some affirmative action to do so.* " *Cucinotti,* 159 A.2d at 217 (emphasis added); *accord Pino,* 1995 WL 708551, at \*4; *see also Kahle v. Glosser Bros.,* 462 F.2d 815, 817 n. 4 (3d Cir.1972) ("It is ... settled in Pennsylvania that words or threats alone are insufficient to put a person in reasonable apprehension of physical injury or offensive touching."). Because Sarvis's administrative complaint does not describe an assault, the district court lacked subject matter jurisdiction to consider that claim.

Finally, because Sarvis did not present claims of battery or assault, he necessarily failed to exhaust a claim that BOP supervisors negligently failed to prevent such intentional harms. *See Mullen v. Topper's Salon and Health Spa,* 99 F.Supp.2d 553, 556 (E.D.Pa.2000) (Negligent supervision claim requires a failure by an employer "to exercise ordinary care to prevent an *intentional harm* to a third-party.") (emphasis added) (citing *Dempsey v. Walso Bureau,* 246 A.2d 418, 419-22 (Pa.1968); Restatement (Second) of Torts § 317 (1965)).

**\*5** Because the battery, assault and negligent supervision claims are unexhausted, any amendment to Sarvis's district court complaint concerning these claims would have been futile. *See Pangburn,* 200 F.3d at 70-71. The district court therefore properly declined to consider such an amendment.

For the reasons set forth above, the judgment of the district court is hereby AFFIRMED.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.))
**(Table, Text in WESTLAW), Unpublished Disposition**
**(Cite as: 234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.)))**

C.A.2 (N.Y.),2000.
Sarvis v. U.S.
234 F.3d 1262, 2000 WL 1568230 (C.A.2 (Vt.))

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2015 WL 1439871 (E.D.N.Y.)
**(Cite as: 2015 WL 1439871 (E.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Dee FARMER, pro se, Plaintiff,
v.
FEDERAL BUREAU OF PRISONS, et. al, Defendants.

No. 13–CV–1255 (DLI)(CLP).
Signed March 27, 2015.

Dee Farmer, Glenville, WV, pro se.

Kevan Cleary, Kelly Horan Florio, United States Attorney's Office, Brooklyn, NY, for Defendants.

### MEMORANDUM AND ORDER

DORA L. IRIZARRY, District Judge.

**\*1** *Pro se* plaintiff Dee Farmer ("Plaintiff"), a former inmate at the Metropolitan Detention Center in Brooklyn, New York ("MDC"), who currently is incarcerated at the Federal Correction Institute in Gilmer, West Virginia ("FCI Gilmer"), seeks to reopen this previously settled action alleging claims against the Federal Bureau of Prisons ("BOP"), the MDC Warden, the FCI Gilmer Warden, the BOP Regional Director for the Northeast Region ("Regional Director"), and the BOP National Appeals Director ("National Appeals Director") (collectively, "Defendants"), pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) ( *"Bivens"* ) and the Americans with Disabilities Act ("ADA"). ( *See generally* Renewed Complaint ("Renewed Compl."), Docket Entry No. 36.) Plaintiff alleges that Defendants discriminated against him on the basis of his disabilities by failing to provide him with appropriate accommodations to permit him to access certain resources available to non-disabled inmates. He also seeks a preliminary injunction against Defendants and appointment of counsel to assist him in the matter. (*See* Proposed Motion for Counsel, Docket Entry No. 37; Motion for Preliminary Injunction, Docket Entry No. 40.)

On August 5, 2014, Defendants moved to dismiss Plaintiff's Renewed Complaint pursuant to Federal Rule of Civil Procedure 12 for lack of subject matter jurisdiction and failure to state a claim and partial motion to dismiss for improper venue or transfer. For the reasons set forth below, Defendants' motion to dismiss is granted, as is the motion to transfer. Plaintiff's motion for a preliminary injunction against the MDC and its staff is denied. Ruling on Plaintiff's motion for the appointment of counsel and for injunctive relief against the BOP and the FCI Gilmore Warden are deferred to the transferee court, the United States District Court for the Northern District of West Virginia.

### BACKGROUND

Plaintiff arrived as an inmate at MDC on June 19, 2012. (*See* August 15, 2014 Declaration of Kenneth Bork ("Bork Dec."), Docket Entry No. 45–1, ¶ 5.) With the exception of a three-day period in November 2012, Plaintiff remained an inmate at MDC until March 11, 2014. (*Id.* ¶ 6.) Prior to his incarceration, Plaintiff resided in Baltimore, Maryland. (*Id.* ¶ 4.) Plaintiff suffers from various medical ailments, including a visual impairment that he asserts impacts his ability to function independently in prison. (*See* Affidavit of Dee Farmer ("Farmer Aff."), Docket Entry No. 35, ¶ 5; *see also* May 29, 2013 letter from Dee Farmer to the Honorable Dora L. Irizarry ("May 29 Letter"), Docket Entry No. 16, at 1.)

On January 8, 2013, Plaintiff filed his initial complaint in the instant action, alleging disability discrimination claims under the ADA against the BOP and MDC Warden Frank Strada. (*See generally* Complaint ("Compl."), Docket Entry No. 2.) In that complaint, Plaintiff alleged that the defendants failed to provide him with reasonable accommodations to enable him to access certain programs and services available to inmates without visual impair-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1439871 (E.D.N.Y.)
**(Cite as: 2015 WL 1439871 (E.D.N.Y.))**

ments. (*See id.* at 3; *see also* May 29 Letter (noting Plaintiff's reliance on other inmates to access BOP programs).) Plaintiff also alleged that he could not exhaust his administrative remedies prior to filing his initial complaint, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), because he did not have access to the required forms or the necessary assistance. (*See* Compl. at 4.)

**\*2** On three occasions in 2013, the parties appeared before the Honorable Cheryl Pollack, United States Magistrate Judge, to determine whether this action could be resolved without further litigation. ( *See* Docket Entry Nos. 28, 30, and 32.) As a result of these conferences, the parties agreed that the MDC staff would assist Plaintiff in completing any necessary administrative remedy request forms in order to help Plaintiff pursue his administrative remedies with respect to the alleged conditions at the MDC that formed the basis of his claims. (*See* Pl. Aff. ¶¶ 8, 10.) Subsequently, Plaintiff submitted administrative remedy requests to the MDC seeking certain accommodations designed to grant him access to various MDC programs and activities, including legal assistance programs. (*See* Dee Farmer's Administrative Remedy Request, Docket Entry No. 35, Exhibit B, at 4–34.) At the November 21, 2013 conference, Plaintiff acknowledged that the MDC had provided him with appropriate accommodations. (*See* Minute Entry for Telephone Conference Proceeding, Docket Entry No. 32.) Consequently, he agreed to dismiss his claims without prejudice. (*See id.*) On November 25, 2013, the parties filed a Stipulation of Dismissal to dismiss the initial complaint without prejudice, which the Court "So Ordered" on November 26, 2013. (*See* Stipulation of Dismissal, Docket Entry No. 33; November 26, 2013 Electronic Order Dismissing and Closing Case.) On March 11, 2014, Plaintiff was transferred out of the MDC, and arrived at his current place of incarceration, FCI Gilmer, in Glenville, West Virginia, on March 24, 2014. (*See* Bork Dec. at ¶ 8.)

On June 12, 2014, Plaintiff filed a motion to re-open this action by affidavit and a Renewed Complaint, alleging claims under the ADA, *Bivens,* and the U.S. Constitution against Defendants. (*See generally* Renewed Compl.; Farmer Aff.) Plaintiff alleges that: (1) MDC staff were not "reasonably available" to assist him during his incarceration at MDC; (2) he informed the MDC Warden, the Regional Director, and the National Appeals Director of this issue; and (3) he is currently unable to access certain programs and lacks assistance in performing daily living activities at FCI Gilmer. (*See* Farmer Aff. ¶ 12; Renewed Compl. ¶¶ 4–5, 13–15.) Also on June 12, 2014, Plaintiff filed a "Proposed Motion for Counsel." (*See* Docket Entry No. 37.) Plaintiff's Renewed Complaint seeks injunctive relief and monetary damages. On July 7, 2014, Plaintiff separately filed a motion for a preliminary injunction regarding the same allegation that the BOP has failed to accommodate his disabilities while at FCI Gilmer. (*See* Motion for Preliminary Injunction, at 5–6.)

## DISCUSSION
## I. Legal Standards for Dismissal

### a. Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). In resolving a motion to dismiss for lack of subject matter jurisdiction, the Court may consider affidavits and other materials beyond the pleadings to resolve jurisdictional questions. *See Morrison v. Nat'l Australia Bank, Ltd.,* 547 F.3d 167, 170 (2d Cir.2008). The Court must accept as true the factual allegations contained in the complaint, but it will not draw argumentative inferences in favor of plaintiff because subject matter jurisdiction must be shown affirmatively. *See id.; Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). "A plaintiff asserting subject matter jurisdiction has the burden of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1439871 (E.D.N.Y.)
**(Cite as: 2015 WL 1439871 (E.D.N.Y.))**

proving by a preponderance of the evidence that it exists." *Makarova,* 201 F.3d at 113.

**b. Rule 12(b)(6)**

**\*3** Under Rule 8(a) of the Federal Rules of Civil Procedure, pleadings must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Pleadings are to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), overruled in part on other grounds by *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an un-adorned, the-defendant-unlawfully-harmed-me ac-cusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555).

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move, in lieu of an answer, for dismissal of a complaint for "failure to state a claim upon which relief can be granted." To resolve such a motion, courts "must accept as true all [factual] allegations contained in a com-plaint," but need not accept "legal conclusions." *Iqbal,* 556 U.S. at 678. For this reason, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to insulate a claim against dismissal. *Id.* "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly,* 550 U.S. at 570). Notably, courts may only consider the complaint itself, documents that are attached to or referenced in the complaint, docu-ments that the plaintiff relied on in bringing suit

and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, and matters of which judicial notice may be taken. *See, e.g., Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007).

In reviewing the complaint, the Court is mind-ful that, "[a] document filed *pro se* is to be liberally construed and a *pro se* [pleading], however inart-fully pleaded, must be held to less stringent stand-ards than formal pleadings drafted by lawyers." *Er-ickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). Accordingly, the Court interprets the complaint "to raise the strongest argu-ments that [it] suggest[s]." *Triestman v. Fed. Bur-eau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (emphasis omitted).

Here, the government argues that Defendants are entitled to dismissal pursuant to Federal Rule of Civil Procedure 12 with respect to all of Plaintiff's claims for the following reasons: (1) the Court lacks subject matter jurisdiction to consider Plaintiff's claims under *Bivens* and the ADA; (2) even if the Court could liberally construe Plaintiff's Renewed Complaint as alleging claims seeking in-junctive relief under Section 504 of the Rehabilita-tion Act of 1973, 29 U.S.C. § 794 ("Section 504"), his claims against the MDC are moot; and (3) with regard to Plaintiff's remaining claims about his con-finement at FCI Gilmer, this Court should dismiss those claims pursuant to Federal Rule of Civil Pro-cedure 12(b)(3) for improper venue or transfer them to the proper district court.

**II. Plaintiff's *Bivens* Claims Against the Indi-vidual Defendants are Barred by Sovereign Im-munity**

**\*4** In *Bivens,* the Supreme Court set forth a federal counterpart to the remedy against state offi-cials created by 42 U.S.C. § 1983. *See Bivens,* 403 U.S. at 389; *Hartman v. Moore,* 547 U.S. 250, 254 n. 2, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) ("[A] *Bivens* action is the federal analog to suits brought against state officials [under § 1983].") . "A plaintiff bringing a claim under *Bivens* must allege that he

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1439871 (E.D.N.Y.)
**(Cite as: 2015 WL 1439871 (E.D.N.Y.))**

has been deprived of a constitutional right by a federal agent acting under color of federal authority," and that the individual defendant was personally involved in the constitutional violation. *Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir.2006) (footnote omitted).

In the instant case, Plaintiff's asserts *Bivens*-type claims against the Wardens of the MDC and FCI Gilmer, the Northeast Regional Director, and the National Appeals Director identifying them solely by their official job titles. (*See generally* Renewed Compl. at 1.) Moreover, Plaintiff's allegations concerning these individuals relate solely to their official roles and to actions they could have taken in their official capacities. (*Id.*) Even with a liberal construction of Plaintiff's complaint, Plaintiff has sued these individuals only in their official capacities, and not in their individual capacities.

As the government accurately notes, "Claims of violations under *Bivens,* against federal employees in their official capacities, however, must be dismissed because sovereign immunity protects them from such suits." (Gov. Mot. at 8.) "It is well-settled that any lawsuit against an agent or employee of the United States in his/her official capacity is an action against the sovereign itself." *Perez v. Hawk,* 302 F.Supp.2d 9, 18 (E.D.N.Y.2004) (citing *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). Moreover, the United States and its agencies have sovereign immunity from suit and only can be sued with their consent and under the terms Congress may impose. *See United States v. Sherwood,* 312 U.S. 584, 61 (1941); *Adeleke v. United States,* 355 F.3d 144, 150 (2d Cir.2004). Without a waiver of sovereign immunity, a district court lacks subject matter jurisdiction to hear such a claim. *See Liranzo v. U.S.,* 690 F.3d 78, 84 (2d Cir.2012) ("The United States, as sovereign, is immune from suit save as it consents to be sued ..., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."). " '[T]he United States

simply has not rendered itself liable ... for constitutional tort claims' for money damages." *F.D.I.C. v. Meyer,* 510 U.S. 471, 478, 114 S.Ct. 996, 127 L.Ed.2d 308, (1994). Accordingly, *Bivens* actions cannot be maintained against the United States, federal agencies, or federal employees sued in their official capacities. *See, e.g., Meyer,* 510 U.S. at 484–86; *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994) (noting that *Bivens* claims "must be brought against the federal officers involved in their individual capacities").

**\*5** Thus, where a *Bivens* action is filed against the United States, its agencies, or its employees in their official capacities, the court lacks jurisdiction to hear the claim and the action must be dismissed. *See Jordan v. Federal Bureau of Prisons,* 2013 WL 1143617, at \*4 (S.D.N.Y. Mar.19, 2013) (dismissing claims against BOP, a federal prison and prison officer under FRCP 12(b)(1) because sovereign immunity had not been waived and, therefore, the court lacked subject matter jurisdiction). Here, because Plaintiff asserts his *Bivens*-type claims against the MDC and FCI Gilmer Wardens, the BOP Northeast Regional Director, and the National Appeals Director solely in their official capacities, and based on actions that they only could have taken in their official capacities, this Court lacks subject matter jurisdiction over Plaintiff's claims, and, therefore, those claims are dismissed.

### III. The Court Lacks Subject Matter Jurisdiction Over Plaintiff's ADA Claims

Plaintiff also asserts that the staff at both the MDC and FCI Gilmer discriminated against him on the basis of his alleged disability in violation of the ADA by failing to provide him with reasonable accommodations to permit him to access programs and services available to non-disabled inmates at those facilities. (*See* Farmer. Aff. ¶¶ 4, 12, 13.) The government argues that these claims fail, because this Court lacks subject matter jurisdiction over claims brought pursuant to the ADA and against federal agencies or officials. (*See* Gov. Mem. at 9.) The Court agrees.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1439871 (E.D.N.Y.)
**(Cite as: 2015 WL 1439871 (E.D.N.Y.))**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. However, the term "public entity" in the ADA applies only to state and local government agencies, not to federal agencies. *See* 42 U.S.C. § 12131(1); *see also Cellular Phone Taskforce v. FCC,* 217 F.3d 42, 73 (2d Cir.2000) ("Title II of the ADA is not applicable to the federal government"); *Sarvis v. United States,* 2000 WL 1568230, *2 (2d Cir. Oct.19, 2000)* (dismissing inmate's ADA claims against BOP because BOP did not qualify as a "public entity" as defined by the ADA). Accordingly, this Court lacks subject matter jurisdiction over Plaintiff's ADA claims, and, therefore, these claims are dismissed.

**IV. Plaintiff's Rehabilitation Act Claims**

Section 504 of the Rehabilitation Act of 1973 provides, in relevant part: "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794. Unlike the ADA, Section 504 provides for relief against the federal government relating to claims of disability discrimination. *See id.* In liberally construing Plaintiff's complaint to raise the strongest arguments it suggests, the Court will consider Plaintiff to argue that the MDC and FCI Gilmer have denied him access to certain programs and services available to non-disabled inmates in violation of Section 504.

**\*6** Section 504 claims cannot be brought solely against individual defendants, even when named in their official capacities. *See B.D .S. v. Southold Union Free Sch. Dist.,* 2009 WL 1875942, at *21 (E.D.N.Y. June 24, 2009). In liberally construing

Plaintiff's complaint, the Court will consider that Plaintiff, in naming the individual defendants in their official capacity, intended to assert a claim against the entities for which they work. *See Henrietta D. v. Bloomberg,* 331 F.3d 261, 288 (2d Cir.2003) ("The real party in interest in an official-capacity suit is the government entity."). Even if Plaintiff's claims could be construed as potentially actionable under Section 504, he cannot seek monetary damages, as he does here, because the federal government has not waived sovereign immunity with respect to claims for monetary relief under Section 504. *See Lane v. Pena,* 518 U.S. 187, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) (holding that Congress has not waived sovereign immunity under Section 504 for awards of monetary damages against the federal government).[FN1] To the extent Plaintiff seeks monetary damages under Section 504, these claims are dismissed. Even if the Court construes Plaintiff's claims to be made pursuant to the Rehabilitation Act, he may seek only injunctive relief.

> FN1. The government aptly noted that "monetary damages may be available in the limited instances where the claims are related to the funding activities of federal providers." (Gov. Mem. at 11 n. 5 .); *see also Sarvis,* 2000 WL 1568230 at *2 ("Congress has not waived the Federal Government's sovereign immunity against awards of money damages for § 504(a) violations, except where a federal agency is acting as a 'Federal provider' of financial assistance.") (citing *Lane v. Pena,* 518 U.S. 187, 193, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). The Court finds that Plaintiff has not alleged that the MDC and FCI Gilmer were acting in the capacity of federal funding providers with respect to the terms of his incarceration and, as such, his claim for monetary damages on this ground is dismissed. *See, e.g., Sarvis,* 2000 WL 1568230 at *2 (dismissing inmate plaintiff's Section 504 claims seeking mon-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1439871 (E.D.N.Y.)
**(Cite as: 2015 WL 1439871 (E.D.N.Y.))**

etary damages where he was denied entry into a prison program because federal prison was not acting as a federal provider of financial assistance).

Assuming that Plaintiff is asserting a claim for injunctive relief under the Rehabilitation Act, the government contends that such a claim related to Plaintiff's incarceration at the MDC is moot. (*See* Gov. Mem. at 11–12.) Where a plaintiff lacks a legally cognizable interest in the outcome of an action, the case is moot and the Court lacks subject matter jurisdiction under Article III of the Constitution. *See* U.S. CONST. art. III, § 2, cl. 1; *Fox v. Board of Trustees of the State Univ. of New York,* 42 F.3d 135, 141 (2d Cir.1994) ("When a case becomes moot, federal courts lack subject matter jurisdiction over the action.") (internal quotation omitted). Indeed, this Court may not "decide a case on the merits before resolving whether the court has Article III jurisdiction." *United States v. Miller,* 263 F.3d 1, 4 n. 2 (2d Cir.2001).

The government contends that "Plaintiff's claims for injunctive relief concerning his access to programs and services at MDC are moot because he [was] transferred out of MDC on March 11, 2014." (Gov. Mem. at 12.) The Court agrees. Because Plaintiff is no longer an inmate at MDC, he cannot benefit from any injunctive relief regarding the MDC, and thus, no longer has a legally cognizable interest in the outcome of his claims regarding programs and services at the MDC. *See Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) ( "It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."); *see also Abernathy v. Strada,* 2013 U.S. Dist. LEXIS 60891, *3–4 (E.D.N.Y. April 29, 2013) (finding inmate plaintiff's claims for injunctive relief to be moot because he was transferred out of MDC and no longer under the supervision of the named defendant). Accordingly, Plaintiff's claims for injunctive relief concerning his access to programs and services at the MDC are dismissed as moot.

**V. Plaintiff's Remaining Claims are Transferred to the Northern District of Virginia**

**a. Venue in the Eastern District of New York is Improper**

**\*7** The only claims remaining after the above-stated dismissals are Plaintiff's claims against the BOP and the FCI Gilmer Warden for injunctive relief under the Rehabilitation Act related to Plaintiff's access to programs and resources at FCI Gilmer.[FN2] The government contends that the Court, pursuant to Federal Rule of Civil Procedure 12(b)(3), "should dismiss these claims or, in the alternative, transfer them to the Northern District of West Virginia ." (*See* Gov. Mem. at 13.) The Court finds that transfer of Plaintiff's remaining claims, rather than dismissal, is appropriate.

> FN2. As noted, Plaintiff only asserted claims under *Bivens* and the ADA, but the Court, in liberally construing his claims, considered him to be making claims under Section 504. Furthermore, Plaintiff's Renewed Complaint and affidavit allege that he pursued administrative remedies only relating to his claims about his incarceration at the MDC. (*See generally* Renewed Compl.; Pl. Aff.) In detailing his pursuit of administrative remedies while at the MDC, Plaintiff asserts his only allegations against the BOP Northeast Regional Director and National Appeals Director, which relate to their involvement in that administrative remedy process. (*See* Farmer Aff. ¶ 9.) Accordingly, these two defendants have no relation to Plaintiff's remaining claims about his incarceration at FCI Gilmer.

"Plaintiff bears the burden of establishing that venue is properly laid in the district in which the complaint was filed." *Universal Marine Medical Supply, Inc. v. Lovecchio,* 8 F.Supp.2d 214, 219 (E.D.N.Y.1998). "Plaintiff must establish venue for each cause of action asserted." *See Pardy v. Gray,* 2007 WL 1825200, at *3 (E.D.N.Y. Jun.21, 2007))

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Slip Copy, 2015 WL 1439871 (E.D.N.Y.)
**(Cite as: 2015 WL 1439871 (E.D.N.Y.))**

(holding that Eastern District of New York was not proper venue for plaintiff's claims and transferring case). When reviewing motions under Federal Rule of Civil Procedure 12(b)(3), courts must accept as true the allegations in the complaint, and construe all reasonable inferences in plaintiff's favor. *Spriggs v. Brownlee,* 2006 WL 1304861, at *9 (N.D.N.Y. May 9, 2006). "However, in defending against such a motion, plaintiff bears the burden of proving that venue is proper." *See id.* (citation omitted). A court may also consider materials outside the pleadings. *See Spriggs,* 2006 WL 1304861 at *9. Should plaintiff fail to satisfy his burden to show proper venue is this district, the court retains discretion whether to dismiss the case or to transfer the case to any district where the case could initially have been brought. *See Minnette v. Time Warner,* 997 F.2d 1023, 1026 (2d Cir.1996). The government contends that Plaintiff has failed to meet the requirements of 28 U.S.C. § 1391, which governs venue in civil actions. The Court agrees.

Pursuant to 28 U.S.C. § 1391, an action may be brought in: "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *See* 28 U.S.C. § 1391(b). Where, as here, a named defendant is a federal employee acting in his official capacity, the venue statute provides that venue is proper where: "[1] a defendant in the action resides, [2] a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or [3] the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e).

**\*8** Applying these standards to the instant case,

the Court concludes that venue is not proper in the Eastern District of New York. First, "[t]he residence of a public official sued in his official capacity is his official residence; that is, the place where his office is maintained." *Federal Aviation Administration,* 369 F.Supp. 741, 746 (E.D.N.Y.1976). Accordingly, the remaining individual defendant, the FCI Gilmer Warden, does not reside in this district, but rather resides in the Northern District of West Virginia. (*See* Gov. Mem. at 14 n. 7 (noting that "the FCI Gilmer Warden maintains his official office at FCI Gilmer in the Northern District of West Virginia")). Moreover, none of the events related to Plaintiff's access to programs and activities at FCI Gilmer occurred in the Eastern District of New York. (*See generally* Renewed Compl.; Farmer Aff.) Lastly, Plaintiff himself does not reside in this district; he actually resides at his pre-incarceration address in Baltimore, Maryland for the purpose of a venue analysis. *See Billiteri v. United States Board of Parole,* 541 F.2d 938, 946 (2d Cir.1976) (finding venue proper based on inmate's pre-incarceration residence); *see also McCune v. United States,* 374 F.Supp. 946, 948 (S.D.N.Y.1974) (dismissing inmate's claim for lack of venue because, *inter alia,* his pre-incarceration address was outside the Southern District of New York). The government notes that, "[a]lthough plaintiff's residence in Maryland may establish venue there for the purpose of his claims against the FCI Gilmer Warden under 28 U.S.C. § 1391(e), it would not be relevant to establish venue for his claims against BOP." (Gov. Mem. at 16 n10.) Consequently, the Court finds that the Northern District of West Virginia is the only proper venue for all of Plaintiff's claims relating to his incarceration at FCI Gilmer.

**b. Transfer to the Northern District of West Virginia is Appropriate**

A district court may transfer a civil action to any other district where the action might have been brought, "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). When making a motion to transfer venue, "[t]he party requesting transfer carries the 'burden

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1439871 (E.D.N.Y.)
**(Cite as: 2015 WL 1439871 (E.D.N.Y.))**

of making out a strong case for transfer.' " *Audi-ovox Corp. v. S. China Enter., Inc.,* 2012 WL 3061518, at *7 (E.D.N.Y. July 26, 2012) (quoting *N .Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.,* 599 F.3d 102, 114 (2d Cir.2010)). At the same time, "motions for transfer lie within the broad discretion of the district court and are determined upon notions of convenience and fairness on a case-by-case basis." *In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 117 (2d Cir.1992) (citing *Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)).

To determine whether a motion to transfer venue should be granted, the Court must apply a two-pronged test: "(A) whether the action could have been brought in the proposed forum; and (B) whether the transfer would 'promote the convenience of parties and witnesses and would be in the interests of justice.' " *EasyWeb Innovations, LLC v. Facebook, Inc.,* 888 F.Supp.2d 342, 348 (E.D.N.Y.2012) (quoting *Clarendon Nat'l Ins. Co. v. Pascual,* 2000 WL 270862, at *2 (S.D.N.Y. Mar.13, 2000)). In this case, both prongs of the requisite two-part inquiry weigh in favor of transfer.

**\*9** With regard to the first prong, based on the analysis above, Plaintiff could have brought the remaining claims regarding his confinement at FCI Gilmer in the Northern District of West Virginia. Therefore, the outstanding inquiry here is whether the convenience of the parties and witnesses, and the interests of justice support the transfer. This second, case-specific analysis generally involves the consideration of the following non-exhaustive list of factors, none of which is dispositive: (1) the convenience of the witnesses, (2) the convenience of the parties, (3) the location of relevant documents and the relative ease of access to sources of proof, (4) the locus of operative facts, (5) the availability of process to compel the attendance of unwilling witnesses, (6) the relative means of the parties, (7) the forum's familiarity with the governing law, (8) the weight accorded the plaintiff's choice of forum, and (9) trial efficiency and the in-

terest of justice, based on the totality of the circumstances. *See Fuji Photo Film Co. v. Lexar Media, Inc.,* 415 F.Supp.2d 370, 373 (S.D.N.Y.2006).

The government argues that, "consideration of each of these factors dictates that the Court should transfer to the Northern District of West Virginia." (Gov. Mem. at 17.) The Court concurs. The government persuasively argues that, "because the alleged events occurred in the Northern District of West Virginia, it is likely that all relevant witnesses and documents would be located there as well." (*Id.*) Moreover, "given the economic constraints on both plaintiff and defendants in this action, adjudicating this case in the district where the witnesses, parties, and documents are located is in the interests of justice and judicial economy both in terms of conducting discovery and eliminating unnecessary travel and expense on the part of the parties, counsel, and other potential witnesses." (*Id.*) While Plaintiff expressed a general preference for maintaining this case in this district, he failed to provide any substantive argument in contesting the government's request. (*See* Plaintiff's Opposition to Defendant's Motion to Dismiss, Docket Entry 47, at 4.)

After weighing the factors set forth above, the Court finds that transfer is warranted. Plaintiff has failed to show that these claims have any fundamental connection to the Eastern District of New York. By contrast, most of the venue factors set forth above support transfer to the Northern District of West Virginia. Accordingly, Plaintiff's remaining Rehabilitation Act claims against the BOP and the FCI Gilmer Warden and motion for the appointment of counsel are hereby transferred to the United States District Court for the Northern District of West Virginia.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is granted to the extent that the following claims are dismissed in their entirety: (1) ADA; (2) for monetary relief under the Rehabilitation Act; and (3) regarding Plaintiff's confinement at MDC.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 1439871 (E.D.N.Y.)                                    Page 9
**(Cite as: 2015 WL 1439871 (E.D.N.Y.))**

Defendant's motion to transfer Plaintiff's remaining
claims for injunctive relief regarding his confine-
ment at FCI Gilmer to the United States District
Court for the Northern District of West Virginia is
granted. Plaintiff's motion for a preliminary injunc-
tion related to his MDC claims is denied. The Court
defers to the transferee court any ruling on
Plaintiff's motion for the appointment of counsel
and the remaining Restoration Act claims relating
to his confinement at FCI Gilmore. These claims
and Plaintiff's motion for the appointment of coun-
sel are hereby transferred to the United States Dis-
trict Court for the Northern District of West Virgin-
ia. The Court certifies pursuant to 28 U.S.C. §
1915(a)(3) that any appeal would not be taken in
good faith. Therefore, *in forma pauperis* status is
denied for the purpose of any appeal. *Coppedge v.
United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917,
8 L.Ed.2d 21 (1962).

     **\*10** SO ORDERED.

E.D.N.Y.,2015.
Farmer v. Federal Bureau of Prisons
Slip Copy, 2015 WL 1439871 (E.D.N.Y.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court, E.D. Texas, Texarkana
Division.
Benjamin Roark
v.
Regina Flanery, et al.

CIVIL ACTION NO. 5:12cv60
5:12–cv–00060Signed September 9, 2014

Benjamin A. Roark, Texarkana, TX, pro se.

Thomas Edward Gibson, U.S. Attorney's Office,
Tyler, TX, for Regina Flanery, et al.

MEMORANDUM ADOPTING REPORT AND
RECOMMENDATION OF THE UNITED
STATES MAGISTRATE JUDGE
MICHAEL H. SCHNEIDER, UNITED STATES
DISTRICT JUDGE
**\*1** The Plaintiff Benjamin Roark filed this law-
suit under *Bivens v. Six Unknown Named Agents of
the Federal Bureau of Narcotics,* 403 U.S. 388
(1971) complaining of alleged deprivations of his
rights during his confinement in the Federal Correc-
tional Institution at Texarkana. This Court ordered
that the case be referred to the United States Magis-
trate Judge pursuant to 28 U.S.C. § 636(b)(1) and
(3) and the Amended Order for the Adoption of
Local Rules for the Assignment of Duties to United
States Magistrate Judges. Plaintiff has named eight-
een Defendants in his currently active amended
complaint. They are: Regina Flanery, dental techni-
cian at the Federal Correctional Institution in Tex-
arkana; Dr. Liera Del Toro, a dentist at
FCI–Texarkana; Hiram Licon, Health Services Ad-
ministrator at FCI–Texarkana; Paul Kastner,
warden of FCI–Texarkana from 2006 to 2008; Dav-
id Justice, warden of FCI–Texarkana in 2007; Keith
Roy, warden of FCI–Texarkana in 2009; Michael
Carvajal, warden of FCI–Texarkana since 2011; G.
Maldonado, a regional grievance officer with the

Federal Bureau of Prisons; Dr. Michael Pappas, an
orthopedic physician; the United States Attorney
General; current Director of the Federal Bureau of
Prisons C.E. Samuels; former directors Harley Lap-
pin and Kathleen Hawk Sawyer; C–Unit manager
Rick Goodsell; associate warden Josh Ibarra; an
unidentified individual believed to be B.A. Rhoden;
secretary to regional director J.A. Keller; and Har-
rel Watts, national grievance coordinator.

Roark raises five basic claims in his complaint.
These are: (1) unreasonable delay in providing ne-
cessary dental care; (2) denial of medical care for
hand and arm disabilities; (3) denial of medical care
by failing to provide a long-term resident doctor to
provide an adequate health care system; (4) viola-
tions of the right to receive adequate medical care
through overcrowding and systemic understaffing
of health care professionals; and (5) failure to
provide necessary tools (tables) for disabled prison-
ers which are necessary for everyday life functions
as well as access to programs and services.

The Defendants were ordered to answer the
lawsuit and filed a motion for summary judgment,
to which Roark filed a response combined with a
counter-motion for summary judgment. The De-
fendants have filed a response to Roark's motion.
The Defendants' motion for summary judgment ar-
gues that: (1) the Court lacks personal jurisdiction
over the defendants Samuels, Watts, Lappin, and
Sawyer; (2) Dr. Del Toro has statutory immunity as
an employee of the Public Health Service; (3) the
statute of limitations has run on many of Roark's
claims; (4) Roark failed to exhaust administrative
remedies on some of his claims; (5) the Defendants
did not violate the Eighth Amendment and were not
deliberately indifferent to Roark's medical and
dental needs; (6) the overcrowding and understaff-
ing did not result in constitutional violations; (7)
Roark has not set out any valid claims of discrimin-
ation or due process violations under the Fifth
Amendment; (8) claims of *respondeat superior* are
not viable in Bivens cases; (9) the Rehabilitation

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

Act does not apply; (10) Roark has not set out a valid claim regarding his writing table and unit assignment; and (11) the Defendants are entitled to qualified immunity.

**\*2** After review of the pleadings, the Magistrate Judge issued a Report recommending that the Defendants' motion for summary judgment be granted. The Magistrate Judge determined that: the court lacked personal jurisdiction over Samuels, Watts, Lappin, and Sawyer; Dr. Del Toro has statutory immunity from suit; Roark's claims against Justice, Kastner, Sawyer, Flanery, and Del Toro are barred by the statute of limitations; and, Roark's claims that the prison failed to provide a long-term doctor or dentist and the laundry facilities are inadequate were not exhausted.

Turning to Roark's Eighth Amendment claims, the Magistrate Judge concluded that: Roark did not show deliberate indifference to a serious medical need because a dentist, Dr. Kemp, stated that Roark had no medical need for dentures, and Roark received other dental care and treatment while waiting his turn on the denture list. The Magistrate Judge also noted that an orthopedic specialist, Dr. Pappas, evaluated Roark's arm and concluded that tendon surgery would be unsuccessful and further intervention would be cosmetic and not likely to offer significant benefit, meaning that the failure to perform such surgery did not amount to deliberate indifference to a serious medical need.

Although Roark claimed that inadequate staffing of the medical department caused him to be on "dangerous chemical therapy" without a doctor to order "mandatory blood testing," the summary judgment evidence showed that over the period of time about which Roark complained, he had blood drawn on 15 occasions and sent to the lab for analysis, and the lab reports were reviewed by the clinical director Dr. Nash or the regional physician Dr. Russell. In addition, Roark was seen during this time by a nurse practitioner named Allen and thus was not denied access to medical care during the period complained of.

Roark also complained that the "Medical Review Committee" denied him thumb repair without due process, inasmuch as he was never given notice of the decision and thus had no opportunity to appeal. The summary judgment evidence showed that in 1996, a review committee denied a recommendation by an orthopedic consultant that Roark be evaluated by an orthopedic hand clinic. The Magistrate Judge stated that even if Roark could somehow overcome the limitations bar on this claim, he did not show he was entitled to notice or an opportunity to be heard concerning this decision, nor that he had a liberty interest in having the consultant's recommendation carried out. The Magistrate Judge therefore determined Roark did not have a viable due process claim.

Although Roark complained that the prison at Texarkana was badly overcrowded, and the Defendants acknowledged that it operated at well above its rated capacity, the Magistrate Judge stated the courts have held that overcrowding alone does not amount to a constitutional violation, and that Roark did not allege facts showing an excessive risk that he will suffer serious harm as a result of the prison population or that the overcrowding caused him to suffer a constitutional violation.

Roark complained that he was subjected to "discrimination" in violation of the Fifth Amendment when other prisoners were moved up on the denture list in front of him, other prisoners or prisons were provided "adequate medical care with much less crowding/understaffing," and he was denied a writing table. The Magistrate Judge concluded that Roark failed to show that he was the victim of discrimination based on race, religion, or national origin, or membership in any other protected class. To the extent that Roark claimed "class of one" discrimination, the Magistrate Judge determined Roark had offered only bare and conclusory allegations in support of such a claim. Nor did Roark have standing to complain that another inmate, Randall McNeese, lived in a dorm without air conditioning.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

**\*3** The Magistrate Judge stated that Roark's claims under the Americans with Disabilities Act lacked merit because the Bureau of Prisons does not fall into the definition of "programs or activities" governed by the Rehabilitation Act and the ADA does not apply to the federal government. The Magistrate Judge also stated that *respondeat superior* liability does not apply in *Bivens* actions, Roark had no liberty interest in having his grievances answered to his satisfaction, Roark failed to set out a viable retaliation claim, and the Defendants are entitled to qualified immunity. The Magistrate Judge therefore recommended that the Defendants' motion for summary judgment be granted and that Roark's claims be dismissed.

**Roark's Objections**

*A. Dental Care*

In his objections, Roark argues that he was placed on the denture waiting list in 2005, not 2007. Even though he was restricted to chewing with only his front teeth, he kept being told to wait his turn. He filed a habeas petition and wrote to the U.S. Justice Department, but to no avail. Roark asserts the dental waiting list was being manipulated and that he had a serious medical need. As the Magistrate Judge stated, Dr. Kemp stated that Roark had no serious medical need for dentures. Roark's disagreement with the dentist's assessment does not show deliberate indifference to a serious medical need. This objection is without merit.

In a related objection, Roark asserts that Dr. Kemp made the statement about his dentures in 2011, but that he, Roark, did not see a contract dentist in 2007. This meant no one made a determination in 2007 that Roark had not shown a necessary medical need for dental prosthetics. However, Roark then contends that his "teeth were worn to mere nubs" by the time Dr. Kemp saw him. According to Roark, his teeth deteriorated between 2007 and 2011, and he does not explain how he could have had a necessary medical need for dental prosthetics in 2007 but not in 2011, when he asserts

his teeth were in much worse shape. This objection is without merit.

Roark also claims "it is obvious that prison officials told Dr. Kemp to state on the record that plaintiff had no medical need for dentures." He states denture fabrication began the very next month, which is "rather fast for a person with no medical need for dentures." Roark offers nothing to support his speculation that Dr. Kemp was told by prison officials to say that he had no medical need for dentures, and his speculation does not form the basis of a valid objection. *See, e.g., Waggoner v. City of Garland, Texas,* 987 F.2d 1160, 1166 (5th Cir. 1993) (speculation is insufficient to create a genuine issue of material fact); *Freeman v. Sims,* 558 Fed.Appx. 412 (5th Cir., March 7, 2014) (conclusory and speculative assertion was insufficient to show that the district court erred in granting summary judgment). Roark's dental records show that his turn on the waiting list came up in January of 2012 and denture fabrication began at that time. This objection is without merit.

Roark cites Bureau of Prisons Program Standard 6400.02, which provides that emergency dental care includes treatments for relief of severe pain, sedative fillings, extractions of non-restorable teeth, and gross debasement of symptomatic areas, and non-emergency dental care, which is provided as resources of staff, time, and materials are available, and commensurate with the inmates' ability to maintain good oral health. He states that the failure to provide sufficient dental staff coverage to make reasonable non-emergency but necessary care available over a period of years amounts to deliberate indifference.

Roark's dental records show that prior to the filing of this lawsuit, he received dental care on a number of occasions, including treatment for an abscessed tooth, no. 12; extraction of non-restorable tooth no. 18; treatment for an infection in tooth no. 2 and a subsequent extraction of that tooth; two comprehensive dental exams including X-rays, a review of his oral hygiene index and dent-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

al history, and a review of his treatment plan; an extraction of the residual root of tooth no. 17; a preliminary alginate impression of the lower arch for fabrication of mandibular acrylic dentures; and final impressions taken for the lower partial dentures and upper alginate impressions taken for occlusion match. The Fifth Circuit has held the fact medical care given is not the best that money can buy does not amount to deliberate indifference to serious medical needs. *Mayweather v. Foti,* 958 F.2d 91, 91 (5th Cir. 1992); *see also Banuelos v. McFarland,* 41 F.3d 232, 235 (5th Cir. 1995) (medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs). The medical and dental care received by Roark may not have been the best money could buy, but it did not fall below the level of deliberate indifference to serious medical needs. *See Stewart v. Murphy,* 174 F.3f 530, 534 (5th Cir. 1999).

**\*4** Roark contends he provided "clear and convincing evidence" of his "necessary need for dentures," which he claims is "enough evidence to support a finding that discovery will reveal the necessary elements." Roark does not explain what he believes additional discovery will reveal, and his speculation is not an adequate objection to the Magistrate Judge's Report. *See generally Raby v. Livingston,* 600 F.3d 552, 561 (5th Cir. 2010) (parties opposing summary judgment "may not simply rely on vague assertions that additional discovery will produce needed but unspecified facts.") This objection is without merit.

**B. Medical Care**
Roark claims the medical staff was untrained and unsupervised in hepatitis chemotherapy treatment, although he offers no facts to support this conclusion. He does not dispute he saw the physician's assistant, but states this physician's assistant was the only one to provide care for some 1800 prisoners. These allegations do not themselves show Roark suffered deliberate indifference to his serious medical needs or that the Magistrate Judge's

conclusion was otherwise incorrect. Roark's objection on this point is without merit.

With regard to his hand, Roark states he was referred to a "hand specialist" in 1996 who recommended testing and possible reconstructive surgery, but the medical utilization committee made a determination that evaluation at the hand clinic was not necessary; he complains this decision was made without any testing to even make an informed judgment, and no notice of denial was ever received.

The summary judgment evidence shows Roark was seen at six-month chronic care clinics between April of 1997 and December of 2008, but there is no indication he complained of his hand injury or requested treatment for this condition in any of these visits. In February of 2009, orthopedic specialist Dr. Pappas evaluated Roark's right wrist and determined that tendon surgery would be unsuccessful and further intervention would be cosmetic and unlikely to offer significant benefit.

The medical utilization committee's disagreement with the orthopedic consultant in 1996, sixteen years before Roark filed suit, does not give rise to a federal cause of action, even if Roark could somehow overcome the limitations bar. He has not shown that he was entitled to notice or an opportunity to be heard, nor that he had a liberty interest in having the orthopedic consultant's recommendation carried out.

In this regard, Roark asserts he had a liberty interest because denial of necessary medical care without any testing exceeds his sentence in such an unexpected manner as to give rise to due process protections by its own force, citing *Sandin v. Conner,* 115 S.Ct. 2293, 2300 (1995). He maintains that "secret denial of further evaluation at a hand clinic denied him a quality of life," and this secret denial also denied any possibility of treatment for a serious medical need determination, which Roark states is a right guaranteed by the Constitution.

In *Cooleen v. Lamanna,* 248 Fed.Appx. 357,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

2007 WL 2687319 (3rd Cir., September 14, 2007), the plaintiff, federal prisoner Timothy Cooleen, complained, *inter alia,* that he was denied due process when the Utilization Review Committee initially rejected an MRI which had been recommended by an orthopedic specialist. The committee also cancelled an appointment with an neurosurgeon. In affirming the district court's denial of this claim, the Third Circuit stated as follows:

> We agree with the district court that Cooleen cannot show the violation of a constitutionally protected liberty interest regarding the medical treatment he received or the Utilization Review Committee's decisions concerning certain procedures. *See Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (procedural due process protects only against a government action that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"). We need not reach the issue of Cooleen's opportunity to challenge the Committee's decisions.

**\*5** Similarly, Roark cannot show the violation of a constitutionally protected liberty interest with regard to the medical review committee's decisions concerning certain procedures. Although Roark complains that the committee did not itself conduct tests before making its decisions, there is no indication that the review committee is a testing body; rather, the medical records show that the committee rejected the recommendation because it was "medically acceptable but not medically necessary." The Constitution does not require that every recommendation made by a medical consultant be accepted and acted upon, and the denial of such a recommendation is not an atypical and significant hardship in relation to the ordinary incidents of prison life, nor did it exceed his sentence in such an unexpected manner as to give rise to due process protections by its own force. This objection is without merit.

Roark states that even if he did have 15 blood tests, he "had to fight and argue for most of those."

He also asserts he had more than 15 blood draws, but some of these were never sent in for testing or were "rotten when they reached the lab." The summary judgment evidence shows Roark had 15 blood draws in which the lab results were reviewed by a physician, even if there were others which were not. He has failed to show deliberate indifference in this regard, and his objections on this ground are without merit.

***C. Overcrowding***

Roark complains that Wardens Roy and Carvajal and Health Services Administrator Licon allowed grossly overcrowded prison conditions and failed to provide an adequate healthcare system. He claims records show these individuals knew of a substantial risk to prisoners' health or safety and that the Court has personal jurisdiction over these defendants. He states Regina Flanery was "personally responsible for maintaining [an] accurate, unbiased denture list, which the lack of contributed for waiting almost 10 years on the waiting list for dentures." The summary judgment evidence shows that the dentist, Dr. Kemp, determined Roark did not have a medical need for dentures, meaning that his claims concerning dentures do not show deliberate indifference to a serious medical need. Nor has Roark shown that the alleged deficiencies in the healthcare system subjected him to deliberate indifference to a serious medical need. Roark's objections in this regard are without merit.

Roark further argues that the fact the prison in Texarkana remained accredited with the American Correctional Association and the Joint Commission on Accreditation of Health Organizations is irrelevant, citing *Gates v. Cook,* 376 F.3d 323, 337 (5th Cir. 2004) as stating that the federal courts should not subvert their judgment on Eighth Amendment violations to the ACA and that ACA inspections are not factual findings binding on the court, although compliance with ACA standards may be a "relevant consideration." The Magistrate Judge recounted the Defendants' assertion that FCI–Texarkana remained accredited with the ACA and JCAHO, but did not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

ascribe any legal significance to this fact, much less hold that such accreditation was proof that Eighth Amendment standards were not violated. Roark's objection on this ground is without merit.

### D. Limitations

Roark objects to the dismissal of "all claims" based on the statute of limitations, arguing that the "continuing tort" doctrine allows his claims to continue. The Magistrate Judge did not recommend dismissal of "all claims" based on limitations and specifically discussed the "continuing tort" doctrine, stating "Roark's overall claims that he was denied dentures and care for his hand over a period of years sufficiently alleges a continuing tort as to accrue when he received dentures in 2012."

However, the Magistrate Judge went on to state that claims against individual Defendants who had left Texarkana or the Bureau of Prisons more than two years before the filing of the lawsuit were barred by limitations even under the continuing tort doctrine because any actions taken by these individual Defendants with regard to Roark necessarily ceased more than two years prior to the filing of the lawsuit. These Defendants included Justice, Kastner, Sawyer, Del Toro, and Flanery. While the overall course of conduct may have continued, the individual who had left could not be held liable for the later actions taken by others. Roark does not address this conclusion by the Magistrate Judge, and in fact cites case law stating that "a cause of action for a continuing tort does not accrue until the defendant's tortious conduct ceases." *Arquette v. Hancock,* 656 S.W.2d 627, 629 (Tex.App.–San Antonio 1983, writ ref'd n.r.e.). This is consistent with the Magistrate Judge's determination that the allegedly tortious conduct of the defendants who left ceased upon their departure. Roark's objections in this regard are without merit.

**\*6** Roark alleges he "was not aware of the injury or that the damage to his remaining teeth was irreparable" until the examination by Dr. Kemp in November of 2011. However, Roark's pleadings make abundantly clear that he had complained

about his teeth and the lack of dentures to prison authorities long before 2011. In any event, the Magistrate Judge stated that Roark's claim concerning his dental care was not barred by limitations. These objections are without merit.

### E. Exhaustion of Administrative Remedies

Roark acknowledges that "the Magistrate Judge confirms proper exhaustion of administrative remedies pursuant to denial of dental care, denial of medical care for the right arm/hand, overcrowding effecting an adequate health care system, denial of writing tables and/or auxiliary aids for this disabled prisoner, and his transfer to many times worse living conditions for requesting a table." He goes on to state that as to the laundry facilities, hallways, closing of the yard and other deficiencies, these were only meant as supporting facts for the institution's "antiquated design" and the effects of the overcrowding on this antiquated design.

Roark argues he tried to exhaust his administrative remedies on the lack of a full time doctor, but he was unable to do so because Licon would not address his informal attempt at resolution. When he tried to file formal grievances anyway, these were rejected because there was no record of an attempt at informal resolution.

The Fifth Circuit has held that conclusory allegations that an inmate filed a grievance appeal which was never returned do not create a genuine dispute as to exhaustion. *Kidd v. Livingston,* 463 Fed.Appx. 311, 2012 WL 614372 (5th Cir., February 28, 2012), *cert. denied,* 133 S.Ct. 36 (2012); *citing Freeman v. Texas Department of Criminal Justice,* 369 F.3d 854, 860 (5th Cir. 2004); *see also Mentecki v. Corrections Corp. of America,* 234 F.3d 1269, 2000 WL 1648127 (6th Cir., October 27, 2000) (speculative and conclusory assertion that filing a grievance would be futile does not satisfy the exhaustion requirement). Roark has offered only conclusory allegations that he was unable to exhaust administrative remedies on all of his claims. Similarly, Roark claims that the commencement of denture fabrication the next month is

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

"rather fast for a person with no medical need for dentures," but the summary judgment evidence shows that Roark had reached the top of the denture waiting list at that time. These objections are without merit.

### F. Other Objections

Roark states he is a layman at the law and a showing of personal jurisdiction is almost impossible, and has no objections to the dismissal of Samuels, Watts, Lappin, and Sawyer for lack of personal jurisdiction. He also offers no objection to the dismissal of Dr. Del Toro on the basis of statutory immunity.

Roark also states he wishes to dismiss his Fifth Amendment discrimination claim with regard to dental care and his Fifth Amendment class-of-one claim regarding denial of access to a table, and to dismiss his claims against any unidentified defendants.

Next, Roark complains that the Magistrate Judge discounted the affidavits given by Roark himself and by inmates Maynard Brown, William Brown, and Brady Long. He contends these affidavits are "circumstantial evidence of systemic medical understaffing contributing to an inadequate health care system." The Magistrate Judge observed that Roark included affidavits from a number of other prisoners and discussed several of these affidavits, but concluded that neither Roark's affidavit nor those of the other prisoners showed Roark suffered a constitutional violation. Roark has not controverted this conclusion, and his objection on this point is without merit.

**\*7** Dr. Pappas was previously dismissed from the lawsuit for failure to effect service of process. Roark contends that Dr. Pappas has not been served with process because he is "hiding" from the lawsuit. According to Roark, Dr. Pappas was tracked by Google to Arizona, where he was dismissed from his job, got another one, was dismissed from there, and went to a sports clinic in Minnesota, and was dismissed from there. Even if true, this does

not vitiate the obligation of the Plaintiff to effect service of process. *See Systems Signs Supplies v. U.S. Department of Justice,* 903 F.2d 1011, 1013 (5th Cir. 1990) (litigant's *pro se* status does not excuse failure to effect proper service); *Kersh v. Derozier,* 851 F.2d 1509, 1512 (5th Cir. 1988) (responsibility of effecting service of process rests, at the end of the day, with the plaintiff). In addition, Dr. Pappas' evaluation of Roark was done in 2009 and thus falls outside of the limitations period. Roark's disagreement with Dr. Pappas' assessment of his condition does not set out a constitutional claim in any event. *Norton v. Dimazana,* 122 F.3d 286, 292 (5th Cir. 1997). Roark's objection on this point is without merit.

Finally, Roark contends that the Defendants are not entitled to qualified immunity and that the Defendants Goodsell, Carvajal, and Ibarra were directly involved in denying him reasonable accommodations. Once qualified immunity is invoked, Roark has the burden of rebutting its applicability by showing that the official's conduct violated a constitutional or statutory right and the official's actions constituted objectively unreasonable conduct in the light of clearly established law at the time of the conduct in question. *Tolan v. Cotton,* 713 F.3d 299, 304 (5th Cir. 2013). Roark has not met this burden and his objections are without merit.

The Court has conducted a careful *de novo* review of all of the pleadings and records in this case. Upon such *de novo* review, the Court has concluded that the Report of the Magistrate Judge is correct and the Plaintiff's objections are without merit. It is accordingly

**ORDERED** that the Plaintiff's objections are overruled and the Report of the Magistrate Judge (docket no. 119) is **ADOPTED** as the opinion of the District Court. It is further

**ORDERED** that the Defendants' motion to dismiss or for summary judgment (docket no. 103) is **GRANTED** and the Plaintiff's counter-motion for summary judgment (docket no. 110) is **DENIED.** It

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

is further

**ORDERED** that the above-styled civil action be and hereby is **DISMISSED WITH PREJUDICE.** It is further

**ORDERED** that any and all motions which may be pending in this action are hereby **DENIED.**

*REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*
CAROLINE M. CRAVEN, UNITED STATES MAGISTRATE JUDGE

The Plaintiff Benjamin Roark, proceeding *pro se,* filed this lawsuit under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388 (1971) complaining of alleged deprivations of his rights. The lawsuit has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges. Plaintiff has named eighteen Defendants in his currently active amended complaint. They are: Regina Flanery, dental technician at the Federal Correctional Institution in Texarkana; Dr. Liera Del Toro, a dentist at FCI–Texarkana; Hiram Licon, Health Services Administrator at FCI–Texarkana; Paul Kastner, warden of FCI–Texarkana from 2006 to 2008; David Justice, warden of FCI–Texarkana in 2007; Keith Roy, warden of FCI–Texarkana in 2009; Michael Carvajal, warden of FCI–Texarkana since 2011; G. Maldonado, a regional grievance officer with the Federal Bureau of Prisons; Dr. Michael Pappas, an orthopedic physician; the United States Attorney General; current Director of the Federal Bureau of Prisons C.E. Samuels; former directors Harley Lappin and Kathleen Hawk Sawyer; C–Unit manager Rick Goodsell; associate warden Josh Ibarra; an unidentified individual believed to be B.A. Rhoden; secretary to regional director J.A. Keller; and Harrel Watts, national grievance coordinator.

**\*8** The currently active pleading is Roark's amended complaint filed August 12, 2013. In this complaint, he raises five basic claims: (1) unreasonable delay in providing necessary dental care; (2) denial of medical care for hand and arm disabilities; (3) denial of medical care due to failure to provide a long-term resident doctor to provide an adequate health care system; (4) violations of the right to receive adequate medical care through overcrowding and systemic understaffing of health care professionals; and (5) failure to provide necessary tools (tables) for disabled prisoners which are necessary for everyday life functions as well as access to programs and services.

**A. Dental Care**

Roark asserts that he was sent to the Federal Correctional Institution at Texarkana in November of 2002. He does not believe that any dental evaluation was done at that time, but in April of 2003, he was seen by the chief dental officer, Harrison, who extracted tooth no. 12 while recording that Roark had "remaining healthy front teeth beginning to wear excessively." Roark voiced a need for partial dentures, which were necessary for the proper chewing of food.

In January of 2005, after waiting over a year, Roark requested his status on the denture waiting list to the Defendant Regina Flanery. She told him that he was not on the waiting list. He was added to the list, but has been bypassed for seven years.

In August of 2005, Roark states he was seen by the chief dentist, the Defendant Vargas Del Toro. Dr. Del Toro extracted part of tooth no. 18 but left the entire root system, saying that she did not have time to dig the root system out of his jaw, and it would eventually work its way out. According to Roark, the records at that time indicate that Roark's oral hygiene was "fair" and that he needed dentures because of excessive wear to his remaining teeth. He also had to chew with his front teeth only, constituting "an apparent non-serious medical need-condition." Roark expressed his concern and need for partial dentures due to this excessive wear in having to chew with his front teeth only and the resulting disfigurement and eventual loss of these

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

teeth altogether.

Roark filed grievances in 2007 seeking dentures, but the only responses he received told him to "wait his turn." Four years later, in August of 2011, Roark wrote to the Department of Justice, Civil Rights Division Disability Section, asking for help, and the Department of Justice began making inquiries to Warden Carvajal. He also filed a habeas corpus petition under 28 U.S.C. § 2241 complaining of the execution of his sentence through unconstitutional prison conditions, in the denial of medical and dental care, but moved to dismiss this petition after learning that the claim should be brought as a *Bivens* action.

The next month, Roark began exhausting administrative remedies regarding his dental claims, but the only responses he received told him to wait his turn and that under BOP Policy 6400.12, the Bureau "does not have to provide teeth no matter where or when removed." He says he has been waiting his turn from 2003 until 2012.

From 2007 until June of 2012, Roark states. the wardens at Texarkana failed to provide an adequate health care system. The health care system lacked sufficient dentists, supporting staff, and dental services to meet the needs of the overcrowded inmate population.

On November 7, 2011, Warden Carvajal responded to Roark's second attempt to exhaust administrative remedies by stating that according to program statement 6400.12, institutions will provide access to non-emergency dental care for prisoners as resources of staff, time and materials are available. The Warden also stated that the Bureau is not required to replace missing teeth, so prosthetics such as dentures and crowns are considered "routine care." Roark was advised to wait his turn on the list, even though he has been waiting for such "routine care" since 2003.

**\*9** In November of 2011, Roark states he finally received a serious evaluation by the new con-

tracted part time dentist, Dr. Kemp. On January 5, 2012, Dr. Kemp extracted the root system which had been left in place by Dr. Del Toro. Dr. Kemp advised Roark that numerous front teeth, at least eight, were ruined beyond repair and were structurally unable to support crowns because they had been "worn to mere nubs by excessive wear."

Roark identified Regina Flanery, Dr. Del Toro, Hiram Licon, Paul Kastner, David Justice, Keith Roy, Michael Carvajal, G. Maldonado, and Harrell Watts as defendants in this claim. He asserts Flanery failed to keep accurate, unbiased, fair and equitable records of the dental waiting lists, and that she manipulated these lists by providing many other inmates with care before he received any, causing him to have to wait almost a decade for "routine care." He states that Dr. Del Toro subjected him to cruel and unusual punishment by "failing to state a serious medical need for partial dentures to abate excessive wear apparent to any eye," and that Dr. Del Toro turned a blind eye to him after examination and in her responses to his 2007 grievances. Roark claims that moving other prisoners ahead of him on the dental care waiting list amounted to discrimination.

Roark further claims Hiram Licon, the health services administrator, was responsible for providing sufficient medical staff and specialty services, and subjected Roark to cruel and unusual punishment by failing to provide an adequate health care system with sufficient numbers of dentists and support staff to meet the needs of an overcrowded inmate population. He states that Wardens Kastner, Justice, and Carvajal, regional director Maldonado, and national director of the grievance process Watts subjected him to cruel and unusual punishment by failing to remedy the problems.

**B. Denial of Medical Care—Americans with Disabilities Act**

In his second claim, Roark asserts that in the late 1980's, he was incarcerated in the Texas Department of Corrections with multiple gunshot injuries. He was referred to John Sealy Hospital in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

Galveston for possible reconstructive surgery to his severely damaged right hand and arm. He was evaluated by an orthopedic specialist and believes he was scheduled for two successive surgeries, of which the first was a tendon-cap release to facilitate movement of the knuckles and fingers of his right hand, and the second was to transplant a tendon from his toe to his thumb, in order to facilitate thumb movement. He is unable to move his right thumb at all, resulting in severe disabilities. Roark states he was paroled from the Texas prison before the tendon transplant surgery took place.

In 1990, Roark was sentenced in a "non-violent no-drug conspiracy" to 360 months in federal prison. In 1995, he sought treatment for tendon repair at the federal correctional institution in El Reno, Oklahoma, and on November 13, 1996, he was evaluated by an orthopedic consultant, whom he believes is named Dr. Melly. This doctor requested X-rays and after a perfunctory glance at Roark's right hand, told him that emergency surgery was not necessary and Roark would be placed on a list for further evaluation. No MRI's, CT scans, or other tests were done.

In November of 2002, Roark was sent to Texarkana, where he remained on the waiting list for further evaluation until 2008. He again requested thumb-tendon treatment, and in February of 2009, he saw a contracted orthopedic consultant, Dr. Michael Pappas. Dr. Pappas ordered X-rays for bone structure integrity, which had never been an issue, and took a "perfunctory" glance at his right hand. No testing was done, and Dr. Pappas stated that in his opinion, tendon repair would be unsuccessful. Roark was told he would be placed on a waiting list for further evaluation. In July of 2011, while on a routine call to the medical department for chronic care evaluation, Roark asked Dr. Clay Nash about his status on the orthopedic waiting list, and he was advised that he was not on any waiting list.

**\*10** In August of 2011, Roark wrote letters to the Department of Justice Civil Rights Division, Disability Section asking for help with his medical and dental needs. The Department sent an inquiry to Warden Carvajal, and from the warden's reply, Roark learned for the first time about a "South Central Medical Review Board" and this board's findings and subsequent denial of treatment, by secret process, for thumb and tendon repair in 1997 and 2009.

**C. Failure to Provide a Long–Term Resident Doctor**

Roark states that sometime in 2010, one resident physician, Dr. Kahl, retired, leaving only one remaining resident physician, Dr. Nash, on location to provide for the medical needs of some 1,800 inmates. In 2011, Dr. Nash took a leave of absence, believed to be for the military reserves, leaving no resident doctor on location.

In July of 2011, Roark began treatment for hepatitis C, involving "very potent drugs" such as peginterferon and ribavirin, which require weekly blood monitoring. On July 7, 2011, he received a dose of peginterferon from a nurse named Washington, but he was supposed to get 50 units and only received 5. He was asked to step out, and the nurse came back with the additional 45 units. The next week, he saw a nurse named Duggins, who had a syringe with 100 units. Roark stated that he was only supposed to get half that much, and Duggins replied "everyone gets this much. After a lengthy confrontation, Duggins squirted 50 units onto the wall and floor, saying "there, all fixed." Roark injected himself with the correct amount from that time on.

Two months after this treatment began, around the time Dr. Nash left, Roark began suffering severe side effects. He asked for blood work and to consult with a doctor, but was told there was no doctor to order blood work; however, he could go to the lab and "maybe she would take my blood anyway." The lab tech, Ms. Robertson, said she needed a doctor's authorization and signature to draw blood and have it analyzed. Roark says that he was "denied blood work repeatedly" and that blood work was very sporadic for the first three months

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

after Dr. Nash left.

In October of 2011, Roark was experiencing severe side effects, causing him to lose some 45 pounds in 12 weeks. A nurse told him that his blood chemistry was so bad he would need blood drawn before his next dose. He was told to wait in the waiting area, and he spent all day waiting while Robertson tried to find a doctor to authorize and sign for blood work. Even though he was denied blood work, he received a dose of peginterferon anyway.

A month later, in late November of 2011, Robertson came to Roark's work assignment and took him to the lab, asking who had been taking his blood samples. She said that vials of his blood had been found in the refrigerator, ruined, instead of being sent off for analysis.

Roark states he experienced severe bone and joint problems because he had so many gunshot injuries, but there was no doctor available to determine if the side effects were permanent, thus preventing him from making an informed decision as to whether or not to end the chemotherapy. He was worried and confused, not knowing if he would be crippled in both hands for life.

Shortly before Dr. Nash left, he delegated the workload and added responsibility for patient requests for hepatitis C treatment and protocol to the pharmacist, Mr. Rayburn. Although Roark says that Rayburn is well informed and diligent, he was not qualified as a doctor. Roark asked him on many occasions if he could consult with a doctor, but Rayburn simply faxed blood chemistry results, when available, to a physician named Dr. Russell, who advised that treatment should be continued without knowledge of most of the side effects. Dr. Russell was unavailable on many occasions because he had other responsibilities. The health services administrator and warden obviously knew that both resident doctors were leaving, but failed to provide adequate replacements.

**D. Overcrowding**

**\*11** Roark says overcrowded and understaffed conditions existed upon his arrival at Texarkana. Half of all TV, game, study, and utility rooms were being utilized for housing, and there were three prisoners in two-man cells. The gym was half full of beds, and G Unit's common areas were full of rows of double bunk beds. The inmate population at that time exceeded 2,100 prisoners, including the camp.

This meant that the health services department could hardly keep up and maintain new inmate orientation and evaluations. The facility receives 15 to 40 new arrivals per week; Roark states one dentist could properly evaluate eight new arrivals per day, this would take four days for just arrival and orientation. For eight of the ten years Roark has been at Texarkana, the prison has only had a part-time dentist, servicing inmates' needs on average just two days a week.

Because of lack of staffing and in an effort to save money, the institution has closed the large lower recreation yard at 5:45 p.m. during the winter. This discriminates against Roark and others who work during the day, because these prisoners are denied access to the big yard, the jogging track, handball courts, the soccer field, the softball field, and open space to relieve overcrowded environments in living quarters and other areas. Ancillary recreational facilities are often closed at the individual discretion of the recreational staff, for no apparent reason other than claims of understaffing. Closing three-quarters of the recreation yard only makes the remainder of the facility even more crowded. Evening meals are usually completed by 5:45 p.m., so Roark and other prisoners have the choice of going to the big recreation yard or eating.

Some time in 2010, Roark says, all laundry machines were removed from the institution, and a policy was implemented to provide all laundry services for prisoners. However, the laundry facility is inadequate for processing the clean clothing and bed linen needed by the large number of prisoners.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

Inmates are not supervised, so washers and dryers are stopped short of their complete cycles, resulting in the return of dirty clothes. Blankets are only provided or exchanged every five to six weeks, resulting in filthy bed linens.

At some time in 2005, all writing tables were removed from the institution because a cell phone was found in a hollowed out table leg. Some unit managers replaced the writing tables, but most did not. This means that Roark and many others have no authorized writing tables, leaving him to write, study, and eat on the floor or bed.

The main entrances and exits to most parts of the facility are 34 and a half inches wide, causing severe bottlenecks when large groups of inmates move. A large man in a wheelchair cannot exist the building on his own, but must be pushed. Emergency gurneys are often dropped trying to traverse these small openings. The doors open out into the corridor, so if two opposing doors are opened, inmates have about 35 inches of space. This results in bottlenecks as well as injuries if doors are opened without warning.

Although it is less overcrowded now, with a population around 1,500, Roark states there are three prisoners living in a two-man cell, which was originally designed to accommodate one. Occupants can only stand in a fixed position and beds are triple bunked, leaving insufficient room for the lower and middle bunk occupants to roll over on their sides. About one-third of the institution is not air-conditioned, which is discriminatory against the inmates in those areas.

**E. Writing Tables for the Disabled**
**\*12** Roark states that officially, there have been no tables, writing or otherwise, in most of the units at FCI–Texarkana, specifically East Unit, in which C–Unit is incorporated. He asserts that the failure to provide tables for qualified disabled prisoners is a violation of the Rehabilitation Act.

Around November 23, 2011, Roark submitted

an inmate request to staff asking that a writing table be provided. Associate Warden J. Ibarra responded by saying that Roark should contact a member of his unit team about getting a table. On December 18, 2011, Roark mailed a request to the unit manager, but it was ignored.

On January 3, 2012, Roark hand-delivered a request for a table. The unit manager, R. Goodsell, told Roark to go and try to find a table, and he, Goodsell, would also try to find one. Goodsell claimed he never received Roark's first request. Nothing came of this request.

In July of 2012, Roark submitted a request for an informal remedy requesting access to an authorized table. Goodsell responded that Roark could use education library tables, but these are not accessible to him; he works from 7 a.m. to 3 p.m., there is institutional count at 4 p.m. resulting in a lockdown through the evening meal at around 6 p.m., and Roark must exercise for an hour and a half because of old injuries resulting in acute arthritis. The education facilities close at 8 p.m.

Goodsell also suggested that Roark use the computer Trulincs stations, which are provided only in the TV room and have four stations for 180 prisoners, and said that there was a plan to provide uniform writing tables, which alleged plan Roark states has been ongoing since 2005.

In September of 2012, while Roark was exhausting his administrative remedies, he was relocated to dorm C–1, the only open dorm in C Unit. Roark states that C–I is "primarily utilized as housing quarters for newly arrived prisoners, troublemakers, and prisoners released from S.H.U. [Special Housing Unit] ad.seg." He contends he was punished by the retaliatory and discriminatory act of moving him from preferred housing, where he had been for about eight years, to an overcrowded and noisy dorm known to prisoners and staff as "the wild west."

Roark contends he "waited patiently" for a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

chance at preferred housing over many years, and writing tables for the disabled should have been provided as a matter of policy; there was no legitimate penal interest in the retaliatory relocation to an environment that was many times worse.

He concedes that there are recently installed tables in C–1, but says that these are "experimental" and inadequate in design because they have a surface area of only 256 square inches, 16 x 16, which he describes as a "mere pedestal." In addition, Roark complains that the experimental double bunk beds with built-in overhead lockers are so low that prisoners cannot sit up straight, causing them to have to bend over.

Roark states Warden Carvajal initiated a plan to provide tables in units B–3, A–1, and C–1. The warden's idea was to remove unauthorized tables and replace them with new ones. Goodsell explained to the prisoners that the unauthorized tables had been taken because several prisoners were using tables and an ironing board to facilitate a meal in the TV room, not in C Unit, while expecting a prison accreditation inspection. Roark waited some 50 days for an authorized table to be provided, and filed a grievance when this did not happen. He states that Goodsell has "allowed the commandeering of tables" since 2005, only to have them confiscated at his whim or for a threat to instill good conduct. Roark states that he himself has purchased at least seven tables, at great personal expense, some of which were confiscated only days after he got them. He states the unit manager has the duty to provide for all prisoners under his direct supervision.

**\*13** Roark asserts grievance no. 705382–F1 shows Warden Carvajal refused to take action to prevent violations of the Rehabilitation Act as well as violations of Bureau of Prisons policies concerning providing necessary tools for the disabled. He also complains of failure to prevent discrimination, which discrimination took the form of Roark's relocation to a living environment which he says was many times worse.

**The Defendants' Motion for Summary Judgment**

The Defendants have answered the complaint and have filed a motion to dismiss or, in the alternative, for summary judgment (docket no. 103). Roark has filed a response to this motion combined with a counter-motion for summary judgment, to which the Defendants have filed a response. The Defendants argue that: (1) the Court lacks personal jurisdiction over the defendants Samuels, Watts, Lappin, and Sawyer; (2) Dr. Del Toro has statutory immunity as an employee of the Public Health Service; (3) the statute of limitations has run on many of Roark's claims; (4) Roark failed to exhaust administrative remedies on some of his claims; (5) the Defendants did not violate the Eighth Amendment and were not deliberately indifferent to Roark's medical and dental needs; (6) the overcrowding and understaffing did not result in constitutional violations; (7) Roark has not set out any valid claims of discrimination or due process violations under the Fifth Amendment; (8) claims of *respondeat superior* are not viable in *Bivens* cases; (9) the Rehabilitation Act does not apply; (10) Roark has not set out a valid claim regarding his writing table and unit assignment; and (11) the Defendants are entitled to qualified immunity.

**A. Personal Jurisdiction**

The Defendants first assert that current Bureau of Prisons director Charles Samuels, national grievance coordinator Harrell Watts, former Bureau of Prisons director Harley Lappin, and former Bureau of Prisons director Kathleen Hawk Sawyer all reside outside of the State of Texas and lack minimum contacts with the State, and the Court cannot properly exercise personal jurisdiction over them. In his response, Roark contends that "defendants not residing in the forum state of Texas have indirect involvement by promulgation of policy, or allowing the continuance of a custom of long standing, effecting [sic] the life, liberty, and care of prisoners in the forum state, specifically Plaintiff's constitutional right to adequate medical care for serious needs." Hence, he maintains that they are subject to the jurisdiction of the Court; he states that directors

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

of the Federal Bureau of Prisons have the authority to abate overcrowding by ordering the regional designation committee to stop designating inmates to a particular facility until the constitutional violations are corrected, by transferring prisoners from a facility, or by restoring lost good time.

The Fifth Circuit has held that the Due Process Clause permits a court to exercise personal jurisdiction over a foreign defendant when that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice. *Revell v. Lidov,* 317 F.3d 467. 470 (5th Cir. 2002). In the context of diversity jurisdiction, the Court explained that a federal district court may exercise personal jurisdiction over a foreign defendant if the long-arm statute of the forum state creates personal jurisdiction over the defendant, and the exercise of personal jurisdiction is consistent with the due process guarantees of the Constitution.

**\*14** In *Stine v. Lappin,* slip op. no. 07cv01839, 2009 WL 103659 (D.Col., January 14, 2009), the plaintiff Mikeal Stine sued Lappin, Regional Director Michael Nalley, and Warden Ron Wiley. The complaint raised conditions-of-confinement issues at the Florence, Colorado maximum security facility. The defendants argued, *inter alia,* that the court lacked personal jurisdiction over Lappin, who lives in Washington, D.C., and Nalley, who is located in Kansas City. The Plaintiff contended that Lappin and Nalley were responsible for placing him in the maximum security facility and enforcing a policy called the Step–Down Unit policy, but the court held that his attempts to make out a case for personal jurisdiction over these defendants by arguing that each of them authorized actions, knowing that the effect of these actions would be felt by him in Colorado, were insufficient.

The court in *Stine* noted that the actions upon which the Plaintiff relied in support of his allegation of personal jurisdiction were taken by the de-

fendants in their capacities as federal officials and employees, and such actions do not suffice to establish minimum contacts for purposes of an individual capacity suit against a federal employee, *citing Hill v. Pugh,* 75 Fed.Appx. 715, 719 (1 0th Cir., Sept. 11, 2003). Consequently, the court concluded that Stine's claims against Lappin and Nalley in their individual capacities had to be dismissed.

Likewise, the fact that Watts answers grievances from inmates confined in the State of Texas is not sufficient minimum contacts to subject Watts to the personal jurisdiction of the federal court in Texas. *Murrell v. Chandler,* civil action no. 1:01cv184, 2007 WL 869568 (E.D.Tex., March 21, 2007), *affirmed in part and reversed in part on other grounds,* 277 Fed.Appx. 341, 2008 WL 1924198 (5th Cir., April 30, 2008); *accord, Swallow v. Baker,* civil action no. 06–cv–02086, 2008 WL 4877014 (D.Col., August 27, 2008)(district court lacked personal jurisdiction over Harrell Watts simply because he had responded to a prisoner's grievance).[FN1] The Defendants' motion to dismiss Samuels, Watts, Lappin, and Sawyer on this basis is meritorious and should be granted.

> FN1. One district court in the Seventh Circuit has held to the contrary. *See Harley v. Harley G. Lappin,* civil action no. 06–953–GPM (S.D.Ill., November 12, 2008) (unpublished) (available on WESTLAW at 2008 WL 4889965) (claim against Harrell Watts for handling of his grievance regarding medical treatment was sufficient to establish minimum contacts and therefore personal jurisdiction).

**B. Statutory Immunity for Dr. Del Toro**

The Defendants assert that Dr. Del Toro was a commissioned officer of the Public Health Services and federal law provides that an employee of Public Health Services cannot be sued in her individual capacity, including in a *Bivens* claim, for actions taken within the scope of her employment. The Fifth Circuit has explained that Public Health Service employees have statutory immunity under 42

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

U.S.C. § 233(a) for claims against them in their individual capacities; the plaintiff's sole remedy is a claim brought under the Federal Tort Claims Act. *Walker v. Reese,* 364 Fed.Appx. 872, 2010 WL 445573 (5th Cir., February 4, 2010). In his response, Roark concedes that Dr. Del Toro has statutory immunity, but says that she may be kept on as a defendant until after discovery to provide information on who instructed her to act with deliberate indifference to inmate dental needs. This contention is without merit, and the Defendants' request to dismiss Dr. Del Toro should be granted.

### C. The Statute of Limitations

The Defendants next argue that all of Roark's claims which arose prior to June 19, 2010, are barred by the two-year statute of limitations. Roark responds that he is complaining of a "continuing tort" and the limitations period has not expired.

**\*15** Federal courts apply the general personal injury limitations period and tolling provisions of the forum state. *Brown v. Nationsbank Corp.,* 188 F.3d 579, 590 (5th Cir. 1999). The Fifth Circuit has observed that the Texas Supreme Court has not endorsed the "continuing tort" doctrine, and Roark's reliance upon it is misplaced. *Flint v. U.S. Bureau of Prisons,* 303 Fed.Appx. 190 (5th Cir., December 16, 2008) (not selected for publication in the Federal Reporter) (available on WESTLAW at 2008 WL 5231856), *citing Creditwatch Inc. v. Jackson,* 157 S.W.3d 814, 816 n.8 (Tex. 2005); *see also General Universal Systems Inc. v. HAL, Inc.,* 500 F.3d 444, 451–53 (5th Cir. 2007). The cases cited by Roark are from Louisiana, but Louisiana is not the forum state for this case; thus, whatever tolling provisions may be recognized by the State of Louisiana are not applicable here.

However, other Fifth Circuit case law holds that the continuing tort doctrine is one of accrual and thus a matter of federal law rather than state law. *Nottingham v. Richardson,* 499 Fed.Appx. 368, 2012 WL 6019093 (5th Cir., December 4, 2012) (acknowledging that other cases have consulted state law with reference to the continuing tort doctrine but stating that these cases "are not precedential and did not analyze the question in any detail").

In *Nottingham,* the Fifth Circuit stated that "although [the plaintiff]'s general complaint was that he received inadequate medical care, each instance of potentially deliberate indifference ceased when he received medical attention." The Court has reviewed *Nottingham* and has determined that under that case, specific allegations of denial of medical care may be barred by limitations where medical treatment was later provided, but Roark's overall claims that he was denied dentures and care for his hand over a period of years sufficiently alleges a continuing tort as to accrue when he received dentures in 2012.

Nonetheless, any claims against Defendants who left Texarkana or the Bureau of Prisons prior to June 19, 2010, would necessarily be barred by the statute of limitations even under the continuing tort theory. This means that Roark's claims against Justice, Kastner, Sawyer, and Del Toro are barred by the statute of limitations, and the Defendants' request to dismiss these individuals based on the expiration of the statute of limitations is meritorious. In addition, the only specific mention of Regina Flanery in Roark's complaint is that he asked her in 2005 about his status on the denture waiting list, and she told him that he was not on the list. He offers no facts showing Flanery did anything else beyond a bare and conclusory assertion that she failed to "maintain accurate competent unbiased dental and/or denture waiting lists records." His claim against Flanery is barred by limitations as well.

### D. Exhaustion of Administrative Remedies

The Defendants state that the Bureau of Prisons has a three-level grievance mechanism which inmates must exhaust prior to bringing *Bivens* actions in federal court.[FN2] This mechanism consists of grievances filed at the unit (BP–9), regional (BP–10), and national (BP–11) levels. Inmates may not raise issues on appeal which they did not raise

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

at lower levels in the process

> FN2. There is a separate exhaustion pro-
> cedure for tort claims, which is not applic-
> able in this case.

The Court has examined Roark's grievances in
connection with his exhaustion of administrative
remedies. In grievance no. 453669–F1, for which
Roark signed the Step One on May 23, 2007, he
complained of being denied dentures, and the re-
sponses advised him that dentures were not con-
sidered emergency care and he was on the waiting
list for routine care. (Docket no. 104, document
104–23).

**\*16** In grievance no. 663719–F1 (docket no.
104, document 104–24), signed on November 5,
2011, Roark again complained of the denial of den-
tures and dental treatment, and the responses ad-
vised him that he has had numerous dental evalu-
ations and extractions, dentures are considered
routine care, and he is on the list to receive routine
care, provided in order to inmates on the list. Al-
though Roark complained of a misaligned jaw, the
grievance responses said there was no medical
evidence of such a condition.

In grievance no. 667323–F1 (docket no. 104,
document 104–25), signed November 28, 2011,
Roark complained that he has been denied treat-
ment for his right arm. The responses advised him
that in February of 2009, he was evaluated by the
orthopedic consultant, who determined that further
surgical intervention was not likely to offer any sig-
nificant benefits.

In grievance no. 674380–F2 (docket no. 104,
document 104–27), signed February 6, 2012, Roark
complained that FCI–Texarkana was grossly over-
crowded. The documentation indicates that the
grievance was rejected twice because it raised mul-
tiple unrelated issues. The responses advised Roark
that FCI–Texarkana was in compliance was Amer-
ican Correctional Association guidelines and that
because Roark had the opportunity to participate in

educational and recreational programs as well as a
work detail assignment, the majority of his day
should extend outside of his housing unit.

In grievance no. 705382–F1 (docket no.
104–28), signed September 8, 2012, Roark com-
plained of the lack of writing tables, arguing that
this amounted to violations of the Americans with
Disabilities Act and Department of Justice regula-
tions prohibiting discrimination against the dis-
abled. The response was that a number of unauthor-
ized tables had been confiscated during a series of
unit shakedowns, and on September 27, 2012,
Roark was reassigned to living quarters which gave
him access to a writing table.

In grievance no. 709862–F1, signed October
17, 2012 (docket no. 104–29), Roark complained
about his move to a "noisy dorm known as the wild
west" for requesting a writing table. He also com-
plained again about the lack of writing tables. The
response was that a project has been initiated to
provide secured, standardized writing tables in
Wing C1, and Roark was assigned there in part to
meet his request for a writing table in his living
area. His current housing assignment includes an
adjacent secured writing table for his use.

In grievance no. 717984–F1 (docket no.
104–30), Roark said that in 2004, he finally worked
his way into "preferred housing," where he re-
mained for eight years without incident. He states
that he "earned his right to a two-man cell," but be-
cause he is disabled and exercised his right to
grieve for a table, he was relocated in retaliation to
a worse environment. The response to this griev-
ance was that Roark's complaint had been previ-
ously addressed and he did not present any new
evidence that would warrant reconsideration.

The exhaustion requirement means that inmates
must complete such administrative remedy pro-
cesses as are available, in a procedurally proper
manner. *Woodford v. Ngo,* 126 S.Ct. 2378, 2388
(2006). The Prison Litigation Reform Act contains
no requirement concerning who must be named in a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

grievance in order to perfect proper exhaustion. There is no indication that the grievance procedure of the Federal Bureau of Prisons requires that inmates name particular officials in their grievances. *See generally Scribner v. Linthicum,* 232 Fed.Appx. 395, 2007 WL 1228552 (5th Cir., April 26, 2007) (Texas state prison grievance procedure).

**\*17** A review of Roark's grievances indicates that he has exhausted his complaints about denial of dental care and medical care for his hand and arm, overcrowding, denial of writing tables, and his transfer to another dorm. Roark's complaints that the prison failed to provide a long-term doctor or dentist and the laundry facilities are inadequate have not been exhausted and may be dismissed on this basis.

**E. No Violation of the Eighth Amendment**

**1. Deliberate Indifference—Failure to Provide Dentures**

Roark maintains throughout his pleadings that he was denied dentures over a period of years, which amounted to cruel and unusual punishment. On November 10, 2011, Dr. Spencer Kemp noted that "per Admin, patients requesting a dental prosthesis must have a medical need for prosthesis and must put in a request to get on the list for prosthesis. This patient has not shown necessary medical need for prosthesis at this time."

The Defendants state when Roark arrived at Texarkana, he had 22 teeth—six upper and six lower anterior teeth and seven upper and three lower posterior teeth. Bureau of Prisons Program Statement 6400.02 provides that non-emergency dental care will be provided as resources of staff, time, and materials are available and commensurate with the inmate's ability to maintain good oral health. Dentures are prioritized for inmates with edentulous state affects their overall health, causing such conditions as mal-absorption or malnutrition. Roark's weight has fluctuated between 230 pounds in February of 2007 and 198 pounds in December

of 2011, generally remaining in the 220's. He underwent a hepatitis C medical regimen, during which time he steadily lost weight; Roark stated that "now that I am off that Interferon, I am gaining my muscle and weight back."

In November of 2007, a contract dentist determined that Roark had not shown a necessary medical need for prosthesis at that time. He reached the top of the waiting list in early 2012, and by June of 2012, when he filed this lawsuit, mandibular partial dentures had been fabricated. He currently has 17 teeth and three partial dentures, two mandibular and one maxillary.

The Defendants further contend that according to BOP policy, an institution with 1,000 general population inmates should have on staff one physician and one dentist, as well as multiple mid-level providers. Even while exceeding its rated capacity, FCI–Texarkana remained accredited with the American Correctional Association and the Joint Commission Accreditation Health Organization.

According to Federal Bureau of Prisons Program Statement P6400.02 (January 15, 2005) (document 104–4), emergency dental care includes treatment for relief of severe dental pain, traumatic injuries, acute infections, sedative fillings, extraction of non-restorable teeth, and gross debridement of symptomatic areas. Non-emergency dental care is provided as resources of staff, time, and materials are available, and commensurate with the inmate's ability to maintain good oral health. Non-emergency care is elective, and may include radiographs, oral health instructions, indicated prophylaxis, other periodontal therapy, endodontic and restorative treatments, oral surgery, and fabrication of a prosthesis.

Removable partial dentures may be provided at the chief dental officer's discretion; the Bureau is not required to replace missing teeth, regardless of where or when the teeth were removed. Removable partial dentures must be justified by a lack of teeth for adequate mastication, and will be provided

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

when the health of the inmate will be adversely affected, as determined by a dentist. Unless co-morbidities have been identified, contributing to malabsorption or malnourishment, an endentulous (i.e.toothless) state will not adversely affect an inmate's overall health. Care will be prioritized for inmates with documented medical conditions contributing to mal-absorption or malnourishment.

**\*18** Access to care must be equitable, through such means as treatment lists or appointment books. When care is requested, inmates will be placed on the waiting list in the chronological order of their initial request for health care located in the health record.

The Fifth Circuit has explained that under certain circumstances, the denial of dentures can amount to deliberate indifference to a serious medical need. In *Vasquez v. Dretke,* 226 Fed.Appx. 338, 2007 WL 756455 (5th Cir., March 9, 2007), the plaintiff alleged that because he had no dentures, he suffers from difficulty eating, headaches, disfigurement, severe pain, bleeding in his mouth, and blood in his stool, and a doctor recommended dentures for him. The Fifth Circuit stated these allegations were sufficient to state a claim for a serious medical need for dentures, reversing the district court's dismissal of the lawsuit as frivolous and for failure to state a claim. *See also Williams v. Mason,* 210 Fed.Appx. 389, 2006 WL 3716385 (5th Cir., December 14, 2006) (allegations that inmate suffered from cuts and bleeding taking days to heal, certain foods were very difficult to chew, he had digestive difficulties and needed dentures to chew properly; and he had not been issued a soft food pass were not frivolous).

By contrast, in *Perkins v. Texas Department of Criminal Justice—Correctional Institutions Division, et al.,* 514 Fed.Appx. 488, 2013 WL 657681 (5th Cir., February 22, 2013), the plaintiff complained of deliberate indifference for failure to provide dentures. The Fifth Circuit observed that the plaintiff did not lose weight for three years after having his teeth pulled, but complained of weight

loss and a dentist suspected that he had deliberately lost weight in order to get dentures. The court determined that the plaintiff "has stated a disagreement with the treatment he received and has raised a claim more akin to medical negligence or malpractice." Similarly, in *Hay v. Thaler,* 470 Fed.Appx. 411, 2012 WL 2086453 (5th Cir., June 8, 2012), the plaintiff complained that he was denied dentures, but the dentist's examinations showed that he did not meet the "medically necessary" criteria, including but not limited to the patient's body mass index, and the district court's grant of summary judgment was upheld. The court again noted that the claims were essentially disagreement with the treatment received, which does not rise to the level of a constitutional claim.

As a general rule, deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. *Norton v. Dimazana,* 122 F.3d 286, 291 (5th Cir. 1997); *Jackson v. Cain,* 864 F.2d 123 5, 1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985); *Norton,* 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. *Varnado v. Collins,* 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. *Graves v. Hampton,* 1 F.3d 315, 319–20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. *Mayweather v. Foti,* 958 F.2d 91 (5th Cir. 1992).

**\*19** More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical

Page 19

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. *Spears v. McCotter,* 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. *Banuelos v. McFarland,* 41 F.3d 232, 235 (5th Cir. 1995).

In *Domino v. TDCJ–ID,* 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." *Estelle v. Gamble,* 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 838 (1994).

*Domino,* 239 F.3d at 756; *see also Stewart v. Murphy,* 174 F.3d 530, 534 (5th Cir. 1999).

Roark's dental records show that after his arrival at Texarkana, he was treated for an abscessed tooth in April of 2003; this tooth, no. 12, was extracted and he received antibiotics. In July of 2005,

Dr. Del Toro found that tooth no. 18 had an enamel fracture due to gross decay and was non-restorable; Roark did not complain of pain and was noted as non-symptomatic, and Dr. Del Toro observed that Roark was already scheduled for an extraction of no. 18. (Docket no. 104, document 104–10, p. 72 of 94). This extraction was performed in August of 2005.

In November of 2006, Roark complained of toothache and an exposed nerve. X-rays were taken which revealed tooth decay in tooth no. 2 but without swelling or redness. Dr. Del Toro prescribed pain medication and an antibiotic and noted that Roark was scheduled for an extraction because the tooth was non-restorable. This extraction was performed in January of 2007. (Docket no. 104, document 104–10, p. 66 of 94). In April of 2007, Roark had a comprehensive exam including X-rays, a review of his oral hygiene index and dental history, and a review of his treatment plan. However, the dental hygienist noted that he was "very unhappy with dental care" and advised him to "make open house to talk with dentist."

On August 14, 2008, Roark again had an exam with X-rays and a review of his oral hygiene index, and he received instruction on oral hygiene techniques with a demonstration of proper brushing and flossing. His oral hygiene was listed as "fair." Two months later, on October 2, 2008, Roark saw Dr. Del Toro asking for antibiotics for a toothache, but she told him that antibiotics were not recommended for his condition at that time.

**\*20** On October 18, 2011, Roark was seen in the clinic and X-rays were taken. On October 31, Roark came to the clinic and talked to Dr. Kemp about dentures. At this time, mandibular acrylic dentures were listed as "in process," and maxillary acrylic dentures were listed as "not started." (Docket no. 104, document 104–10, p. 48 of 94). Two weeks later, on November 10, 2011, the mandibular dentures were listed as "not started." Dr. Kemp made an administrative note stating that "per admin, patients requesting a dental prosthesis

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

must have a medical need for prosthesis and must put in a request to get on the list for prosthesis. This patient has not shown necessary medical need for prosthesis at this time." Docket no. 104, document 104–10, p. 47 of 94).

On January 30, 2012, Dr. Kemp performed an extraction of the residual root of tooth no. 17. Three weeks later, on February 23, 2012, a preliminary alginate impression was taken of Roark's lower arch for mandibular acrylic dentures. An administrative note by Dr. Kemp on April 23, 2012 states that "Pt is in process of fabrication of lower partial denture. Pt has eleven remaining upper teeth including five posterior teeth. Mastication and function of existing upper dentition appears adequate at this time." An order form from a dentist named Dr. Downing, to Burbank Dental Laboratories, reads "Fabricate /p framework, set teeth and return for try-in. I want to have the teeth set *high*. I want to open the anterior bite. I am planning to build up the lower anterior teeth with composite at a later date. Give me a call if this is unclear."

On May 16, 2012, the final impressions for Roark's lower partial dentures were taken, and upper alginate impressions were taken for occlusion match. (Docket no. 104, document 104–10, p. 32 of 94). Roark filed this lawsuit on June 19, 2012. On June 27, 2012, a set of mandibular acrylic dentures was delivered to Roark, and he received counseling in dental appliance care. On August 23, 2012, Dr. Downing noted that teeth no.'s 13 and 14 needed extraction. This was done on August 30, 2012.

Roark has failed to show that the prison officials showed a "wanton disregard" for his dental needs. Although he complains that the failure to provide dentures when he wanted them was deliberate indifference, Dr. Kemp stated that Roark had no medical need for dentures. Roark's disagreement with Dr. Kemp's determination does not show that the dentist, or the prison officials, were deliberately indifferent to his dental needs. *Hay,* 470 Fed.Appx. at *3 (no deliberate indifference where dentist's examination showed prisoner did not meet the

"medically necessary" criteria for dentures); *Gobert v. Caldwell,* 463 F.3d 339, 346 (5th Cir. 2006).

In his response to the motion to dismiss, Roark says that "dental records clearly demonstrate a serious medical need for dentures," but does not identify what records show this; in fact, Roark attaches as an exhibit the November 2011 statement from Dr. Kemp that he has not shown a necessary medical need for prosthesis at that time. He speculates that "an inference can be drawn that prison officials trained/ordered Dr. Kemp to state on the record that Roark failed to demonstrate a need for dentures when it was apparent to any eye that Roark's dental condition was shocking to the conscience," but offers no substantiation of this claim. Roark insists that he was supposed to have been placed on the waiting list in 2003 and that he actually was put on the list in 2005.

Roark attaches an affidavit from an inmate named Maynard Brown, which says he was told between 2006 and 2010 that he, Brown, was on the waiting list for dentures, but that the list was moving very slowly. In 2012, Brown was told that he had not been on the list, but had been added in 2010.

**\*21** An affidavit from an inmate named Wesley Kingston states he arrived in Texarkana in June of 2007 and was placed on the denture waiting list in September of 2007. After he filed a grievance and verbally consulted with the health services administrator, Kingston believes he was moved to the top of the list, and preparations for dentures commenced about one week later; Kingston does not state when he filed the grievance or consulted with the administrator. He received his dentures in October of 2010. Although Kingston states he "did not have or express a serious medical need for dentures," there is no indication as to whether or not the medical department believed that he had such a need.

Roark also attaches exhibits documenting that he, Roark, received dental care and that he had been

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

put on the denture waiting list in 2005. Neither his response nor the exhibits contravene the conclusion that Roark did not suffer deliberate indifference to his serious dental needs. As a result, his claim of deliberate indifference concerning the failure to provide him dentures in what he believed to be a timely manner is without merit.

**2. Treatment for Roark's Arm**

The medical records show that Roark received a gunshot wound to his right arm and hand in 1981, and he received reconstructive surgery while in the custody of the Texas Department of Criminal Justice. He entered federal custody in July of 1990.

In October of 1996, an orthopedic specialist recommended that Roark be referred to a hand clinic for possible additional reconstructive surgery, but a determination was made by the Bureau of Prisons' Utilization Review Committee that evaluation at the hand clinic was not medically necessary. Between April of 1997 and December of 2008, Roark was seen at six-month chronic care clinic evaluations, but there was no indication that Roark complained of this injury or requested treatment for it.

In January of 2009, the physician at the chronic care clinic requested evaluation by an orthopedic specialist for possible corrective surgery and ordered a wrist brace for Roark. X-rays were taken, and on February 5, 2009, an orthopedic specialist, Dr. Pappas, evaluated Roark's right wrist and concluded that tendon surgery would be unsuccessful and that further intervention would be cosmetic and not likely to offer significant benefit. (Docket no. 104, document 104–6, pp. 11–12 of 55).

In his complaint, Roark asserts that Dr. Pappas failed to perform corrective surgery to attach his thumb tendon, the need for which was "apparent to any eye." He concedes that Dr. Pappas determined that in his opinion, tendon repair would be unsuccessful. Roark states Dr. Pappas wrote in his notes that "Plaintiff was verbally told he'd be placed on a waiting list for further evaluation," but this state-ment does not appear on the copy of Dr. Pappas' notes which is included in the Court's record.

In July of 2011, Roark states he asked Dr. Nash about his status on the orthopedic waiting list, and Dr. Nash told him he was "on no waiting list." The next month, he wrote to the Department of Justice, and at that time learned about the "South Central Medical Review Board," which Roark says was responsible for denial of thumb tendon repair.

In his response, Roark asserts he never sought cosmetic surgery, but only thumb tendon repair. He states the evaluations by orthopedic consultants in 1996 and 2009 consisted of about three minutes of consultation and visual views of X-rays, but no soft tissue evaluations were ever done; Roark contends that the lack of any testing or examination to facilitate possible thumb tendon repair amounts to no treatment at all. His disagreement with the medical care received, and his belief that the examination was inadequate because more tests should have been run, do not show that Roark was the victim of deliberate indifference to his serious medical needs. *See Patterson v. Dretke,* civil action no. 2:04cv132, 2004 WL 1205121 (N.D.Tex., June 2, 2004) (inmate's disagreement with medical treatment received and belief that more tests should be conducted does not amount to deliberate indifference), *citing Varnado,* 920 F.2d at 321. Roark's claim on this point is without merit.

**\*22** Dr. Pappas' denial of surgery occurred in February of 2009 and thus is barred by the statute of limitations; furthermore, Dr. Pappas has never been served with process and has been dismissed under Fed. R. Civ. P. 4(m). Aside from these issues, Roark has failed to show that he was the victim of deliberate indifference to his serious medical needs; his complaint is essentially that he believed he should have tendon repair surgery and disagreed with the orthopedic specialist's determination that such surgery would be of little benefit. Such disagreement cannot form the basis of a deliberate indifference claim. *Norton,* 122 F.3d at 293. Because Roark has failed to show that the prison medical

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

personnel demonstrated a "wanton disregard for a serious medical need," his claim of deliberate indifference with regard to his arm is without merit. *Domino,* 239 F.3d at 756; *Stewart,* 174 F.3d at 534.

### 3. Inadequate Staffing of the Medical Department

Roark contends that for extended periods of time, specifically identifying September of 2011 to January of 2012, the prison had only one physician's assistant and no resident doctor for a prison population of over 1500 inmates. During that time, he was on "dangerous chemical therapy" for hepatitis without a doctor to order "mandatory blood testing." Roark states that

The Defendants' failure to provide adequate medical staffing resulted in 'substandard' medical care creating a substantial risk of serious harm to Plaintiff while undergoing dangerous chemo therapy. Plaintiff was started on dangerous chemical therapy for Hepatitis C without a resident doctor and for the most part one P.A. Essentially Plaintiff was left to his own care/devices lacking a doctor to order mandatory blood-chemistry testing necessary to monitor and most importantly *regulate* dangerous drug doses to prevent known serious risk of injury or death.

At the time of treatment, a doctor's signature on bloodwork orders were [sic] mandatory to validate the medical system. Further, Warden Carvajal failed to provide a(any) doctor with knowledge concerning Hepatitis C treatment options, knowledge of severe side effects both short/long term risks to plaintiff's health and well being necessary for Plaintiff to make an intelligent decision warranting ending treatment to prevent long term serious harm. Plaintiff was left to his imagination creating serious emotional injuries.

The Defendants state according to Roark's medical records, he underwent treatment by medications called Interferon and Ribavirin between July of 2011 and January of 2012. During this period of time, he had his blood drawn on 15 different occasions and sent to the lab for analysis. Each of the lab reports was reviewed by either Dr. Nash, the clinical director, or Dr. Russell, the regional physician. *See, e.g.,* docket no. 104, document 104–8, p. 35 of 64 (lab results of blood drawn November 21, 2011, reviewed by Dr. Russell).

In his response, Roark states when Dr. Nash left for deployment in the military reserves, this left no doctor available to read the lab results, consult for medical advice as to side effects, or reduce doses of drugs to prevent serious injury or death. He describes Dr. Russell as "a competent, hard working regional doctor" but that Dr. Russell has many other duties or institutions to attend to and "his availability to monitor thousands of inmates is not indicative of timely reviews and physician-patient interaction."

Roark's contention in this regard fails to show deliberate indifference to his serious medical needs. While there may not have been a doctor physically present at the prison, this circumstance did not interfere with his blood testing or the review of his lab results. *See Stewart,* 174 F.3d at 534–36. Roark was seen during this period of time by Allen, a nurse practitioner, meaning that he was not denied access to medical care. His claim on this point is without merit.

**\*23** Roark complains of particular instances of receiving allegedly substandard care, but fails to show that he suffered harm as a result. He states that in July of 2011, a nurse named Washington almost gave him too small of a dose of interferon, but then gave him the correct amount. A week later, a nurse named Duggin started to give him too large of a dose, but also ended up giving him he correct amount. Neither Washington nor Duggin are defendants in this lawsuit.

Roark complained that in October of 2011, he was suffering side effects, including weight loss, ulcers in the mouth, tongue, throat, stomach, and upper and lower gastrointestinal tracts, psoriasis, and fungal infections, but was unable to see a doc-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 23

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

tor; however, he did not file any grievances concerning his inability to see a doctor about these side effects, and thus did not exhaust his administrative remedies concerning this claim. Furthermore, Roark's medical records show that in December of 2011, he saw a nurse practitioner named Gary Allen and said that he wanted to delay treatment of psoriasis and nail fungus until he finished the interferon treatment. (Docket 104–6, p. 9 of 55). Thus, Roark did have access to medical care during the time period of which he complains, and the fact that he saw a nurse practitioner rather than a doctor does not amount to a constitutional violation. Roark's claim on this point is without merit.

In a related claim, Roark argues that he was denied due process in the fact that the "Medical Review Committee" denied him thumb repair without due process, because he was never given notice of this decision and thus had no opportunity to appeal. The Warden's response to grievance no. 667323–F1 (docket no. 104–25, p. 5 of 9) states that "on October 30, 1996, you were examined by the orthopedic consultant, and he recommended that you be evaluated by the orthopedic hand clinic for possible further reconstructive surgery. The Medical Review Committee reviewed the recommendation and determined the medical care recommended by the orthopedic consultant was medically acceptable but not medically necessary; therefore, the request was denied." The response went on to note that in February of 2009, Roark was again evaluated by an orthopedic consultant, who considered further intervention to be cosmetic and not likely to offer any significant benefits.

This response indicates that in 1996, some 16 years before Roark filed suit, a review committee denied a recommendation by an orthopedic consultant that Roark be evaluated by an orthopedic hand clinic. Even assuming that Roark could somehow overcome the limitations bar on this claim, he has not shown that he was entitled to notice or an opportunity to be heard concerning this decision, nor that he had a liberty interest in having the orthoped-

ic consultant's recommendation carried out. Roark thus cannot maintain a due process claim. *See generally Augustine v. Doe,* 740 F.2d 322, 327 (5th Cir. 1984) (in determining whether governmental action has violated an individual's right to procedural due process, the district court must first address whether or not the governmental action has deprived the person of a protected life, liberty, or property interest). Roark's claim on this point is without merit.

**4. Overcrowding**
Roark complains that the prison at FCI–Texarkana was severely overcrowded, operating at almost 200 percent of its rated capacity. The Defendants acknowledge that the prison operated well above its rated capacity; in 2004, the prison reached its peak at 193.35 percent, and is currently at 167.3 8 percent.

**\*24** However, the courts have held that overcrowding alone does not amount to a constitutional violation. In *Lineberry v. U.S.,* civil action no. 5:08cv72, 2009 WL 499763 (E.D.Tex., February 27, 2009, *appeal dismissed as frivolous* 436 Fed.Appx. 293, 2010 WL 7114190 (5th Cir., June 3, 2010), this Court held as follows:

Lineberry first complains about the overcrowding, and it appears that in fact, the prison is overcrowded. The main prison at Texarkana has a capacity of approximately 740 inmates, and as of January 29, 2009, the inmate population was 1,302 inmates. *See* http://www.bop.gov/ locations/weekly_report.jsp# bop.

However, this fact alone does not show that a constitutional violation has occurred. In *Rhodes v. Chapman,* 452 U.S. 337 (1981), prisoners housed in an Ohio maximum-security prison brought a class action in federal court alleging that double-celling was unconstitutional. They asserted that double-celling confined inmates too closely. The evidence showed that the cells in the facility were approximately 63 square feet and contained a two-tiered bunk bed, a night-stand, a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 24

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

sink, and a toilet, as well as a cabinet, a shelf, and a radio built into the wall.

At the time that the case went to court, the facility held 38 percent more inmates than its rated capacity, and had approximately 1,400 inmates who were double celled. Some of these could spend time outside of their cells, but others, in more restrictive classifications, were only given between two and six hours per week in out-of-cell time.

The district court found that these conditions amounted to cruel and unusual punishment, and the Sixth Circuit affirmed the decision, concluding that the district court's findings were not clearly erroneous. On appeal, the Supreme Court reversed, holding that the district court's conclusion that double-celling at the facility constitutes cruel and unusual punishment was "unsupportable." The Court stated that to the extent that prison conditions are restrictive and even harsh, so long as they do not amount to cruel and unusual punishment, they are part of the penalty that criminal offenders pay for their offenses against society

In the present case, Lineberry offers nothing beyond conclusory allegations that he has been subjected to cruel and unusual punishment as a result of the overcrowding. The fact that multiple inmates are placed into cells designed to hold only one, by itself, is not cruel and unusual, as the Court explained in *Rhodes*. He has not shown that the overcrowding has created conditions which go beyond being restrictive and harsh, to the unnecessary and wanton infliction of pain, or which are grossly disproportionate to the severity of the crime warranting imprisonment. Lineberry's claim for relief on this ground is without merit.

Similarly, Roark has failed to show that he was subjected to cruel and unusual punishment as a result of the overcrowding. The Fifth Circuit has explained that indicia of confinement constituting

cruel and unusual punishment include wanton and unnecessary infliction of pain, conditions grossly disproportionate to the severity of the crime warranting imprisonment, and the deprivation of the minimal civilized measures of life's necessities. *Wilson v. Lynaugh,* 878 F.2d 846, 848 (5th Cir.), *cert. denied* 493 U.S. 969 (1989). The Supreme Court has held, however, that to the extent that prison conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society. *Rhodes,* 452 U.S. at 346–7.

**\*25** In this case, the fact that inmates who work during the day are denied access to the big yard, the jogging track, handball courts, the soccer field, and the softball field does not amount to an unnecessary and wanton infliction of pain, nor does the fact that corridors are congested during large-scale moves. These conditions do not amount to cruel or unusual punishment.

While Roark complains about the removal of laundry machines and the subsequent failure to wash clothes and bed linens thoroughly, he has not exhausted his administrative remedies concerning this claim. Roark has not alleged facts showing that there is an excessive risk that he will suffer serious harm as a result of the prison population. *See Collins v. Ainsworth,* 382 F.3d 529, 539 (5th Cir. 2004).

In an affidavit attached to his response, Roark states that prisoners were "warehoused" in the gym and common areas were used as living quarters. As a result of the crowding and mismanagement, many departments, including medical and dental as well as education and recreation, were unable to meet the needs of the inmate population. He was "substantially prejudiced/anguished" by these conditions and fears for his health and safety, although he acknowledges that the facility is less crowded now than it has been in the past.

Roark also attaches affidavits from other prisoners, including Jerry Crist, Ricky Dority, Billy

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
(Cite as: 2014 WL 4447451 (E.D.Tex.))

Key, and Dale Lancy, attesting to the overcrowded conditions. There is no dispute that the prison was overcrowded and operating at well above its rated capacity. Neither Roark's affidavit nor those of the other prisoners show that Roark suffered an Eighth Amendment violation, nor does Roark's argument that 130 percent of designed capacity is the upper limit at which prison officials retain the ability to provide necessary services. His claim on this point is without merit.

**F. Discrimination**

**1. Fifth Amendment Discrimination**

Roark contends that he was subjected to "discrimination" in violation of the Fifth Amendment when other prisoners were moved up on the denture list ahead of him, other prisoners or prisons were "provided adequate medical care with much less crowding/understaffing," and he was denied an adequate writing table. The Supreme Court has explained that in order to set out a Fifth Amendment discrimination claim, the plaintiff must plead and prove that the defendants acted with discriminatory purpose; this involves a showing that the decision-maker undertook a course of action "because of," and not merely "in spite of," the action's adverse effects upon an identifiable group. Thus, the Supreme Court stated, it follows that the plaintiff must plead sufficient factual matter to show that the defendants adopted and implemented the policies at issue not for a neutral reason but "for the purpose of discriminating on account of race, religion, or national origin." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1948 (2009) .

Roark has failed to show that he was the victim of discrimination based on race, religion, or national origin, nor membership in any other protected class. He presents an affidavit from Wesley Kingston stating that he, Kingston, believes he was moved to the top of the denture waiting list after filing a grievance and consulting with the Health Services Administrator, but fails to show whether or not a determination was made that Kingston had

a medical need for dentures making his case an emergency rather than routine. The summary judgment evidence shows that when Roark complained about the lack of a writing table, he was moved to a housing area where tables were provided, and he fails to show on basis he was allegedly discriminated against through the denial of a writing table. He has failed to show that he was the victim of unlawful discrimination in violation of the Fifth Amendment.

**\*26** Roark refers to himself in his complaint (p. 41) as being a "class of one," stating that his Fifth Amendment right to due process was violated when he was not provided with a writing table in his living area, but other living areas such as G Unit did get tables. The Fifth Circuit has explained that to establish liability under a "class of one" equal protection analysis, the plaintiff must establish that he was intentionally treated differently from others similarly situated and that there was no rational basis for any such difference. *Wilson v. Birnberg,* 667 F.3d 591, 599 (5th Cir. 2012). In this case, Roark has not provided sufficient information to ascertain whether he was "similarly situated" to the prisoners on G Wing, nor whether or not a rational basis existed for the difference in treatment. Instead, he offers only the bare assertion that inmates on G Wing had access to writing tables while inmates on C Wing did not. The Fifth Circuit has held that bare and conclusory assertions are insufficient to support a "class of one" equal protection claim, particularly where these assertions offer no basis upon which to determine that persons similarly situated to the plaintiff were treated differently without rational basis. *Bell v. Woods,* 382 Fed.Appx. 391, 2010 WL 2545421 (5th Cir., June 18, 2010), *citing Pedraza v. Meyer,* 919 F.2d 317, 318 n. 1 (5th Cir. 1990); *Smith v. Kimbhal,* 421 Fed.Appx. 377, 2011 WL 1304862 (5th Cir., April 6, 2011), *citing Ashcroft,* 129 S.Ct. at 1950. Roark's claim of "class of one" discrimination is without merit.

Roark also complains of discrimination in that about one-third of the prison does not have air con-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

ditioning. He attaches an affidavit from an inmate named Randall McNeese, stating that he, McNeese, lived in B–3 Dorm, which had no air conditioning, and temperatures in his cell sometimes exceeded 107 degrees. However, Roark does not indicate that he lived in B Dorm at any time, nor that C Dorm, where he lived, was without air conditioning. He lacks standing to complain about McNeese's living conditions, and the assertion that heat in B dorm created "stressful, potentially dangerous and violent living conditions" does not show that these conditions existed on C Dorm, where Roark was housed. *See Coon v. Ledbetter,* 780 F.2d 1158, 1159 (5th Cir. 1986) (persons claiming a deprivation of constitutional rights are required to show a deprivation of their personal rights); *Reichenberger v. Pritchard,* 660 F.2d 280, 285 (7th Cir. 1981) ("mere remote or speculative possibility of injury" not sufficient under Section 1983). Roark's claim on this point is without merit.

**2. Americans with Disabilities Act Discrimination**

Roark asserts that he is a "disabled individual" and that the failure to provide him with a writing table violates the Americans with Disabilities Act and the Rehabilitation Act. He states that in November of 2011, he submitted an inmate request for staff asking for a table, and Warden Ibarra responded by saying that Roark should contact a member of his unit team. When he did so in December of 2011, his request was ignored.

In January of 2012, he submitted another request for a table, and Goodsell told Roark to go ahead and find a table and that he, Goodsell, would also try to find one. When nothing came of this, Roark submitted an informal request for remedy asking for a table. Goodsell told him that he could use tables in the library, which in fact Roark could not use because of his work schedule, or one of the four computer Trulincs stations, which Roark says were located in the TV room and had to serve 180 prisoners. Goodsell told Roark that there was a plan to provide uniform writing tables, but Roark indic-

ates that he has been told this since 2005.

In September of 2012, which is after the lawsuit was filed but prior to the amended complaint, Roark states he was reassigned to C–1 Dorm, which he characterizes as "primarily utilized as housing quarters for newly arrived prisoners, troublemakers, and prisoners released from SHU [Special Housing Unit] administrative segregation." He states this was an undesirable housing assignment compared to the place from which he had come, indicating a belief that the transfer was retaliatory. Roark concedes that there were writing tables in C–1, but says that these were "experimental" and poorly designed because they had a surface area of only 16 by 16 inches and thus were merely "pedestals."

**\*27** Goodsell told Roark and other prisoners that unauthorized tables were being confiscated because prisoners were using several tables and an ironing board as eating tables in the TV room while expecting a prison accommodation inspection. Roark characterizes this as "punishment" though he does not dispute that the confiscated tables were in fact unauthorized. He also contends that the failure to provide a writing table was "cruel and unusual punishment."

The Fifth Circuit has held that claims for monetary damages under the Rehabilitation Act for alleged discrimination under any program or activity against the Bureau of Prisons or its director are shielded by sovereign immunity. *Chamberlain v. Chandler,* 344 Fed.Appx. 911, 2009 WL 2957305 (5th Cir., September 15, 2009), *citing Lane v. Pena,* 518 S.Ct. 187, 192–93 (1996). Furthermore, individuals may not be sued in their individual capacities under the Rehabilitation Act. *Lollar v. Baker,* 196 F.3d 603, 609 (5th Cir. 1999). Although Roark expressly relies on Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), the Bureau of Prisons does not fit within the definition of "programs or activities" governed by § 794(a). *Williams v. Meese,* 926 F.2d 994, 997 (10th Cir. 1991); *Arawole v. Heimanway,* civil action no. 4:04cv506, 2005 WL 659133 (N.D.Tex., March 22, 2005).

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

Roark has no basis for a claim under the Rehabilitation Act and this contention is without merit.

Similarly, the Fifth Circuit has held that the Bureau of Prisons is an agency of the Department of Justice, which is within the executive branch of the federal government, and the Americans with Disabilities Act is not applicable to the federal government. *Marlin v. Alexandre,* 254 Fed.Appx. 374, 2007 WL 3390995 (5th Cir., November 15, 2007), *citing United States v. Bourgeois,* 423 F.3d 501, 509 (5th Cir. 2005) *and Henrickson v. Potter,* 327 F.3d 444, 447 (5th Cir. 2003). As with the Rehabilitation Act, the Americans with Disabilities Act does not apply to persons sued in their individual capacities. *Lollar,* 196 F.3d at 609; *James v. Federal Bureau of Prisons,* civil action no. 1:04cv678, 2008 WL 686419 (E.D.Tex., March 10, 2008). Roark's claim under the Americans with Disabilities Act is without merit.

**G. Qualified Immunity**

The Defendants assert they are entitled to the defense of qualified immunity for claims brought against them in their individual capacities. The invocation of qualified immunity applies to claims for damages brought against government officials in their individual capacities. The Fifth Circuit has stated that the qualified immunity defense serves to shield a government official from civil liability for damages based upon the performance of discretionary functions if the official's actions were reasonable in light of then clearly existing law. *Atteberry v. Nocona General Hospital,* 430 F.3d 245, 253 (5th Cir. 2005), *citing Thompson v. Upshur County,* 245 F.3d 447, 456 (5th Cir. 2001). In this regard, the Fifth Circuit has explained even if the official's conduct violated a clearly established constitutional right, the official is nonetheless entitled to qualified immunity if his conduct was objectively reasonable. *Jones v. Collins,* 132 F.3d 1048, 1052 (5th Cir. 1998).

After the defendants properly invoke qualified immunity, the plaintiff bears the burden to rebut its applicability. *Tolan v. Cotton,* 713 F.3d 299, 304

(5th Cir. 2013). In order to abrogate a public official's right to qualified immunity, the plaintiff must show the official's conduct violated a constitutional or statutory right and the official's actions constituted objectively unreasonable conduct in the light of clearly established law at the time of the conduct in question. *Id.* In other words, when the defendant moves for summary judgment based on qualified immunity, it is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have then known the alleged acts of the defendant violated the Constitution. *Stevenson v. Young,* slip op. no. 12–60138, 2013 WL 1152046 (5th Cir., March 19, 2013), *citing Thompson v. Upshur County,* 245 F.3d 447, 460 (5th Cir. 2001).

**\*28** In this case, Roark has not shown that the conduct of any of the Defendants violated any clearly established constitutional or statutory rights of which a reasonable prison official would have known, nor that the actions of the Defendants were objectively unreasonable in light of clearly established law. He has failed to meet his burden of overcoming the qualified immunity defense and the Defendants' motion to dismiss or for summary judgment should be granted on this basis as well.

**H. Other Claims**

Roark extensively discusses theories of liability predicated upon various defendants' positions of authority. To the extent that such claims are based on *respondeat superior* liability, they are without merit; the Supreme Court has explained that "it is undisputed that supervisory *Bivens* liability cannot be established solely on a theory of *respondeat superior.*" *Ashcroft,* 129 S.Ct. at 1948; *Cronn v. Buffington,* 150 F.3d 538, 544 (5th Cir. 1988). Roark's claims based upon *respondeat superior* are without merit.

Roark also complains that he filed grievances which placed prison officials on notice of the problems, but that these grievances were not acted upon in the manner he believed appropriate. The Fifth Circuit has held that inmates do not have a constitutionally protected liberty interest in having griev-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

ances resolved to their satisfaction, and there is no violation of due process when prison officials fail to do so. *Geiger v. Jowers,* 404 F.3d 371, 373–74 (5th Cir. 2005); *see also Edmond v. Martin,* 100 F.3d 952, 1996 WL 625331 (5th Cir., October 2, 1996) (prisoner's claim that a defendant "failed to investigate and denied his grievance" raised no constitutional issue); *Thomas v. Lensing,* 31 Fed.Appx. 153, 2001 WL 1747900 (5th Cir., December 11, 2001) (same).Roark's claim that his grievances were not acted on in the manner he believed appropriate is without merit.

Roark goes on to assert claims of retaliation, specifically indicating that he "was punished by retaliatory and discriminatory acts, of relocation from preferred housing (two man cell) earned by good conduct, as other prisoners, C2–7(L) for approximately 8 years to an overcrowded, noisy dorm known among staff and prisoners alike as the 'wild west.' "

The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that but for the retaliatory motive, the action complained of would not have occurred. *Johnson v. Rodriguez,* 110 F.3d 299, 310 (5th Cir. 1997). This requirement places a heavy burden upon inmates, because mere conclusionary allegations will not suffice; instead, the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred. *Woods v. Smith,* 60 F.3d 1161, 1166 (5th Cir. 1995). The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation. *Johnson,* 110 F.3d at 310, *citing Woods v. Edwards,* 51 F.3d 577, 580 (5th Cir. 1995).

In this case, Roark has failed to offer anything beyond his own personal belief that he was the victim of retaliation, nor that but for a retaliatory motive, he would not have been transferred to a housing area with writing tables after complaining

that he did not have a writing table. The response to Roark's grievance advised him that C–1 was the first wing in the East Unit to be outfitted with approved secured writing tables, and he was sent there after filing a grievance about not having a table. He has not shown either direct evidence of retaliation nor a chronology from which retaliation may be inferred. Roark's claim on this point is without merit.

**I. The Unidentified Defendants**

**\*29** Roark named three unidentified "John Doe" defendants in his lawsuit. The first of these, on page 12 of the amended complaint, is identified as "John Doe, U.S. Attorney General" responsible for the promulgation of Bureau of Prisons policies. The second, also on page 12 of the amended complaint, is identified as the Director of the Federal Bureau of Prisons in 1997, who was Kathleen Hawk Sawyer. The third, on page 33 of the amended complaint, is identified as "John Doe, believed to be B.A. Rhoden, Secretary to J.A. Keller, Regional Director." Roark states that this individual failed to take action to prevent violations of the Rehabilitation Act and is sued for monetary damages in his individual capacity.

To the extent that Roark seeks to sue Sawyer and the U.S. Attorney General in their personal capacities, such claims fail because these defendants are not subject to the personal jurisdiction of the Court. Roark has not shown that he is entitled to have the Court order the Director or the Attorney General to promulgate regulations requiring that the medical review committee provide written notice of their decisions concerning a medical provider's recommendations. Although Roark states that he is suing the unknown individual, possibly Rhoden, in his individual capacity, this claim lacks merit because the Rehabilitation Act does not allow for suits against individuals in their individual capacities. *Lollar,* 196 F.3d at 609.

Furthermore, the Fifth Circuit has held parties not joining in a successful motion for summary judgment are nonetheless entitled to benefit from that motion. *See Lewis v. Lynn,* 236 F.3d 766, 768

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

(5th Cir. 2001). This is because, as the Fifth Circuit explained, where a defending party establishes that a plaintiff has no cause of action, the defense generally also inures to the benefit of a defaulting defendant. *Lewis,* 236 F.3d at 768, *citing United States v. Peerless Ins. Co.,* 374 F.2d 942, 945 (4th Cir. 1967); *see also Armenta v. Pryor,* civil action no. 5:06cv76, 2009 WL 331876 (E.D.Tex., Feb. 9, 2009, *aff'd* 377 Fed.Appx. 413, 2010 WL 1849278 (5th Cir., May 10, 2010) (dismissing unserved defendants where the plaintiff's "allegations of retaliation are wholly conclusory and insubstantial, and insufficient to maintain a Section 1983 action," whether the retaliation was carried out by served or unserved defendants). Hence, these unnamed parties who did not join in the motion for summary judgment because they were not served are entitled to benefit from that motion.

### Conclusion

The Defendants have filed a motion to dismiss or, in the alternative, for summary judgment. Because this motion relies on matters outside the pleadings, it is properly construed as a motion for summary judgment. Fed. R. Civ. P. 12(d).

On motions for summary judgment, the Court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party; after such examination, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Securities and Exchange Commission v. Recile,* 10 F.3d 1093, 1097 (5th Cir. 1994); *General Electric Capital Corp. v. Southeastern Health Care, Inc.,* 950 F.2d 944, 948 (5th Cir. 1992); Rule 56(c), Fed. R. Civ. P. . The plaintiff cannot oppose summary judgment by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). The Court added that "summary

judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant." *Little,* 37 F.3d at 1075.

***30** In this case, the pleadings and the competent summary judgment evidence show there are no disputed issues of material fact and that the Defendants are entitled to judgment as a matter of law. Accordingly, the Defendants' motion for summary judgment should be granted.

### Roark's Counter–Motion for Summary Judgment

Roark's response to the Defendants' motion for summary judgment includes a counter-motion for summary judgment. He argues he has stated sufficient facts to set out a claim for relief which is "plausible" and thus meets the pleading standards of *Bell Atlantic v. Twombly,* 550 U.S. 544, 570 (2007). Roark states he has legal standing to bring his claim and that the Court has personal jurisdiction over Samuels, Watts, Lappin, and Sawyer because they were personally involved in creating policies; in addition, he maintains the court has personal jurisdiction over Watts because Watts, as national grievance coordinator, had the authority to abate the unreasonable delay in the provision of dentures.

Roark argues he has exhausted all of his administrative remedies and goes on to repeat the allegations of his complaint, which have been discussed above. Neither his allegations nor the exhibits he attaches show he is entitled to summary judgment as a matter of law; on the contrary, the undisputed facts demonstrate that the Defendants are entitled to summary judgment for the reasons stated herein. Roark's counter motion for summary judgment should be denied.

### RECOMMENDATION

It is accordingly recommended that the Defendants' motion to dismiss or for summary judgment (docket no. 103) be granted and that the above-styled civil action be dismissed with preju-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)
**(Cite as: 2014 WL 4447451 (E.D.Tex.))**

dice. Consequently, Plaintiff's counter-motion for summary judgment should be denied.

A party's failure to file objections to the findings, conclusions, and recommendations contained in this Report within 14 days after service with a copy thereof shall bar that party from *de novo* review by the district judge of those findings, conclusions, and recommendations and, except upon grounds of plain error, from appellate review of the unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc* ).

**SIGNED this 9th day of July, 2014.**

E.D.Tex., 2014
Roark v. Flanery
Not Reported in F.Supp.3d, 2014 WL 4447451 (E.D.Tex.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Kansas.
Dennis G. CAPPELL, Plaintiff,
v.
DEPARTMENT OF the ARMY, SECRETARY,
Defendant.

No. 2:13–CV–2303–JTM.
Signed Nov. 6, 2014.

Dennis G. Cappell, Kansas City, MO, pro se.

Christopher Allman, Robin R. Anderson, Office of
United States Attorney, Kansas City, KS, for Defendant.

**MEMORANDUM AND ORDER**

J. THOMAS MARTEN, District Judge.

*1 Plaintiff Dennis G. Cappell seeks monetary
damages from his past employer, defendant Department of the Army ("defendant") for alleged race
discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e, *et seq.* ("Title VII"). This matter is
before the court on defendant's Motion for Summary Judgment (Dkt.50) and Motion to Strike Deposition Correction Sheet (Dkt.52). For the reasons
stated below, defendant's motions are granted. Because defendant's Motion to Strike has direct bearing on its Motion for Summary Judgment, the court
undertakes this analysis first.

**I. Motion to Strike Deposition Correction Sheet**

In its Motion, defendant seeks to strike
plaintiff's deposition corrections on the grounds
that the corrections were untimely and substantively altered plaintiff's testimony. Defendant deposed plaintiff, appearing *pro se,* on June 4, 2014.
At the start of the deposition, plaintiff was informed that he would have an opportunity to review
the transcript and make any changes or corrections

on an errata sheet. Dkt. 52–2, at 7. He was also advised that he would have only thirty days to make
these changes or corrections; otherwise, the transcript would be deemed correct. Dkt. 52–2, at 7.

The preliminary transcript was sent to plaintiff
on June 12, 2014. Dkt. 52–1, at 2. The cover letter
attached to the transcript reminded plaintiff that he
had thirty days to review, sign, and return the transcript along with any corrections. Dkt. 52–1, at 2.
On July 14, 2014, two days *after* the initial deadline
had passed without response from plaintiff, he was
again advised, in writing, to return the signature
page and any corrections within ten days or the
transcript would be filed without his signature. Dkt.
52–3, at 2. Plaintiff still failed to respond. Given
plaintiff's testimony, defendant therefore filed the
pending Motion for Summary Judgment on July 24,
2014. Four days later, on July 28, 2014, defendant
received plaintiff's deposition correction sheet.[FN1]

> FN1. It appears that plaintiff certified his
> changes before a notary public on July 22,
> 2014. Dkt. 52–4, at 3. These changes were
> certified by the court reporter on July 25,
> 2014. Dkt. 52–4, at 2. Defendant's counsel
> did not receive these changes until July 28,
> 2014.

Federal Rule of Civil Procedure 30(e) provides:

If requested by the deponent or a party before
completion of the deposition, the deponent shall
have 30 days after being notified by the officer
that the transcript or recording is available in
which to review the transcript or recording and, if
there are changes in form or substance, to sign a
statement reciting such changes and the reasons
given by the deponent for making them. The officer shall indicate in the certification prescribed
by subdivision (f)(1) whether any review was requested and, if so shall append any changes made
by the deponent during the period allowed.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

"The Tenth Circuit construes the 30–day period for submitting changes as 'mandatory' and that deposition changes are permissible under Rule 30(e) **only** if the party submitting the errata sheet establishes that the submission was provided to the court reporter within the time limit." *United States ex rel. Smith v. Boeing Co.,* 2011 U.S. Dist. LEXIS 12980, at *3, 2011 WL 587966 (D.Kan. Feb. 10, 2011) (citing *Rios v. Bigler,* 67 F.3d 1543, 1552 (10th Cir.1995) (emphasis in original)); *see also ICE Corp v. Hamilton Sundstrand Corp.,* 2007 U.S. Dist. LEXIS 89290, at *4–5, 2007 WL 4259484 (D.Kan. Dec. 3, 2007) (narrowly construing the 30–day requirement and striking an untimely errata sheet).

**\*2** It is undisputed that the changes to plaintiff's deposition occurred more than thirty days (and indeed, more than *forty* days) after plaintiff learned of the availability of this transcript on June 12, 2014. Plaintiff has not filed any opposition to defendant's motion. While the court acknowledges plaintiff's *pro se* status, both at the time his errata sheet was due and now, it is well established in this Circuit that "a plaintiff's *pro se* status does not relieve him from complying with this court's *procedural* requirements." *Auld v. Value Place Prop. Mgmt., LLC,* 2010 U.S. Dist. LEXIS 14907, at *47 n. 79, 2010 WL 610690 (D.Kan. Feb. 19, 2010) (citing *Barnes v. United States,* 173 F. App'x 695, 697 (10th Cir.2006) (emphasis added)). Plaintiff was warned of the consequences of his failure to submit timely corrections to his deposition transcript. He failed to heed those warnings. As such, defendant's Motion to Strike (Dkt.52) is granted.

## II. Motion for Summary Judgment
### A. Local Rule Dispute
Similarly, defendant alleges that plaintiff failed to comply with standard summary judgment procedure and respond specifically to the facts set forth in defendant's Memorandum. Instead, defendant alleges, plaintiff "opted to create his own list of facts." Dkt. 61, at 2. Defendant therefore requests that its statements of fact not specifically controver-

ted by plaintiff be deemed admitted in accordance with Kansas Local Rules.

The Kansas Local Rules provide as follows with regard to summary judgment procedure:

(a) **Supporting Memorandum.** The memorandum or brief in support of a motion for summary judgment must begin with a section that contains a concise statement of material facts as to which the movant contends no genuine issue exists. The facts must be numbered and must refer with particularity to those portions of the record upon which movant relies. All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless *specifically controverted* by the statement of the opposing party.

(e) **Duty to Fairly Meet the Substance of the Matter Asserted.** If the responding party cannot truthfully admit or deny the factual matter asserted, the response must *specifically* set forth in detail the reasons why. All responses must fairly meet the substance of the matter asserted.

D. KAN. R. 56.1(a), (e) (emphasis added).

The only factual statements from defendant's motion *specifically controverted* by plaintiff are: 5, 7, 13, 18, 19, 26, 27, 30, 32, 36, 40, 41, 53, 57, 60, and 61. Defendant therefore argues that the remaining facts set forth in its Memorandum in Support of Summary Judgment should be deemed admitted for purposes of summary judgment. The court agrees. Again, plaintiff's *pro se* status does not relieve him from complying with the court's procedural requirements. *Auld,* 2010 U.S. Dist. LEXIS 14907, at *47 n. 79, 2010 WL 610690. Therefore, those facts not specifically controverted by plaintiff are deemed admitted for purposes of summary judgment.

### B. Factual and Procedural Background
**\*3** Plaintiff's allegations stem from his time as a dual-status employee at the Army Air Support Facility Olathe ("ASF Olathe") located in Gardner,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

Kansas. Plaintiff is an African–American who was hired in 2004 as a federal civilian employee. As a condition of his employment, he also maintained membership in the Army Reserves. Plaintiff generally worked as a Maintenance Administrative Technician, but, when he received military orders, would report to duty as a member of the military as a Chinook helicopter pilot in training. Plaintiff often reported to military duty at ASF Olathe. During the time in question, plaintiff's civilian hierarchy was as follows: (1) immediate supervisor Russell Reese ("Reese"), (2) senior civilian/second-level supervisor rater Ronald Erkie ("Erkie"), and (3) third-level supervisor Aviation Support Facility Supervisor Michael Walsh ("Walsh").

**1. Civilian Issues**

As a Maintenance Administrative Technician, plaintiff's primary civilian responsibility was collecting timesheets and inputting payroll for all ASF Olathe employees. Because his military orders sometimes took him away from these duties for months at a time, other civilian employees were tasked with inputting payroll in plaintiff's absence, ensuring that all ASF Olathe employees continued to get paid in a timely manner. Plaintiff was responsible for verifying that all payroll matters and materials were correct and in order upon his return from his military duties.

**a. Race Discrimination Claims**[FN2]

> **FN2.** Plaintiff alleges six discrete claims in his Complaint, each of which can be categorized as either race discrimination or retaliation for engaging in protected activity. Based on its review of the evidence, the court recognizes that plaintiff's categorization of these discrete claims fluctuated throughout the duration of this case. In the interest of clarity and ease of discussion, the court sets forth the following facts according to plaintiff's most recent categorization of his discrete claims.

For much of 2009, plaintiff was on military or-

ders and attending flight school. In his absence, a Caucasian civilian employee, Leonard Rickard ("Rickard"), assumed responsibility for inputting payroll for ASF Olathe. On his 2009 annual evaluation, plaintiff was cited for numerous payroll discrepancies that were discovered by an audit. Plaintiff discussed these errors with his immediate supervisor, Reese, and questioned why they were included on his evaluation when the errors had been made by Rickard while plaintiff was on military orders. In response, Reese allegedly told plaintiff that it did not matter if he personally made the mistakes; he had to be the "fall guy." According to plaintiff, he was forced to take the blame for Rickard's mistakes solely because of his race. Defendant disputes this allegation, claiming that plaintiff was told that "owing to the nature of his job duties, he [was] ultimately the person responsible for correcting pay errors, regardless of who initially made them." Dkt. 51–6, at 3. As such, plaintiff was the "fall guy."

On April 15, 2010, plaintiff received an interim evaluation which documented four payroll issues and/or errors. Plaintiff disputed that any of the payroll errors could be attributable to him as he had, once again, been on military orders at the time the errors were made. Plaintiff's second-level supervisor, Erkie, looked into the errors and ultimately reduced the number of documented issues from four to two and asked plaintiff to sign the evaluation, acknowledging his receipt. Plaintiff refused. As a result, Erkie included the following comments in the evaluation:

**\*4** Mr. Cappell was briefed on his midterm review on 15 April 2010 at that time he was asked to acknowledge the face to face review. Mr. Cappell said he would do so. On follow up the next day it was found that he in fact did not acknowledge the review and was now refusing to do so because he did not agree with the rater assessment. Mr. Cappell then went on military orders and was not available to acknowledge the review. On 17 June Mr. Cappell was again asked to complete the process and acknowledge the interim re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

view, Mr. Cappell refused to do so stating that his supervisor was a lier [sic] and his assesment [sic] was completely wrong. Mr. Cappell said he believes that if he acknowledges the review he is agreeing with the rater assessment. He was told that he is only acknowledging with the face to face review held on 15 april [sic] 2010.

Dkt. 51–5, at 13.

Plaintiff alleges that he was pressured by Reese and Erkie approximately eight or nine times between April 2010 and December 2010, and once between December 20, 2010, and January 1, 2011, to sign the interim evaluation. According to plaintiff, he was pressured to sign in retaliation for a complaint he made to defendant's Equal Employment Opportunity ("EEO") Office.

In addition to an interim evaluation, civilian employees were also usually entitled to an annual evaluation of their performance. However, for dual-status employees, annual evaluations were only given when the individual had worked 120 *consecutive* days in his civilian position. This 120–day requirement could be extended or reduced at a supervisor's discretion.

After his 2010 interim evaluation, plaintiff was placed on military orders and remained so until early 2011. Because of his status, plaintiff's civilian supervisors opted against issuing plaintiff an annual evaluation at the time it was normally due, December 15, 2010, and instead chose to wait until plaintiff had returned from military orders and worked 120 consecutive days. According to plaintiff's supervisors, this was done for plaintiff's benefit. If they had issued the evaluation on time, they would have had no choice but to base it on plaintiff's subpar interim evaluation, given that plaintiff had been dispatched almost immediately thereafter on military orders. Plaintiff views the situation differently, alleging that Caucasian employees were given special "close out" evaluations in December 2010, despite not having worked for 120 consecutive days. Plaintiff ultimately received

his 2010 annual evaluation in July 2011, after having worked 120 consecutive days.

**b. Retaliation Claims**

In February 2011, the military unit assigned to ASF Olathe was preparing to deploy to Afghanistan. Given the amount of work necessary to arrange the deployment, Walsh temporarily assigned plaintiff to the Flight Operations Office to assist ASF dispatcher Carolyn Simpson ("Simpson") with answering phones and monitoring the facility's security cameras and gates. According to Walsh, this was not a *re*-assignment of duties; rather it was just an additional workload. To effectuate this change, plaintiff's workspace was temporarily relocated to the Flight Operations Office near Simpson, which was upstairs from plaintiff's original location.

**\*5** On February 4, 2011, Walsh sent an email to Simpson's supervisor, Bric Lewis ("Lewis"), notifying him of the move:

Bric, I am going to administratively assign Dennis to Ops as "Other duties as required" for a period of time to help out Carol and you. I still want him to work on getting his password back for timecards and take over that duty again. This does not negate any work that maintenance needs done. Tony and Russell can pass on tasks to Dennis through you. Give him a cubicle to work from. We need assistance with answering phone calls, visitors at the gate/door, administrative stuff, etc. Please keep him gainfully employed.

Dkt. 51–2, at 9.[FN3]

> **FN3.** The email was also sent to plaintiff's supervisors, Reese and Erkie. Dkt. 51–2, at 9.

Although there was some initial confusion as to whether plaintiff's supervisory structure changed, Walsh ultimately clarified the situation, telling plaintiff that he still reported to Reese and Erkie, but also temporarily received orders from Lewis. The ASF Olathe military units were deployed in

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

March 2011. Plaintiff returned to his original work-space in July 2011. Plaintiff now alleges that he was not immediately returned to his original work-space in retaliation for his December 2010 EEO complaint.

Simultaneous with this temporary workspace relocation, plaintiff's supervisors began noticing that his sick-leave use fit a pattern designated by defendant's Office of Personnel Management as potential sick-leave abuse. This pattern consisted of: (1) using more than sixty hours of sick leave per year with no documented special circumstances, (2) consistently using sick leave on the day before a weekend, and (3) taking a full day of sick leave for a short appointment. Plaintiff's supervisors had also become concerned that plaintiff was "shopping" for sick leave approval from different supervisors. Therefore, Walsh and Erkie informed plaintiff that they, not Reese or Lewis, would have to approve plaintiff's sick-leave requests. In accordance with defendant's standard policies, plaintiff was also asked to provide documentation of medical appointments and to give three days' notice whenever possible. Plaintiff alleges that this change in procedure was in retaliation for his EEO complaint.

**2. Harassment/Hostile Work Environment**
In addition to these discrete acts, plaintiff also alleges that he was the victim of a hostile work environment and harassment. According to plaintiff, at some point, an unknown person wrote the word "rat" on a whistle-blower poster outside of his office. Plaintiff notified his supervisor and the poster was immediately removed. Plaintiff also alleges that his third-level supervisor, Walsh, tried to incite racial tension between plaintiff and another employee by telling the other employee that plaintiff had complained about his racial jokes.

**3. Military Issues**
On December 15, 2010, as a result of his failure to pass readiness-level testing, plaintiff was issued a non-medical suspension, grounding him from flying Army helicopters. Plaintiff alleges that he would not have failed these requirements had he

not been under the stress caused by the situation with his civilian employment. On April 1–2, 2011, the Army convened a Flight Evaluation Board ("FEB") to hear testimony, review plaintiff's flight records, and assess his skills as a helicopter pilot. The FEB concluded that plaintiff engaged in a "substandard performance of duty" and recommended dismissal. Dkt. 51–4, at 9.

**4. EEO Complaint**
**\*6** Plaintiff made initial contact with an EEO counselor on December 20, 2010. He filed a formal complaint on January 29, 2011, alleging discrimination based on race and color. On March 25, 2011, defendant's EEO Office confirmed the following list of claims as those that had been accepted for investigation:

a. On December 15, 2010, your annual evaluation was due for the rating period of October 1, 2009 through September 30, 2010; however, as of February 19, 2011, you have not received your evaluation.

b. In April 2010, statements were placed in your interim review for the appraisal period of October 1, 2009 to September 30, 2010, that you feel are inaccurate, causing you to deny acknowledgement of the review.

c. April to October 2010, you felt you were constantly being pressured to acknowledge your interim review.

d. On multiple occasions, since December 2008, you have been blamed for discrepancies for which you were not responsible.

e. On February 9, 2011, Mr. Ronald Erkie, your senior rater, informed you that your immediate supervisor would be changed to Mr. Bric Lewis, your leave requests would be made in accordance to new guidelines, and you were being moved to a different work area.

Dkt. 51–14, at 2–3.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

On April 8, 2013, defendant issued a final decision on these claims, finding that plaintiff was not the victim of discrimination.

**5. Resignation**

Plaintiff submitted a letter of resignation from his civilian position on August 8, 2012, to be effective August 20, 2012—eight months prior to defendant's decision on plaintiff's EEO claims. Plaintiff's resignation, tendered more than a year after his last complained-of incident, claimed that his decision to resign was "largely due to the emotional damage caused by the actions of the three named individuals in [his] EEOC complaint." Dkt. 51–12, at 2.

On June 21, 2013, plaintiff filed, *pro se,* a suit against defendant in the United States District Court for the District of Kansas alleging discrimination based on race/color, harassment/hostile work environment, and retaliation. Defendant now seeks summary judgment on all of plaintiff's claims.

**III. Legal Standard for Summary Judgment**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. *FED. R. CIV. P . 56(a).* A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Communs.,* 456 F.3d 1215, 1219 (10th Cir.2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol–Myers Squibb Co.,* 353 F.3d 848, 851 (10th Cir.2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.,* 428 F.3d 933, 935 (10th Cir.2005). These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment. *Mitchell v. City of*

*Moore, Okla.,* 218 F.3d 1190, 1197 (10th Cir.2000) (citing *Adler v. Wal–Mart Stores,* 144 F.3d 664, 670 (10th Cir.1998)). The court views all evidence and reasonable inferences in the light most favorable to the non-moving party. *LifeWise Master Funding v. Telebank,* 374 F.3d 917, 927 (10th Cir.2004).

**IV. Analysis**

**\*7** Based upon plaintiff's complaint and the pretrial order (Dkt.49), the court understands plaintiff's claim to be as follows: (1) constructive discharge from his civilian position, (2) removal from his military position, (3) race/color discrimination, (4) hostile work environment/harassment, and (5) retaliation.

**A. Constructive Discharge from Civilian Posi- tion**

In the pretrial order, plaintiff contends that the situation at ASF Olathe was "intolerable" and he was therefore "forced to resign under constructive discharge ...." Dkt. 49, at 9. As a result, he is due lost pay and benefits. Defendant disagrees, arguing that plaintiff's claim for constructive discharge should be dismissed for lack of jurisdiction due to plaintiff's failure to administratively exhaust the claim. The court agrees.

As a general rule, "[e]xhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII." *Clay v. UPS,* 983 F.Supp.2d 1331. 1338 (D.Kan.2013) (quoting *Jones v. Runyon,* 91 F.3d 1398, 1399 (10th Cir.1996)). The plaintiff bears the burden of establishing the court's subject-matter jurisdiction. *See Southway v. Cent. Bank of Nigeria,* 328 F.3d 1267, 1274 (10th Cir.2003). "A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Jones v. UPS,* 502 F.3d 1176, 1186 (10th Cir.2007) (quoting *MacKenzie v. City and Cnty. of Denver,* 414 F.3d 1266, 1274 (10th Cir.2005)). To exhaust administrative remedies, "the charge must contain facts concerning the discriminatory and retaliatory ac-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

tions underlying each claim because each discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted." *Clay,* 983 F.Supp.2d at 1338 (quoting *Manning v. Blue Cross and Blue Shield of Kansas City,* 522 Fed. Appx. 438, 440–41 (10th Cir.2013)). However, the court "liberally construes charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim." *Id.* (citing *Jones,* 502 F.3d at 1186).

Plaintiff failed to file a charge of constructive discharge with defendant's EEO office. Defendant's formal acknowledgement of plaintiff's EEO claims lists the following charges: (1) denial of 2010 annual evaluation, (2) inaccurate 2010 interim evaluation, (3) pressure to acknowledge 2010 interim evaluation, (4) taking blame for discrepancies for which plaintiff was not responsible, (5) change in supervisor, (6) change in sick-leave request procedure, and (7) change in location of workspace. Dkt. 51–4, at 2–3. There is no evidence in the record that plaintiff ever disagreed with this list as a *complete* listing of his claims against defendant.

Even now, plaintiff does not specifically controvert defendant's claim that he did not administratively exhaust a claim of constructive discharge. In its Statement of Facts, defendant set forth the following:

**\*8** The Army's April 8, 2013 final decision on Cappell's EEO complaint does *not* include a claim that Cappell was forced to resign his job as a Maintenance Administrative Technician with the Army.

Cappell did *not* administratively exhaust a claim for constructive discharge regarding his August 2012 resignation from his position as a Maintenance Administrative Technician with the Army.

Dkt. 51, ¶¶ 109, 110 (emphasis in original). Plaintiff failed to specifically controvert these statements in his Opposition. In fact, plaintiff's own

statement of facts makes absolutely *no* mention of his alleged constructive discharge claim. *See* Dkt. 57. The court therefore finds that plaintiff failed to administratively exhaust a claim of constructive discharge. As such, the court lacks subject-matter jurisdiction over this claim and it is dismissed.

The court further notes that *even if* plaintiff had administratively exhausted this claim, defendant would still be entitled to summary judgment.

A constructive discharge occurs when a reasonable person in the employee's position would view [his] working conditions as intolerable and would feel that [ ]he had no other choice but to quit. In determining whether an employee's working conditions would cause such feelings in a reasonable person, we apply an objective test under which neither the employee's subjective views of the situation, nor [his] employer's subjective intent with regard to discharging [him], are relevant. The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions.

*Tran v. Trs. of the State Colleges in Colo.,* 355 F.3d 1263, 1270 (10th Cir.2004) (internal citations omitted).

Here, there is simply no evidence that plaintiff, or any reasonable person in plaintiff's position, would view his working conditions as intolerable and therefore feel as though he had no other choice but to quit. The latest civilian event that plaintiff complains of took place in February 2011 when plaintiff changed workspaces. Dkt. 51, ¶ 54. However, Plaintiff continued to work for defendant for another *eighteen* months after this move, eventually resigning on August 8, 2012. Dkt. 51–12, at 2. Even then, plaintiff continued to work for another two weeks, until August 20, 2012. Dkt. 51–12, at 2; *see also Shelar v. Ameripride Servs.,* 2006 U.S. Dist. LEXIS 45904, at *28, 2006 WL 1877010 (D.Kan. July 6, 2006) (holding that "[g]iving sever-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

al weeks notice of the date on which one will be compelled to resign is unprecedented, in this court's experience, for a successful constructive discharge claim). Plaintiff's own actions belie his claim that his working conditions were intolerable.

Furthermore, the record shows that, of those eighteen months, at least twelve were spent under the direction of new supervisors. Dkt. 51–3, at 34. Plaintiff admitted that the situation was better under these new supervisors and even thanked them in his resignation letter for their "outstanding leadership skills and efforts in helping [him] cope with the situation." Dkt. 51–3, at 34; Dkt. 51–12, at 2. Finally, plaintiff admitted that he ultimately quit because he had a new job opportunity, not because of the alleged intolerable conditions of his work environment. Dkt. 51, ¶ 16. Therefore, even if plaintiff *had* administratively exhausted a claim for constructive discharge, defendant would still be entitled to summary judgment. As such, plaintiff's claim of constructive discharge is dismissed for failure to exhaust administrative remedies.

**B. Removal from Military Position**
**\*9** Plaintiff's claim for loss of his military career meets a similar fate. In the pretrial order, plaintiff alleges that "[t]he stress created by the constant pressuring and threats caused [plaintiff] to lose focus resulting in him failing his readiness level one check ride requirements." Dkt. 49, at 6–7. However, plaintiff's EEO charge made no claim of discrimination, retaliation, or harassment with regard to his military career. As with his constructive discharge claim, "[e]xhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII" for plaintiff's claim of the loss of his military career. *Clay,* 983 F.Supp.2d at 1338 (quoting *Jones,* 91 F.3d at 1399). Plaintiff's EEO charge did not contain any facts concerning the discriminatory or retaliatory actions underlying a claim of the loss of his military career. In fact, plaintiff's EEO charge did not mention the loss of his military career at all; rather, the charge stated only that the stress from plaintiff's civilian position

"resulted in [him] being unable to perform [his] military duties." Dkt. 51–13, at 2–6. This is particularly telling, as plaintiff had been placed on a non-medical suspension just days before he reached out to defendant's EEO office.[FN4] Therefore, the court grants defendant's motion for summary judgment on plaintiff's claim of loss of military career.[FN5]

FN4. Plaintiff was issued his non-medical suspension on December 15, 2010. Dkt. 51, ¶ 89. He made contact with defendant's EEO office on December 20, 2010. Dkt. 51, ¶ 102.

FN5. The court acknowledges defendant's argument that plaintiff's claim for loss of military career is also barred by the *Feres* doctrine, which arises out of the United States Supreme Court's decision in *Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Originally intended to protect the United States from liability for injuries suffered by service personnel brought under the Federal Tort Claims Act, the rule has been expanded to include *all* injuries suffered by military personnel that are related to the individual's status as a member of the military. *See Pringle v. United States,* 208 F.3d 1220 (10th Cir.2000). While many circuits have addressed the interaction between the *Feres* doctrine and claims brought under Title VII, as well as how the doctrine relates to dual-status employees, the Tenth Circuit has yet to directly address the issue of whether dual-status employees can bring claims under Title VII in light of *Feres.* Because the court dismisses plaintiff's claim for loss of military career on other grounds, it declines to engage in a full analysis of the *Feres* issue.

**C. Race Discrimination**
Plaintiff next alleges that he was subjected to discrimination based on race and/or color as a result of the following incidents: (1) Reese's use of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

term "fall guy," (2) negative comments in his 2010 interim evaluation, and (3) lack of an annual evaluation. Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. Discrimination may be proven through either direct or indirect evidence of discrimination. *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1225 (10th Cir.2000) (internal citations omitted). Here, plaintiff fails to come forward with any direct evidence of discrimination. The Court must therefore determine if there is sufficient indirect evidence for Plaintiff to survive summary judgment.

In the absence of any direct evidence, courts in this Circuit have used the widely known analytical framework articulated by the Supreme Court in *McDonnell–Douglas Corp. v. Green.* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This framework first requires a plaintiff to establish a prima facie case of discrimination. *Smothers v. Solvay Chems., Inc. .,* 740 F.3d 530, 538 (10th Cir.2014) (citing *MacKenzie,* 414 F.3d at 1274). To do so, a plaintiff must demonstrate "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Monroe v. City of Lawrence,* 2014 U.S. Dist. LEXIS 9317, at *18–19, 2014 WL 289463 (D.Kan. Jan. 27, 2014) (quoting *Carney v. City & Cnty. of Denver,* 534 F.3d 1269, 1273 (10th Cir.2008)). Once established, the defendant employer must offer a "legitimate nondiscriminatory reason for the adverse employment action." *Id.* The burden then shifts back to the plaintiff to show that "there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual." *Id.* Here, plaintiff fails to set forth a prima facie case on any of his claims of race discrimination.

**1. Use of the term "fall guy"**
**\*10** In 2009, upon returning from flight school to his civilian employment, plaintiff discovered errors with how payroll had been handled by Rickard in his absence. These errors were documented in plaintiff's 2009 annual evaluation. When plaintiff questioned the inclusion of these errors, he was allegedly told by Reese that he had to be the "fall guy," which meant, in plaintiff's mind, that he had to be the one to "take the blame for the situation." Dkt. 51–3, at 77. According to plaintiff, he only had to take the blame because Rickard was Caucasian. Dkt. 51–3, at 78.

Reese does not deny using the term "fall guy" in this discussion with plaintiff; however, Reese stated that he explained to plaintiff that "owing to the nature of his [plaintiff's] job duties, he is ultimately the person responsible for correcting pay errors, regardless of who initially made them." Dkt. 51–6, at 3. Reese further stated that, by telling plaintiff that he had to be the "fall guy," he was "trying to convey that, even if a pay error didn't originate with [plaintiff], [plaintiff] was the one to whom employees would complain, and it was his job to ultimately fix them." Dkt. 51–6, at 3.

Whatever Reese's intent behind the statement was is irrelevant because plaintiff fails to show that Reese's statement, or any alleged consequence of that statement, resulted in an adverse employment action. As noted above, in order to maintain a prima facie case of race and/or color discrimination, a plaintiff must demonstrate an adverse employment action. *Monroe,* 2014 U.S. Dist. LEXIS 9317, at *18–19, 2014 WL 289463 (quoting *Carney,* 534 F.3d at 1273). "An adverse employment action includes acts that 'constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' " *Dick v. Phone Directories Co.,* 397 F.3d 1256, 1268 (10th Cir.2005) (citing *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 532 (10th Cir.1998)). The Tenth Circuit has traditionally defined the phrase "adverse employment action" liberally, taking a "case-by-case approach, examining the unique factors relevant to the situation

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

at hand." *Hillig v. Rumsfeld,* 381 F.3d 1028, 1031 (10th Cir.2004) (quoting *Sanchez,* 164 F.3d at 532). It is important to note that, because of this case-by-case approach, adverse employment actions are not limited to particular specified acts. *EEOC v. C.R. Eng., Inc.,* 644 F.3d 1028, 1040 (10th Cir.2011).

Here, plaintiff offers no proof that Reese's use of the term "fall guy," or even the fact that plaintiff was allegedly being "forced" to take the blame for the mistakes of others, affected his civilian employment in any way. There is no evidence that plaintiff suffered any change in his job, duties, pay, or benefits. Indeed, plaintiff testified that the only proof he had of discrimination with regard to this incident was his own speculation because Rickard was Caucasian. Dkt. 51–3, at 45–46. It is well established that a plaintiff's "feeling" that he is the victim of racial discrimination "fails to demonstrate a material issue of fact in the absence of supporting evidence." *Money v. Great Bend Packing, Co.,* 783 F.Supp. 563, 574 (D.Kan.1992); *see also Arzate v. City of Topeka,* 884 F.Supp. 1494, 1501 (D.Kan.1995) (holding that "it is well settled that the plaintiff's own 'belief' or 'feeling' that he was the victim of disparate treatments is insufficient as a matter of law to prove age discrimination.").

**\*11** The court therefore finds that plaintiff fails to maintain a prima facie case with respect to his "fall guy" claim. As such, defendant's motion for summary judgment on this claim is granted and the claim is dismissed.

**2. 2010 Interim Evaluation**
    Somewhat related to the "fall guy" statement is plaintiff's allegation that his supervisors included false statements in his 2010 interim evaluation. Plaintiff underwent an interim evaluation on April 15, 2010. Dkt. 53–1, at 188–91. The initial evaluation documented four payroll errors for which plaintiff was held accountable. Dkt. 53–1, at 190. When plaintiff disputed these findings, his second-level supervisor, Erkie, went back and reviewed the information. Dkt. 51, ¶ 25. Erkie then amended

plaintiff's evaluation to identify only two payroll errors. Dkt. 53–1, at 195. Plaintiff again disagreed with the finding and refused to sign the evaluation. Dkt. 51, ¶¶ 25, 26.

    Not only does plaintiff fail to maintain a prima facie case on this claim, it appears, from plaintiff's own testimony, that there is no claim at all. Despite his current allegations, plaintiff testified as follows:

    Q. Okay. Regarding your interim evaluation in 2010 ... you said had statements that you disagreed with. Are you claiming that those statements were placed in your interim evaluation because of your race?

    A. No, I'm not, no, not because of my race, no.

    Q. Are you claiming it was because of your col- or?

    A. No.

    Q. Are you claiming that they were placed in your interim review because of any EEO activity?

    A. No.

      Dkt. 51–3, at 44.

    Even if plaintiff had not made those statements during his deposition, he still fails to show any adverse employment action. Plaintiff makes no allegation and offers no evidence that, as a result of this interim evaluation, he suffered any kind of change in his job, duties, pay, or benefits. Plaintiff testified that it was his belief that these alleged false statements would be included in his final evaluation. Dkt. 51–7, at 35. However, Walsh testified that these statements would "not be added into the end of the rating cycle." Dkt. 53–1, at 40. Plaintiff offers no proof that these alleged false statements actually appeared in his 2010 final evaluation. In fact, his 2010 annual evaluation was delayed *specifically* so that these statements would not be included. Therefore, defendant's motion for summary judgment on this claim is granted and the claim is dis-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

missed.

### 3. 2010 Annual Evaluation

As noted above, dual-status employees received an annual civilian evaluation only after working 120 consecutive days during the rating period. Dkt. 53–1, at 92. Because of military orders, dual-status employees sometimes did not work 120 consecutive days in their civilian position during a particular rating period. This is exactly what happened to plaintiff; for the rating period ending September 30, 2010, he had not worked 120 *consecutive* days in his civilian position. Dkt. 51–3, at 87; Dkt. 53–1, at 17. Plaintiff was therefore ineligible for an annual evaluation at the normal time.[FN6]

> **FN6.** There is some discrepancy as to whether plaintiff worked 120 consecutive days in his civilian position from October 1, 2009, through September 30, 2010. During his EEO testimony, plaintiff claimed that he worked 123 days from October 1, 2009, through the end of January 2010. Dkt. 53–1, at 35–36. However, plaintiff failed to provide any proof that these were 123 *consecutive* days. Plaintiff later admitted in his deposition testimony that "he did not meet the 120 day requirement." Dkt. 51–3, at 49.

**\*12** Plaintiff's supervisors therefore had two choices: either conduct a special "close-out" evaluation of plaintiff, which would have been based on plaintiff's sporadic civilian performance after October 1, 2009, or wait until plaintiff returned to his civilian position and had worked 120 consecutive days. Dkt. 51–2, at 4. Plaintiff's supervisors opted to wait. Dkt. 51–2, at 4. Plaintiff alleges that this decision was based solely on his race, as dual-status Caucasian employees who had not satisfied the 120–day requirement were given special "close out" evaluations. Dkt. 51–3, at 48; Dkt. 57, at 29–30.

Whether this is true is not relevant to plaintiff's

prima facie case. The Tenth Circuit has held that "Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination *based upon* an employee's protected class characteristics." *EEOC v. Flasher Co.,* 986 F.2d 1312, 1319 (10th Cir.1992). Plaintiff once again fails to show how defendant's action, or lack thereof, in this case, was because of his race. Plaintiff himself *admitted* that he was not entitled to receive his annual evaluation on December 15, 2010, because he had not worked 120 consecutive days in his civilian position. Dkt. 51–3, at 49. Plaintiff cannot now claim discrimination for being denied something he was never entitled to in the first place. Furthermore, plaintiff offers no proof that delay in his evaluation caused any harm or alteration to his job, duties, pay, or benefits.

And even if plaintiff could establish an adverse employment action, he fails to show "disparate treatment among similarly situated employees." *Monroe,* 2014 U.S. Dist. LEXIS 9317, at \*18–19, 2014 WL 289463. "To be 'similarly situated' to the plaintiff, the other employee must 'share the same supervisor' or decision maker." *Smothers,* 740 F.3d at 540 (quoting *EEOC v. BCI Coca–Cola Bottling Co. of Los Angeles,* 450 F.3d 476, 489 (10th Cir.2006)). Plaintiff admitted that he did not share the same first-level supervisor as those given special "close out" evaluations and that this difference could possibly account for the difference in evaluation procedure. Dkt. 51–3, at 50.

Finally, even if plaintiff could maintain his prima facie claim, defendant proffered a legitimate business reason for postponing plaintiff's 2010 annual evaluation. Reese testified that he chose to wait to administer plaintiff's annual evaluation after determining that "completing such an evaluation for [plaintiff] in late 2010 would not have been beneficial to [plaintiff] because, in our view, his performance had been subpar and prone to errors. Had he been given an annual evaluation at the end of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

2010, it would not have been a successful rating." Dkt. 51–2, at 4. Plaintiff's evaluation, ultimately administered in July 2011, was indeed successful. Dkt. 51–3, at 92.

**\*13** The burden therefore shifts back to Plaintiff to show that "there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual." *Smothers,* 740 F.3d at 538 (citing *MacKenzie,* 414 F.3d at 1274). A plaintiff usually makes a showing of pretext in one of three ways:

(1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

*Kendrick,* 220 F.3d at 1230 (internal citations omitted).

Here, plaintiff fails to allege pretext, let alone offer evidence to support any of these methods. There is no evidence to suggest that defendant acted in any way except in accordance with its personnel policies. As such, the court grants defendant's motion for summary judgment on this claim.

**D. Retaliation**
Plaintiff alleges that his remaining claims stem from retaliation for his December 2010 EEO complaint. Again, plaintiff offers no *direct* evidence of this alleged retaliatory behavior. The court therefore analyzes plaintiff's retaliation claims using the burden-shifting framework set forth under *McDonnell–Douglas.*

To establish a prima facie case for retaliation, a plaintiff must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged ac-

tion materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Proctor v. UPS,* 502 F.3d 1200, 1208 (10th Cir .2007) (citing *Argo v. Blue Cross & Blue Shield of Kans., Inc.,* 452 F.3d 1193, 1202 (10th Cir.2006)). Defendant does not contest that plaintiff engaged in protected activity, recognizing plaintiff's complaints to defendant's EEO Office as such activity. Therefore, only the latter two elements are at issue.

The anti-retaliation provision of Title VII

protects an individual not from *all* retaliation, but from retaliation that produces an *injury or harm* ... [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

*Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67–68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting *Rochon v. Gonzales,* 438 F.3d 1211, 1219 (D.C.Cir.2006) (emphasis added)). Here, plaintiff's allegations of retaliation include: (1) pressure to sign the 2010 interim evaluation, (2) change of workspace, and (3) implementation of sick-leave procedures.

**1. Pressure to Sign the 2010 Interim Evaluation**
**\*14** Plaintiff first alleges that his supervisors, specifically Reese and Erkie, repeatedly pressured him to sign his 2010 interim evaluation in retaliation for his EEO complaint. Dkt. 57, 7–10. More specifically, plaintiff alleges that Erkie approached him "eight or nine times" between April and December 2010 requesting that plaintiff sign the evaluation. Dkt. 51–3, at 78–80. He also alleges that Erkie pressured him at some point between the time plaintiff contacted defendant's EEO Office on December 20, 2010, and January 1, 2011. Dkt. 51–3, at 80–81.

Plaintiff presents no evidence that this alleged

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

pressure was a materially adverse action. To be materially adverse, a retaliatory action must be sufficient to "dissuade a reasonable worker from making or supporting a charge of discrimination ... While the employer's conduct need not affect the terms and conditions of employment, the inquiry is an objective one, and not based on a plaintiff's personal feelings." *Daniels v. UPS,* 701 F.3d 620, 638 (10th Cir.2012). Here, we know that the alleged pressure did *not* dissuade plaintiff from filing an EEO claim because he filed his EEO claim *after* allegedly being subject to this pressure for six months.

Even if plaintiff could prove a materially adverse action, he fails to maintain the causation element of his prima facie claim. In 2013, the Supreme Court altered its view with respect to the causation requirement under Title VII. Title VII retaliation claims are now subject to a heightened "but-for" causation standard. Under this standard, "a plaintiff making a retaliation claim 'must establish that his or her protected activity was a *but-for* cause of the alleged adverse action by the employer.' " *Grote v. Beaver Express Serv., LLC,* 2013 U.S. Dist. LEXIS 115383, at *22–23 (10th Cir.2013) (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar,* —— U.S. ——, ——, 133 S.Ct. 2517, 2534, 186 L.Ed.2d 503 (2013) (emphasis added)). This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar,* 133 S.Ct. at 2533.

Here, plaintiff relies only on the short time period between his EEO complaint and the alleged pressuring to show causation. "To determine if plausible causation exists between [a plaintiff's] protected conduct and an adverse action, courts have looked at how close in time the protected conduct and adverse action are and how reasonable the inference is that the protected conduct was the cause of the adverse action." *Carroll v. Gradient Fin. Group, LLC,* 2013 U.S. Dist. LEXIS 93432, at *20, 2013 WL 3328695 (D.Kan. July 2, 2013) (citing *Marx v. Schnuck Markets, Inc.,* 76 F.3d 324,

329 (10th Cir.1996)). However, "[e]ven where a plaintiff has established an inference of retaliatory motive based on time, he must still 'present ... direct evidence of retaliatory animus or circumstantial evidence which adequately demonstrates that an improper motive was a substantial motivation in the employer's decision.' " *Lombard v. Potter,* 368 F.Supp.2d 1178, 1195 (D.Kan.2005) (quoting *Gonzagowski v. Widnall,* 115 F.3d 744, 749 (10th Cir.1997)). Here, plaintiff offers no additional evidence that this alleged "pressuring" was due to his EEO activity. Furthermore, the court finds it curious that plaintiff alleges that the pressuring occurred from April to December 20, 2010, and is *not* considered by plaintiff to be retaliatory (admittedly because it cannot be retaliatory until plaintiff engages in protected activity), but then suddenly becomes retaliatory when it happened *once* after plaintiff made contact with defendant's EEO office.

**\*15** Moreover, plaintiff admitted that he had no idea if Erkie, who allegedly was responsible for a majority of the pressure, was even aware of plaintiff's EEO activity. Dkt. 51–3, at 81. A plaintiff "cannot establish a causal connection between protected opposition and adverse employment action unless the employer *knew* that the employee had engaged in protected opposition." *Grote,* 2013 U.S. Dist. LEXIS 115383, at *22 (emphasis added). "The employer must know not only that the employee has opposed an action of the employer ..., but that the opposition was based on a belief that the employer's action constituted discrimination prohibited by Title VII." *Id.* (quoting *Zokari v. Gates,* 561 F.3d 1076, 1081 (10th Cir.2009)). Therefore, defendant's motion for summary judgment on this claim is granted.

**2. Change of Workspace**
Plaintiff's next claim focuses on temporarily changing his workspace from the lower level of ASF Olathe upstairs to the Flight Operations Office. Prior to February 2011, plaintiff occupied a cubicle in the downstairs area of the ASF Olathe facility. Dkt. 51, ¶ 48. In February 2011, the military

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

unit assigned to ASF Olathe was preparing to de-ploy to Afghanistan. Dkt. 51, ¶ 49. To facilitate this process and to assist Simpson with her duties, Walsh moved plaintiff upstairs to Flight Operations and closer to Simpson. Dkt. 51, ¶ 53. Walsh ad-vised plaintiff's supervisors, Reese and Erkie, as well as Simpson's supervisor, Lewis, of the tempor-ary move via email. Dkt. 51–2, at 9. Walsh testified that it was never his intent for plaintiff's supervis-ory chain to change, only that Lewis also be able to assign plaintiff work when necessary. Dkt. 51–2, at 5.

Plaintiff now alleges that there was no legitim-ate business reason for the move because there were six other employees, four military personnel and two civilian employees, who could have as-sisted Simpson. Dkt. 57, at 31. This is evidenced by the fact, plaintiff argues, that the military unit de-ployed in March 2011 and plaintiff was not re-turned to his original workspace until July 2011. Dkt. 57, at 32. Plaintiff claims that the real reason he was moved was so that Erkie could continue har-assing him (Dkt. 57, at 32) and to prevent other ASF Olathe employees from talking to him. Dkt. 51–3, at 52–53.

Again, plaintiff provides no evidence that this temporary move was materially adverse. Plaintiff himself admitted that he "had no problems coming up there [to Flight Operations] and helping out with the workload." Dkt. 51–7, at 64. Plaintiff's only complaint, then, seems to be that he remained up-stairs for nearly four months after the units de-ployed. Dkt. 51–7, at 64. However, he sets forth no evidence showing that the temporary relocation, which this court views as a mere inconvenience, at best, could be viewed as an action that would dis-suade a reasonable worker from making a com-plaint of discrimination. The court does not con-sider a "mere inconvenience to be an adverse em-ployment action." *Young v. White,* 200 F.Supp.2d 1259, 1276 (D.Kan.2002) (citing *Sanchez,* 164 F.3d at 532). As such, defendant's motion for summary judgment with regard to this claim is granted.

**3. Change in Sick–Leave Procedures**

   **\*16** Plaintiff's final claim of retaliation is the alleged sudden change in his sick-leave request pro-cedures. As briefly mentioned above, in February 2011, plaintiff's supervisors began to notice that his sick-leave use fit an Army-established pattern in-dicative of potential leave abuse. Dkt. 51, ¶ 65. Specifically, it was noted that plaintiff had used over sixty hours of sick-leave per year, often used sick-leave on the day before a weekend, and would sometimes take a full day of leave for a short ap-pointment. Dkt. 51, ¶ 65. Plaintiff's supervisors were also concerned that he had begun "supervisor shopping," meaning that he would seek sick-leave approval from different supervisors. Dkt. 51, ¶ 66. As such, plaintiff's supervisors decided to more closely monitor his sick leave use. Dkt. 51, ¶ 67. Plaintiff was therefore asked to submit sick-leave requests only to Erkie or Walsh, to provide three-days' notice whenever possible, and to submit a doctor's note. Dkt. 51, ¶¶ 68, 95.

   In plaintiff's Opposition, he alleges that this change in procedure was a direct result of his race, since there were Caucasian individuals who also fit the profile of a sick-leave abuser who were not asked to comply with the regulations. Dkt. 57, at 33. However, during his deposition testimony, plaintiff claimed the change in procedure was done in retaliation for his EEO complaint:

   Q. Let's talk about at some point Mr. Erkie asked that your sick leave requests go through him, be approved by him?

   A. By he or Mr. Walsh.

   ...

   Q. Are you claiming that occurred because of your race?

   A. I would say that was retaliation.

   Q. Okay. So not race?

   A. No.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

...

Q. So your claim that Mr. Erkie approving your sick leave is just a hunch that it was your EEO activity?

A. No, it's retaliation.

Q. Retaliation for your EEO activity?

A. Yes.

...

Q. Okay. The requirement that—the rule that was given to you that you needed to provide a doctor's note for sick leave. What evidence do you have that that was based on your—that that rule was imposed on you because of your race?

A. It was retaliation.

Q. So it was not because of your race?

A. No.

...

Q. Okay. Was the three days notice rule, was that because of your EEO activity?

A. Yes, I think it was.

Dkt. 51–3, at 53, 54–55, 59. The court therefore presumes that plaintiff is arguing this as a retaliation claim.

Plaintiff again fails to maintain his prima facie case. He offers no evidence that this change in sick-leave procedure was a materially adverse action. Plaintiff admitted that he was never denied sick leave. Dkt. 51–3, at 56–57. He also conceded that he "gladly provided" doctor's notes and that doing so was standard operating procedure, as was making the request three days in advance. Dkt. 51–3, at 55–56, 58. Plaintiff also admitted that he would take an entire day of sick leave when his appointment lasted less than two hours and did so on a

weekly basis for counseling sessions. Dkt. 51–7, at 61. Plaintiff fails to provide any evidence of harm as a result of the change in sick-leave procedure. Likewise, plaintiff has no proof that retaliation was a but-for cause of this change. When specifically asked for this evidence, plaintiff pointed only to the fact that the change occurred after he filed his EEO complaint. Dkt. 51–3, at 55. Mere timing, without more, is not sufficient to establish causation. *Lombardo,* 368 F.Supp.2d at 1195.

**\*17** Even if plaintiff could maintain his prima facie case, defendant proffers a legitimate business reason for implementing the procedure. Walsh testified during the EEO proceedings that plaintiff, along with others, fit the profile of a potential sick-leave abuser according to guidelines issued by defendant's Office of Personnel Management. Dkt. 53–1, at 113–15. It was only then that plaintiff's sick leave was more closely monitored. Dkt. 53–1, at 116. Plaintiff offers no evidence of pretext in response to this reason. As such, defendant's motion for summary judgment on this claim is granted.

**E. Harassment/Hostile Work Environment**
Finally, plaintiff alleges that he was subject to harassment and a hostile work environment. However, he offers no explanation as to the nature of this allegedly hostile environment. Rather, plaintiff simply alleges that "[t]he three supervisors discriminated and retaliated against a protected class. Their behaviors were pervasive, lasting over time and the hostility seriously disrupt [sic] my work and interfered with my career progress as a civilian and soldier." Dkt. 57, at 34. It seems, given his reference to a "protected class," that plaintiff is alleging racial harassment. The court will therefore proceed with an analysis of a hostile work environment based on race.

"Title VII forbids employment discrimination on the basis of race ...." *Herrera v. Lufkin Indus.,* 474 F.3d 675, 680 (10th Cir.2007) (quoting *Chavez v. New Mexico,* 397 F.3d 826, 831 (10th Cir.2005)). "This includes an employee's claims of a hostile work environment based on race ... discrimination."

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)
**(Cite as: 2014 WL 5782389 (D.Kan.))**

*Id.* (citing *Chavez,* 397 F.3d at 831–32). To survive summary judgment on a claim alleging a racially hostile work environment, a plaintiff "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and that the victim was targeted for harassment because of his ... race ...." *Id.* (internal citations omitted).

Here, plaintiff fails to assert sufficient evidence from which a jury could find that his work environment was racially hostile. Plaintiff admitted that he was not aware of any racial comments or slurs, made either by his colleagues or his supervisors, during his time at ASF Olathe. Dkt. 51–3, at 99. In fact, the only racial comments or jokes that plaintiff did admit to hearing were ones that he participated in. Dkt. 51–3, at 99.

Plaintiff attempts to bolster his harassment claim by alleging that the word "rat" appeared on a poster on a bulletin board outside his office and that Walsh attempted to incite racial tension between plaintiff and another employee with whom plaintiff admittedly exchanged racial jokes. Dkt. 51–3, at 60, 67. These alleged isolated incidents do not rise to the level of a hostile work environment. "To establish a racially hostile work environment ... plaintiffs must prove more than a few isolated incidents of racial enmity." *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1412 (10th Cir.1987) (quoting *Snell v. Suffolk Co.,* 782 F.2d 1094, 1103 (2d Cir.1986)). "Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Id.* Plaintiff admitted that the word "rat" was immediately removed from the bulletin board. Dkt. 51–3, at 60. He also concedes that, even if Walsh tried to incite racial tension (of which he has no proof), the result was only a "little racial tension." Dkt. 51–3, at 67.

**\*18** Even if plaintiff could establish a prima facie case of harassment, he cannot impute liability

to defendant. "An employer may be directly or vicariously liable for a hostile workplace." *Debord v. Mercy Health Sys. of Kan., Inc.,* 737 F.3d 642, 650 (10th Cir.2013) (citing *Burlington Indus. v. Ellerth,* 524 U.S. 742, 758–59, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). "An employer is directly liable for a hostile work environment created by an employee if the employer's negligence causes the actionable work environment." *Id.* (quoting *Baty v. Willamette Indus.,* 172 F.3d 1232, 1241 (10th Cir.1999)). "An employer is negligent ... *if it knew or should have known* about the conduct and failed to stop it." *Id.* (quoting *Ellerth,* 524 U.S. at 759) (emphasis added). Here, plaintiff admitted that the only complained-of harassment, the writing of the word "rat" on a poster, was immediately removed by his supervisors. Dkt. 51–3, at 60.

Plaintiff alleged in his EEO testimony that he told Erkie that "he [Erkie] was leaning towards harassment and [plaintiff] would seek legal guidance." Dkt. 53–1, at 56. However, there is no evidence in the record that plaintiff ever made an official complaint of harassment. Based on this lack of evidence, the court finds that no reasonable jury could find that plaintiff suffered racial harassment. The court therefore grants defendant's motion for summary judgment on this claim.

**IT IS THEREFORE ORDERED** this 6th day of November, 2014, that defendant's Motion for Summary Judgment (Dkt.50) is hereby granted. It is also ordered that defendant's Motion to Strike (Dkt.52) is granted.

D.Kan.,2014.
Cappell v. Department of Army, Sec.
Not Reported in F.Supp.3d, 2014 WL 5782389 (D.Kan.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.